# EXHIBIT 8

J.  Owen Murrin (SBN 75329)
Murrin Law Firm
7040 E.  Los Santos Drive
Long Beach, California 90815
Phone:  562-342-3011
Fax:  562-724-7007
E-mail: jmurrin@murrinlawfirm.com
Attorney for Plaintiffs YEYO LLC, et al.

**Electronically FILED by
Superior Court of California,
County of Los Angeles
11/04/2025 8:39 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By Y. Ayala, Deputy Clerk**

## SUPERIOR COURT OF THE STATE OF CALIFRONIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| YEYO LLC, a California limited liability company, and<br>GAMAN LLC, a Wyoming limited liability company, owned by<br>ED BAEZA, an individual, and<br>CONCEPCION BAEZA, an individual,<br><br>                    Plaintiffs,<br><br>        v.<br><br>PRINCIPLE FINANCIAL SERVICES INC., a California corporation;<br>THEPFSWAY GROUP, a California corporation, formerly known as PRINCIPLE FINANCIAL SERVICES INC.;<br>LARRY TUPLER, an individual;<br>MARK SANSOUCY, an individual;<br>UMB BANK, N.A, a federally chartered bank, individually and as a trustee;<br>BANK OF UTAH, individually and as a trustee;<br>FIRST WESTERN TRUST BANK, a Colorado corporation; and<br>DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.: 25STCV32085<br><br>**COMPLAINT**<br>1.  VIOLATION OF CORPORATIONS CODE §§ 25401 AND 25501<br>2.  BREACH OF FIDUCIARY DUTY<br>3.  CONVERSION<br>4.  NEGLIGENCE/GROSS NEGLIGENCE<br>5.  VIOLATION OF CIVIL CODE § 3372<br>6.  BREACH OF CONTRACT/RESCISSION<br>7.  BREACH OF APPLIED COVENANT OF GOOD FAITH AND FAIR DEALING<br>8.  UNFAIR COMPETITION AND VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, et seq.<br>9.  FINANCIAL ELDER ABUSE (Welfare and Institutions Code § 15600 et seq.)<br>10. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY<br>11. VIOLATION OF CORPORATIONS CODE § 25504.1<br>12. BREACH OF FIDUCIARY DUTY AND ACCOUNTING<br>13. VIOLATION OF CORPORATIONS CODE §§ 25401 AND 25501<br><br>JURY TRIAL DEMANDED |

Plaintiff herein alleges as follows:

**PARTIES**

1.      Plaintiffs ED BAEZA and CONCEPCION BAEZA are and have been husband and wife. They were members of their companies, GAMAN LLC and YEYO LLC. When ED BAEZA is used it includes him acting in his capacity as representative for all plaintiffs, his wife, GAMAN LLC, and YEYO, LLC.

2.      At all times herein, GAMAN LLC has been and is a Wyoming limited liability company, registered to do business under and pursuant to the laws of the State of California.

3.      At all times herein, YEYO LLC has been and is a California limited liability company doing business under and pursuant to the laws of the State of California.

4.      At all times herein, THEPFSWAY GROUP, formerly known as PRINCIPLE FINANCIAL SERVICES INC., or the new entity that encompasses PRINCIPLE FINANCIAL SERVICES INC., hereinafter referred to as "PFSI", has been and is a California corporation operating under and pursuant to the laws of the State of California.  When PFSI is used it refers to PFSI or the THEPFSWAY GROUP or both.

5.      At all times herein, LARRY TUPLER is believed to have been and is the resident of the City of Los Angeles, County of Los Angeles, State of California.

6.      At all times herein, MARK SANSOUCY has been acting as an individual as the owner, Controller and officer of PFSI.  It is believed that he has been and is a resident of the City of Los Angeles, County of Los Angeles, State of California.

7.      At all times herein, UMB BANK, N.A, is a federally chartered bank and is sued individually and as a trustee (Collectively referred to hereafter "THE TRUSTEE DEFENDANTS").

8.      At all times herein, BANK OF UTAH, is sued individually and as a trustee (Collectively referred to hear-after, "THE TRUSTEE DEFENDANTS").

9.      At all times herein, FIRST WESTERN TRUST BANK ("FIRST WESTERN") is and has been a Colorado corporation qualified to do and doing business in the State of California. It is collectively referred to hear-after, "THE TRUSTEE DEFENDANTS".

10.      At all times herein, PRINCIPLE FINANCIAL SERVICES INC. has been and is a California

corporation doing business pursuant to the laws of the State of California.

11.    Plaintiffs are ignorant of the true names and capacities of the Defendants named herein as DOES 1 through 10, inclusive, and therefore sue said Defendants by their fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of said fictitiously named Defendants when the same are ascertained.

12.    Plaintiffs are informed and believe, and based on such information and belief allege, that the Defendants named herein as Doe Defendants, and each of them, were at all relevant times the agents, servants and employees of each other, and that in doing the things hereinafter alleged, each of said Defendants was acting within the course and scope of such agency and employment.

## GENERAL ALLEGATIONS

13.    LARRY TUPLER ("TUPLER") and MARK SANSOUCY ("SANSOUCY") worked for a company called Reliant Life Shares ("Reliant").  However, SANSOUCY and DOES 1-10 struck out on their own and created PFSI, that became THEPFSWAY GROUP, both entities are hereinafter referred to as "PSFI".

14.    Still, MARK SANSOUCY continued to interact with Reliant and LARRY TUPLER, securing business from them or interfacing with them in a way that was tantamount to or in fact a joint venture, or joint enterprise. In the alternative, it is alleged that PFSI is the successor in interest to Reliant. The nature of this relationship is not yet fully known but is believed to involve a connection between Reliant, PFSI, Scott Grady, Sean Michaels, Daniel Cooper of Reliant, and MARK SANSOUCY of PFSI.  During this period, the lines between the two companies blurred, and MARK SANSOUCY, LARRY TUPLER and Vincent Bovino became representatives for both companies. In addition, Reliant and PFSI shared the same unique proprietary protocol and statutory trust used to present the product as legitimate. Both companies claimed their products were exempt from state and federal securities regulations when they were not. Both companies shared the same fraudulent business model.

15.    Both companies told investors like they told Plaintiffs that their investments would be, once purchased, owned and handled by a trustee who would handle investors' monies including monies for

premiums and the death benefit investment. This meant an independent trustee would insure and protect against Reliant, PSFI, SANSOUCY, Grady, Michaels or anyone from defalcation or misappropriation. Plaintiffs relied upon this trustee protocol to give them that confidence to invest. The concept was that the trustee would keep the money safe and distribute any death benefit directly to investors. In this case directly to Plaintiffs. The concept was the death benefit would actually be kept by the trustee, in this case, by the TRUSTEE DEFENDANTS. The system broke down due to fraud and defalcation when one of the policies matured and was not to Plaintiffs. This is known to be the case because of the policies matured in 2023 relating to insurance police 6093385, Massachusetts Mutual Life Insurance Company. This should have entitled Plaintiffs to at least $32,850.82. SANSOUCY advised Mr. Baeza in 2024 that he hadn't paid a matured policy because he needed it to cover legal fees for Mr. Baeza taking legal action. Mr. Grady persuaded TRUSTEE DEFENDANTS to allow him to intercept money that should have gone to Plaintiff Investors that caused Reliant to go down and caused investors lose money. These TRUSTEE DEFENDANTS have not done their jobs to protect the assets under their care.

16.    Plaintiffs believed they were purchasing products from Reliant, but in reality, they ended up unknowingly with PFSI. This further demonstrates that these companies were acting in concert. The business practices employed by PFSI were directly taken from Reliant, which itself had adopted methods from earlier fraudulent enterprises notorious for exploiting investors. The purpose of these schemes was to enrich the promoters unfairly through deception and deceit.

17.    PFSI's sales and offerings were so intertwined with Reliant's sales and offerings that they must be treated as a single integrated offering subject to federal registration requirements. The well-established factors for determining integration are satisfied in this case, including:

      a.    The offering was part of a single plan of financing.

      b.    The offerings involved issuing the same or similar class of security.

      c.    Offerings were made at or near the same time.

      d.    The type of consideration received was the same.

      e.    The offerings were made for the same general purpose.

18.    This integrated offering involved an out of state sale, which made the above endeavor an

interstate endeavor, prohibiting PFSI or Reliant from claiming the intra-state exemption. For example:

a.   Plaintiff FELICIA CLARK (hereinafter "INVESTOR FELICIA CLARK") is, and at all times relevant was, a resident of the City of Denver, County of Denver, State of Colorado.  Dave Underwood, who worked for Reliant/PFSI, sold Felicia Clark a policy in Colorado around late 2013 or early 2014. They met twice in person.  The actual signing occurred at a Starbucks located at 17200 E Iliff Ave, Aurora, CO 80013. The policy was registered to an address in Palmdale, California — an address of a friend she never lived at, which Dave had requested. Later, Dave solicited her for another purchase during another visit to Colorado. FELICIA CLARK invested $75,000 in the integrated offering. She invested through her Entrust IRA.

b.   Plaintiff DOROTHY BERRY (hereinafter "INVESTOR DOROTHY BERRY") is, and at all times relevant was, a resident of the City of Prescott, County of Yavapai, State of Arizona. Dorothy Berry signed the documents at her home in Arizona. The paperwork was sent and returned via FedEx. DOROTHY BERRY invested $145,000 and paid $9,000.60 in premiums.

c.   Plaintiff NILS LARSEN (hereinafter "INVESTOR NILS LARSEN") is, and at all times relevant was, a resident of the City of Hallein, Country of Austria. NILS LARSEN invested $100,000 and paid premiums of $20,877.

d.   Plaintiff GAMAN LLC (hereinafter "INVESTOR GAMAN LLC") is, and at all times relevant was, a limited liability company organized and operating under the laws of the State of Wyoming. GAMAN LLC invested $350,000. This is an interstate sale which required federal regulation.

19.   Defendants never registered federally. Federal securities law applied here and a federal registration was required and sales agents needed to be associated with a federal approved broker dealer. None of this was done This administration of the above violates 15 USC §§77e(a), 77e(c), 77g(a)(a) and 77aa and is a source of deception and concern, or at the very least, unlawful. This fact that was not revealed and should have been revealed is deception and/or negligence. Plaintiffs did not assume the risk nor is it a defense. Plaintiffs had no idea that securities laws were being violated.

20.   As important as the deception surrounding the business model used by Defendants is their failure to disclose their business model.

21.   During the time the sales were being made to plaintiffs, substantial litigation was going on

among the owners of Reliant which eventually led to the downfall of Reliant. This fact needed to be disclosed to potential investors because it put investors at risk for any purchases they unknowingly made through a company on the brink of collapse. This risk made this investment unsuitable. Security laws require that pending litigation be disclosed to potential investors. It was not disclosed. This pending case and the surrounding circumstances associated are outlined in the appellate opinion known as *Reliant Life Shares LLC v Cooper*, 90 Cal. App 5th 12 (2023) which is incorporated by reference as though fully set forth hereat. This constituted substantial material information that was known to SANSOUCY and TUPLER, and therefore to PFSI, yet it was deliberately withheld. The omission was intentional, driven by their fear that disclosure would jeopardize their ability to complete the sale.

22.    Plaintiffs met LARRY TUPLER at the Long Beach Convention Center in 2019.  TUPLER worked for both Reliant and PFSI or acted as the referring agent to PFSI.  He convinced the BAEZAS to invest in a life settlement program involving their 401k account.  They relied on TUPLER's representation that the program was legitimate and would provide 6.7% interest.

23.    On or around February 11, 2020, the BAEZAS transferred $116,000 from their 401k into a life settlement program, unaware of whether it was through Reliant or PFSI.

24.    Not hearing from LARRY TUPLER for many months, around September 15, 2020, the BAEZAS requested their money back. They contacted TUPLER to do this. TUPLER apologized and informed them that their investment was active, with two certificates maturing.  He arranged an appointment for the BAEZAS to reinvest.

25.    On September 16, 2020, the BAEZAS met with LARRY TUPLER.

26.    After meeting with TUPLER, the BAEZAS were persuaded by TUPLER to invest an additional $34,368.91 in a life settlement program. This investment lists Vincent Bovino as the agent. However, the BAEZAS have no recollection of meeting Bovino and never discussed investments with Bovino.

27.    TUPLER assured the BAEZAS that life settlement products would provide a return of 6.7% and BAEZAS would retain the ability to withdraw their invested proceeds at any time.

28.    The BAEZAS met with TUPLER regarding GAMAN LLC, and YEYO LLC to invest new money in life settlements.  GAMAN LLC's paperwork shows an investment through Reliant Life

Shares, while YEYO LLC's paperwork indicates an investment through PFSI.  The reasons for using a Reliant product for one company and PFSI product for the other were not explained to BAEZAS. It is believed this happened because TUPLER did not have confidence in Reliant in light of Reliant having the ownership dispute and the company being in a state of disarray however this was not revealed to Plaintiffs at the time.

29.    SANSOUCY, Controller of the issuer PFSI which became THEPFSWAY GROUP, sold an investment to YEYO LLC for $450,000 of life settlement products.  PFSI was or is under the auspices of the THEPFSWAY GROUP.   SANSOUCY has personal liability because of a controlling person. SANSOUCY also occupies a fiduciary position with fiduciary duties on all the investments Plaintiffs made in life settlements which is subject matter of this suit. Both SANSOUCY and TUPLER were personally aware that the business model employed and derived from Reliant did not work and was based upon deceptions. They persisted in selling these life settlement investments because it made the owner of the business model rich at the expense of consumers and investors. SANSOUCY and TUPLER were willing to (and did) put their own financial interest above the interests of the customers, namely in this case, the Plaintiffs. This business model, which was taken from Reliant, which in turn was taken from Pacific West, which in turn was taken from OFG, which in turn was taken from Omni, which in turn was taken from Brian McGuane, or was at least derived in one way or another from these prior entities and people,  became the prototype for the PFSI products that Plaintiffs purchased.

30.    The Reliant/PFSI model was fundamentally flawed for many reasons. For example, it was impossible to predict the death of the insured to make accurate predictions. This resulted in flawed capitalization and internal strife. The business model was not in compliance with registration and licensing requirements. Upon selling these products to Plaintiffs, SANSOUCY, TUPLER, and PFSI were not forthright about what happens when other investors do not pay their premiums and what happens if the sponsoring organization (Reliant or PFSI) does not pay its share of premiums or has financial difficulties. SANSOUCY and PFSI knew or should have known that the business model they were using was similar or the same as the business model of other previously mentioned entities that had been shut down by regulators, and had left investors frustrated and disappointed in the returns.

31.    On October 15, 2020, the BAEZAS' company YEYO LLC invested $450,000, with MARK

SANSOUCY listed as their salesperson, as part of a PFSI life settlement.

32.    On October 9, 2020, the BAEZAS' company GAMAN LLC invested $350,000 in a Reliant life settlement program but sold through SANSOUCY and the PFSI channel of commerce under their supervision.

33.    No one who sold the life settlement package to Plaintiffs discussed, disclosed, or distinguished between a Reliant sponsored life settlement investment and the PFSI sponsored life settlement investment.

34.    The BAEZAS made the following investments for which they are seeking relief, as follows:

| Client Name | Date | Dollar Amount Invested | Name of Insurance Company | Reliant Policy Number | Insurance Policy Number | Sales Person or Signatory | Trustee/ Escrow |
|---|---|---|---|---|---|---|---|
| Concepcion Baeza | 02/11/2020 | $19,300.00 | AXA Equitable Life Insurance Company | VR7091 | 161217091 | Vincent Bovino | UMB |
| Concepcion Baeza | 02/11/2020 | $19,300.00 | United of Omaha Life Insurance Company | PC4205 | BU1784205 | Vincent Vovino | UMB |
| Concepcion Baeza | 02/11/2022 | $19,500.00 | Zurich American Life Insurance Company | FR1977 | 171977 | Vincent Bovino | UMB |
| Concepcion Baeza | 02/11/2020 | $19,300.00 | AXA Equitable Life Insurance Company | FA2969 | 156222969 | Vincent Bovino | UMB |
| Concepcion Baeza | 02/11/2020 | $19,300.00 | United of Omaha Life Insurance Company | EJ3741 | BU178741 | Vincent Bovino | UMB |
| Concepcion Baeza | 02/11/2020 | $19,300.00 | Zurich American Life Insurance Company | BN8859 | 198859 | Vincent Bovino | UMB |
| Concepcion Baeza | 10/02/2020 | $17,184.45 | Brighthouse Life Insurance Company | DB6208 | 7396208 and 7368965 | Vincent Bovino | UMB |
| Concepcion Baeza | 10/02/2020 | $17,184.46 | Protective Life Insurance Company | BL5053 | B0081505 | Vincent Bovino | UMB |
| Ed Baeza | 02/11/2020 | $19,300.00 | United of Omaha Life Insurance Company | PC4205 | BU1784205 | Vincent Bovino | UMB |
| Ed Baeza | 02/11/2020 | $19,500.00 | Zurich American Life Insurance Company | FR1977 | 171977 | Vincent Bovino | UMB |
| Ed Baeza | 02/11/2020 | $19,300.00 | AXA Equitable Life Insurance Company | FA2969 | 156222969 | Vincent Bovino | UMB |
| Ed Baeza | 02/11/2020 | $19,300.00 | United of Omaha Life Insurance Company | EJ3741 | BU1783741 | Vincent Bovino | UMB |
| Ed Baeza | 02/11/2020 | $19,300.00 | Zurich American Life Insurance Company | BN8859 | 198859 | Vincent Bovino | UMB |
| Ed Baeza | 10/02/2020 | $17,184.45 | Brighthouse Life Insurance Company | DB6208 | 7396208 and 7368965 | Vincent Bovino | UMB |
| Ed Baeza | 10/02/2020 | $17,184.46 | Protective Life Insurance Company | BL5053 | B00815053 | Vincent Bovino | UMB |
| Ed Baeza GAMAN LLC | 10/09/2020 | $60,000.00 | Zurich American Life Insurance Company | FR1977 | 171977 | Larry Tupler | UMB |
| Ed Baeza GAMAN LLC | 10/09/2020 | $60,000.00 | AXA Equitable Life Insurance | FA2969 | 156222969 | Larry Tupler | UMB |

8

COMPLAINT

| Client Name | Date | Dollar Amount Invested | Name of Insurance Company | Reliant Policy Number | Insurance Policy Number | Sales Person or Signatory | Trustee/ Escrow |
|---|---|---|---|---|---|---|---|
| Ed Baeza GAMAN LLC | 10/09/2020 | $60,000.00 | United of Omaha Life Insurance Company | EJ3741 | BU11793741 | Larry Tupler | UMB |
| Ed Baeza GAMAN LLC | 10/09/2020 | $30,000.00 | Brighthouse Life Insurance Company | DB6208 | 7396208 and 7368965 | Larry Tupler | UMB |
| Ed Baeza GAMAN LLC | 10/09/2020 | $80,000.00 | Protective Life Insurance | BL5053 | B00815053 | Larry Tupler | UMB |
| Ed Baeza GAMAN LLC | 10/09/2020 | $60,000.00 | United of Omaha Life Insurance Company | PC4205 | BU1784205 | Larry Tupler | UMB |
| YEYO LLC | 10/15/2020 | $450,000.00 | Portfolio 0919 | Portfolio 0919 | Portfolio 0919 | Mark Sansoucy | First Western |

35.     The above chart encompasses six contracts, identified as Exhibits 1000, 1001, 1002, 1003, 1004, and 1005. Taken together, these documents form a unified global contract, each resting on the same representations and, ultimately, the same faulty promises.

36.     Life settlement investments involve a death benefit and/or an interest in a life insurance policy.  PFSI, MARK SANSOUCY, and LARRY TUPLER sold these life investments to the BAEZAS and their companies without full disclosure, concealing material facts and falsely disclosing or not clearly stating the correct anticipated rates of return and cash out rights.  It is alleged that Reliant was undergoing financial problems and that is why PFSI became utilized. It is alleged that this was a material fact not properly disclosed by Defendants.  They provided misleading information to make a sale, violating securities laws.  Critical information about premiums, their impact on the investment, and industry instability, were also not disclosed, in addition to the above.

37.     Fraud could and should not have sold this to Plaintiffs under the circumstances. If they believed otherwise, they were required to make full and adequate disclosure, which they failed to do.

38.     Because PFSI acted as and is an extension of or is in conjunction with Reliant, it is liable jointly and separately for all sales of life settlement products to Plaintiffs or the Court needs to determine what PFSI, TUPLER, and SANSOUCY are responsible for compared to Reliant.

39.     It is also specifically alleged that Defendants did not disclose the full history of the industry and significant details about how Reliant commenced business under the leadership of a disbarred attorney. The disbarment was a result of improprieties arising out of his improper use of client trust funds. The records show SANSOUCY and TUPLER worked for Reliant at the same time, which required their affiliation and relationship with Reliant to be disclosed. All of this information should

have been explained to Plaintiffs and interested investors at large, but it was kept secret.  The in-house squabbles in Reliant allowed PFSI to take over the BAEZAS account. This also is a material fact that needed to be disclosed but was not. TUPLER was not properly trained, licensed, or qualified to sell securities. His conduct was in violation of  the principles in the securities and investment industry. Those securities standards require a fair and balanced presentation. Securities laws require observing high standards of commercial honor and just and equitable principles of trade. Defendants did not comply with those standards.  Defendants did not use properly trained or qualified agents. TUPLER was not a licensed FINRA salesmen. Instead, they created a false appearance of possessing ethics, knowledge, training, affiliation with PFSI, and expertise in securities and investments, none of which they actually had.

40.     Plaintiffs gave these Defendants 30 days' notice to correct and repair their actions pursuant to Civil Code Section 1770.  Defendants did nothing.  This letter is attached as Exhibit 121 and incorporated herein by reference.

41.     Additionally, SANSOUCY, TUPLER, and PFSI were aware that over time fellow investors may become unwilling or unable to pay premiums, posing a significant risk to these investments.  Yet this too was not explained. When a substantial group of people refuse to pay their premiums, it puts the entire program at risk of default, jeopardizing the returns on investment for everyone involved.  Failure to explain this constitutes a dereliction of duty, negligence, fraud, and a violation of securities laws, making it a significant violation that permeates the entire case and all causes of action.

42.     SANSOUCY, TUPLER, and PFSI were aware that Reliant, as a viable business, was deteriorating, with a likely short-lived period due to the conflict among owners and a growing number of upset investors who were already not paying their premiums.  The financial strain on Reliant led to the redirection or comingling of funds, so that funds intended for certain policies were used to cover other policy's premiums.  The business evolved into a Ponzi scheme at the time of the Plaintiffs' sales, another fact not explained to Plaintiffs during any sales presentation.  For this reason, the Plaintiffs are seeking reimbursement not only for the loss incurred in PFSI but reimbursement of all their investments, whether in Reliant or PFSI.

43.     PFSI, like Reliant, uses the Reliant model to manage its businesses through a master trust,

which controlled the multiple sub-trusts.

44.    All of the sub-trusts under the Trust are separate and distinct from one another, and each sub-trust hold only one life insurance policy.   Individual customers of PFSI or Reliant would purchase specific fractional interest positions (FIP) as beneficiaries of a specified sub-trust.

45.    Under PFSI's business model created by Defendants, these FIPs entitled those customers in good standing (having paid their premium notices), to receive, at some point in the future, a specified monetary payout of a portion of the death benefit of the insurance policy at issue. The amount was fixed upon purchase of the FIPs. Assuming the insurance policy remained in force at the time of the insured's death, the insurer paid out on the policy.

46.    Importantly, based on the PFSI Business model or structure created by all Defendants, each FIP in one particular policy was co-dependent upon all of the other FIPs invested in that policy, such that if one fractional interest position holder did not pay their pro rata portion of the premiums, fees or expenses for the policy in their sub-trust, and no one stepped up to pay their pro rata portion of the premiums for them, then the entire policy would be at risk of lapsing — which would then cause the entire death benefit to be lost to each and every other fractional interest position holder in that sub-trust. This was also a risk if PFSI or Reliant went under because PFSI and Reliant covered the premiums of many unsold and defaulted policies for the defaulting investors. This risk of lapsing and the above risks were matters intentionally concealed by all Defendants that deceived Plaintiffs into believing their investment was safe and secure. It is believed that Reliant and PFSI took positions themselves in the various life settlements they sold. This was not disclosed to Plaintiffs.

47.    Unfortunately, the business model employed by PFSI mirrors the model used by Reliant, and the predecessors as mentioned above, namely: Pacific West, Oxford Financial, Omni and Brian McGuance. Over time, this model has consistently proven detrimental to investors, many of whom have suffered substantial financial losses. The model was based on misleading customers about both the amount of money they might ultimately earn and the amount of premiums they would be required to pay to maintain their investment. The Reliant and PFSI business model further depended on many customers eventually failing or refusing to pay the additional funds required for ongoing premiums, costs, and fees. When defaults occurred, the customer's investment interest would revert back to PFSI

or Reliant. PFSI could then either retain and hold the forfeited interest for its own benefit or resell the same fractional interest positions to new customers under the same misleading model. This practice allowed PFSI to profit at the direct expense of investors, creating a clear conflict of interest that was never disclosed. Moreover, PFSI engaged in inequitable practices by selectively repurchasing certain investors' interests while refusing to buy back others. Plaintiffs purchased these products only after being assured that they would always be able to recover their principal payment.

48.     The PFSI business model is further complicated by the fact that, for some of the policies, there are unallocated interests that have not been sold—meaning that not all of the fractional interests in a policy's net death benefit are held by customers.  This is particularly problematic because PFSI and Reliant lack any independent operating income to cover the premium shortfalls for those unallocated portions. Also, the financial status of Reliant and PFSI were not properly disclosed.  Without proper funding, the policies are at risk of lapsing.  This risk was not properly disclosed to investors.  In addition, this faulty business model had no procedure or mechanism in place to address the anticipated shortfall where investors opted out of paying additional premium payments.  This was a fundamental flaw in the Reliant and then the PFSI business model as set up by Michaels, Cooper, and others.  PFSI salespersons failed to explain or disclose these risks when selling the product.  This amounts to an intentional concealment of a material fact and a material omission by Defendants—which was purposeful— and systematic to PFSI (and Reliant) and a collective failure to act.  The business model itself, set up SANSOUCY, and copying Reliant, Pacific West, Oxford Financial, and Omni, incentivized everyone to employ untrained, unknowledgeable, aggressive, and unscrupulous salespersons, which is exactly what happened here.  There is a dark history behind this model that was never properly disclosed to investors. Online reviews have been concealed or manipulated to create the false impression that PFSI and Reliant investments enjoyed broad satisfaction and approval, when in fact they did not.

49.     Additionally, some fractional interest position holders have forfeited their positions (which have then reverted back to PFSI/Reliant), but the pro rata premiums attributable to those forfeited positions must still be paid—only PFSI/Reliant is able to do that, but now it cannot do that. That puts everyone's investment at risk.  None of this was properly disclosed.

50. PFSI salespersons failed to explain or disclose these risks when selling the product in a fair and balanced way. This amounts to an intentional concealment of a material fact and a material omission by Defendants—and a collective failure to act.

51. PFSI, SANSOUCY and TUPLER, as owners, members, officers, and/or directors of PFSI, participated in and encouraged the scheme by which PFSI sold fractional shares of policies under false and/or misleading pretenses. Each of them breached their duties to these Plaintiffs in connection therewith by ratifying and engaging in fraudulent conduct toward the customers, including by failing to prevent Reliant and PFSI from selling such shares to Plaintiffs under false and/or misleading pretenses.

52. Unfortunately, part of the flaw in the system that Defendants sold to Plaintiffs is the fact that the insured regularly live longer than the available premium reserves can cover. This makes the entire investment structure unsupportable and dishonest. It allows unscrupulous salespeople to tell investors that additional premiums beyond the initial reserves would not be required. PFSI, SANSOUCY and TUPLER, failed to properly train their salesmen and did not act truthfully in the development and promotion of the products sold to Plaintiffs. They did not provide a full or fair discussion of the product. The salesmen would always tell the buyers, like what happened to the Plaintiffs, that the probability of the need to pay more premiums was low. They stated this without any basis, as in fact, frequently the reserves were inadequate. Many investors, like Plaintiffs, were told not worry because they had charged enough for the reserves. Defendants did not tell Plaintiffs and other investors that the basis for determining reserves was questionable.

53. A program that depends on the continuous payment of premiums must be transparent about all issues, which in this case it was not. The model is based on selling the sizzle and hiding the risks . The result is that this program enriches the owners and salespersons and vendors namely TUPLER, SANSOUCY, PFSI, and The TRUSTEE DEFENDANTS, at the investors' expense, while the investors bare the financial burden, and higher risk. This is a risk that the investors were not fully informed.

54. The TRUSTEE DEFENDANTS are the owners of at least one of the policies, and as such, are knowing participants in the wrongdoing explained throughout this Complaint. and perpetuated on Plaintiffs. The TRUSTEE DEFENDANTS had prior dealings with Reliant so they know PFSI's predecessors were using The TRUSTEE DEFENDANTS to effectuate the wrongdoings namely to

usurp the protection and independence the Trust Account and escrow was to provide knowing better they allowed these Defendants to do the same thing. Therefore, part of the purpose of this case is to ask that Defendant Fiduciaries be accountable as a fiduciary for all of the losses that occurred here.

55.     SANSOUCY, Cooper, TUPLER, PFSI, and TRUSTEE DEFENDANTS fostered, condoned, or ratified the misconduct of each other including by doing the following:

      a.  All of them allowed PFSI and Reliant to violate broker-dealer securities law in violation of California Corporations Code §§ 25004 and 25501.5.

      b.  All of the above allowed PFSI to ignore the requirements of Corporations Code § 25102(q), which governs exemptions necessary to legally sell securities without California registration.  Their failure to meet these criteria rendered the sale of securities to Plaintiffs illegal and voidable. Specifically, investor qualifications were not verified such as net worth thresholds, verification of state residence, nor did they provide audited financial statements as mandated by law.

      c.  All of the above Defendants built, oversaw, or participated in a sales system that relied on aggressive, untrained, and unscrupulous sales personnel and a sales presentation such as what was presented to BAEZAS, and the Plaintiffs herein.

      d.  Participated in a structure that enabled the frequent and widespread dissemination of false and misleading statements to investors, including Plaintiffs.

      e.  Participated in a system that lacked proper supervisory mechanisms or controls over the salesforce which commonly allowed its salesmen to make misrepresentations during the sales process. These deficiencies were not incidental but were part of a deliberate scheme developed and maintained by all of the above.

      f.  All of the above knowingly failed to prevent, and in fact encouraged, the use of false and fabricated representations.  These misrepresentations were not only permitted — they were fostered as part of the sales strategy.

56.     PFSI and Reliant salespersons and all concerned falsely represented to investors, including Plaintiffs, that the investment was liquid, when in fact it was not.  Upon purchase, the investment becomes locked until the death of the insured and remains entirely contingent on continued premium

payments. Plaintiff, without success, has made a request for the return of his money even at a loss.

57.    PFSI and Reliant claimed to have a refund program, misleading investors into believing PFSI / Reliant offered a policy that allowed investors to retrieve their investment if desired at any time. TUPLER confirmed this by qualifying it would require 30 days' notice. Plaintiffs requested the return of their money in these programs and gave over 30 days' notice, to no avail.

58.    PFSI and Reliant salespersons marketed their products to Plaintiffs deceptively. They equated the fractional interests sold to Plaintiffs with the types of investments made by Warren Buffett and Bill Gates or people of substantial means to create the impression this program is how the rich and famous become rich or invest their money. They deceptively promoted this falsehood to add credibility to their programs.  In reality, Buffet and Gates and other institutional investors purchase large portfolios of policies outright and do not buy fractional interests in one or two individual policies.  The nature of Plaintiffs' investments—highly leveraged, high-load, and fragmented—was fundamentally different and riskier than anything Buffett or Gates would or did invest in.

59.    PFSI and Reliant failed to disclose the substantial costs and burdens associated with using a trust to manage and oversee the investment.  These trusts were marketed as independent third-party protectors but in practice, they impose significant administrative expenses and have not been able to provide the oversight represented. Investors were led to believe that the use of bank trustees would safeguard against loss, theft, or mismanagement.  In practice, however, such protection was illusory and did not prevent the mismanagement or risk that has ultimately harmed Plaintiffs.

60.    PFSI and Reliant misrepresented and oversimplified the critical relationship between ongoing premium payments and the success of the investment.  They failed to adequately explain that the failure to pay premiums by other investors, Reliant, and PFSI, could cause the entire investment to collapse.  In fact, the premium structure was a central and dangerous vulnerability that made the investment inherently unstable—an issue that was not properly explained to Plaintiffs.

61.    It was PFSI and Reliant's policy to withhold the names of insureds and their medical information—despite the fact that such information is materially necessary for any investor to make an informed decision.  PFSI and Reliant justified this omission by citing the insureds' right to confidentiality.  However, the fact that the insured's health information is confidential does not render

this information any less material to a potential investor. The deliberate failure to disclose the complete medical records and the names of the person whose death benefit is being bought constitutes deceit, fraud, and a violation of securities laws, including California Corporations Code § 25401 et seq. This omission makes the sale of these investments per se illegal.

62.     PFSI and Reliant refused to disclose other critical historical information about the company and its principals, including SANSOUCY, Reliant, Michaels, Grady, and Murphy. They withheld information regarding prior investors, performance history, and rates of return from earlier offerings — data that should have been readily accessible. This omission was a calculated decision to conceal unfavorable truths. The failure to disclose such material facts is, in and of itself, a form of deceit, fraud, and a direct violation of securities laws and California Corporations Code § 25401 et seq.

63.     PFSI and/or Reliant failed to disclose the disciplinary history and eventual disbarment of Scott Grady by the California State Bar and his relationship to Plaintiffs. This was a material omission, as Grady was a central figure in orchestrating the investments sold to Plaintiffs. Grady's lack of credibility was well known by SANSOUCY and TUPLER but not revealed or disclosed to Plaintiffs. It should have been disclosed as it was an important consideration for any reasonable investor. By withholding this information, PFSI, SANSOUCY, and TUPLER engaged in conduct that is per se fraudulent and in direct violation of securities law and California Corporations Code § 25401 et seq.

64.     PFSI, Reliant, SANSOUCY, and TUPLER knowingly and deliberately sold unsuitable investments to Plaintiffs. They did this knowing that the Plaintiff was an elder and was not well-served by these investments. These life settlement products, riddled with complexity and hidden risks, are inherently inappropriate for such populations. For example, Reliant allowed the sale of over $1.3 million in Reliant products to Raymond Douglass, now deceased, a man who was in his 80's at the time he invested and who suffered from dementia, diabetes, and serious health issues. SANSOUCY was instrumental in refusing to return the money when the Douglass family asked for it. In the Douglass case, the insureds were of a similar age or younger than Douglass, making the purchase of such a product a poor and unsuitable investment. Selling these products to Douglass was unconscionable, and the failure to facilitate any return compounded the wrongdoing. SANSOUCY played a direct role in this conduct.

65.     PFSI and Reliant violated well-established principles of having a diverse investment portfolio and instead placed as much money in their own programs as opposed to a better and more diversified portfolio. Additionally, salespersons under PFSI and Reliant ignored financial elder abuse safeguards that prohibit selling seniors investment products exceeding 10% of their net worth. Both the Douglass and BAEZA investments in life settlements far exceeded 10% of their net worth.

66.     PFSI together with Reliant misrepresented the likelihood and impact of premium payments exceeding the original reserves.  These overages were described as "rare," when in truth, they occurred "frequently" or not properly tracked or disclosed. This was a critical factor determining whether an investment yielded any return at all.  This misrepresentation misled investors about the true risk profile of the product.

67.     PFSI, like Reliant, allowed commission-driven sales tactics to take priority over the fiduciary duty that is owed by those who sell investments.  The structure incentivized closing sales regardless of the suitability or risk to the investor which happened here and was equivalent to PFSI, SANSOUCY, and TUPLER putting their financial interest above that of the client/customer.

68.     PFSI, SANSOUCY and TUPLER failed to adequately disclose the financial and practical consequences of an insured outliving the investor.  This risk undermined the investment's value and utility and was either downplayed or not discussed at all. This deprived investors of a full understanding of the potential outcomes and risks.

69.     PFSI imposed high and undisclosed "load" costs — fees and expenses that substantially reduced the actual amount of investor funds being applied toward the policies.  These costs were never clearly disclosed or adequately explained, violating the duty to fully inform investors of material facts.

70.     PFSI or Reliant's representatives manipulated life expectancy estimates to make the investments appear more favorable than they actually were.  By artificially shortening life expectancy projections, they made returns seem imminent and more lucrative, which induced investors to commit funds under false pretenses.

71.     SANSOUCY and Reliant treated investors unequally, particularly in relation to premium obligations.  Some investors were excused from or deferred in their premium payments without explanation, while others were not, creating inequity and undermining the principle of fair dealing

among similarly situated participants.

72.     PFSI failed to provide investors with the disclosures required under California Civil Code § 1689.7, including the notice of the right to cancel and the home solicitation sales advisory notice. These omissions deprived investors of critical consumer protections guaranteed under California law and were compounded by the failure to honor similar cooling-off periods applicable to the sale of securities.

73.     PFSI's salespersons encouraged investors, including Plaintiffs, to fund PFSI investments using retirement accounts such as IRAs.  This advice was grossly unsuitable given the illiquid and high-risk nature of the products, and it has recklessly jeopardized Plaintiffs' retirement to the extent that he used IRA funds to invest.  Most retirees or elders on a fixed income are not in the position to pay the exorbitantly high premiums that were requested.  Most retirees like Plaintiffs are on a limited budget and cannot afford to pay ongoing premiums, thus this was an investment which would deplete Plaintiffs funds set aside for  retirement. This makes this investment even more unsuitable.

74.     PFSI failed to disclose the attrition rate of investors who are forced to abandon their investments.  We're referring to all investors in the integrated offerings.  That includes Reliant.  This is due to the investors' concern about accumulating premium payments.  This data is material, was available and could have been disclosed by SANSOUCY and TUPLER, who had access to the data.

75.     PFSI and SANSOUCY failed to properly disclose what happens when insurance policies lapse, including how easily such lapses can occur.  Further, it was not disclosed that if the insured reaches the age of 100, there is no payout at all—an outcome that renders the entire investment worthless.  These critical facts were not explained and represent material omissions that violate securities law and deceive investors.

76.     PFSI and SANSOUCY had the ability to make good and return the money, and they went back and forth on whether he or they were going to do that but eventually refused.  That refusal is additional grounds for liability.  It was illegal, negligent and improper to refuse a refund under these circumstances for reasons explained above.  The way this refusal is happening is actually punishing Plaintiffs because one of their policies has matured, and the Plaintiff have not gotten the money.

77.     Exhibit 1 is a document provided to Plaintiffs by Defendants or one of its agents to show the investment products purchased by Plaintiffs were a joint integrated offering sponsored by both Reliant

1  and PFSI.

2      78.   This matter was originally sued out in a similar case(s) that Mark SANSOUCY, Principle

3  Financial Services Inc., Larry TUPLER, and Vince Bavino were involved in. As part of the resolution

4  of that case(s), Mark SANSOUCY, Principle Financial Services Inc., Larry TUPLER, and Vince

5  Bavino signed a tolling agreement waiving statutes of limitations for all matters raised in the cases.

6  These cases are known as *Douglass v. Reliant Life Shares, LLC.* (Case No.: 2:23:CV00460-SD-AGR)

7  and *Baeza v. Reliant Life* Shares, LLC. (Case No.: 2:23:CV00674-SB-PD). A copy of the tolling

8  agreement is attached as Exhibit A and B. In reality, there is no statute of limitation issue in this case

9  because Plaintiffs' investments necessitate ongoing premium payments. Each premium obligation

10  represents an ongoing violation which can be sued independently.

11      79.   It is believed that UMB, FIRST WESTRN TRUST BANK, and BANK OF UTAH were

12  TRUSTEES of various Statutory (Series) Trust and Declaration of Trust ("Trust Agreements").

13  RELIANT together with PFSI appointed the above as trustees of the Statutory Trust involved with ED

14  BAEZA and his wife's investments. It is believed that UMD acted in this capacity until about June 29,

15  2022 when an instrument of resignation of appointment and acceptance ("Instrument of Resignation")

16  to place appointing BANK OF UTAH as the successor trustee. On or about June 16, 2015, RELIANT

17  and PFSI utilized FIRST WESTERN TRUST bank as trustee of a Statutory Trust Agreement and

18  Declaration of trust hereinafter after "FIRST WESTERN BANK series to trust Agreement". It is

19  believed that PFSI Group had similar trust agreement with the same TRUSTEE DEFENDANTS.

20

21  **FIRST CAUSE OF ACTION**

22  **VIOLATION OF CORPORATIONS CODE §§ 25401 AND 25501**

23  **AGAINST PFSI, SANSOUCY AND LARRY TUPLER**

24      80.   Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein,

25  including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations

26  section of this complaint and such allegations in any subsequent cause of action.

27      81.   This cause of action refers specifically to Defendants MARK SANSOUCY, LARRY

28  TUPLER, and PFSI, as listed in the title of this cause of action.

82.     Defendants, by virtue of the aforementioned facts set forth in the General Allegations and detailed in subsequent allegations, have engaged in the sale of securities to Plaintiffs in violation of Corp. Code § 25401.  This code prohibits offers or sales of securities, including investment opportunities, that contain untrue statements of material facts or omit to state material facts necessary for making the statements not misleading, as observed in the circumstances under which they were made.

83.     As the investment necessitates ongoing premium payments, each payment is a new securities violation.

84.     The areas of untrue statements, concealment, or violations that also contribute to the elements of fraud, breach of fiduciary duty, and wrongdoing include all the items set forth in all the paragraphs up to this one, incorporated by reference as though fully set forth herein. Some of these items (not all) are repeated below:

a.  Failure to describe various aspects of the investment that made it unsuitable or not in the best interest of Plaintiffs, such as continuing premium calls, the potential longevity of the insured beyond a time that could benefit Plaintiffs, the inability of heirs to inherit these insurance policies without the ongoing premium obligations that could render the entire investment worthless.

b.  Misrepresentation of these investments as equivalent to viatical investments purchased by Warren Buffett and Bill Gates while at the same time disclosing the failures of similar investments like Oxford Financial, Omni, and Pacific West, and the dark history of this kind of investment.

c.  Misrepresentation of these investments as superior to the stock market to convince Plaintiff Investors to invest but failing to represent its lack of diversity.

d.  Failure to provide accurate statistics and information to Plaintiffs regarding pending suits, prior suits, prior investor returns, overall returns, complaints about premiums, and reviews.

e.  Failure to disclose the untrained, inexperienced, incompetent, unlicensed, and unregistered status of Defendants salespersons.

f.   Falsely claiming that investors have the right to withdraw money at any time.

g.   Failure to provide specific rates of return of past products.

h.   Failure to disclose the investments' liquidity and diversity.

i.   Failure to disclose information about the directors, officers, partners, members, or trustees of the issuer, as required by law.

j.   Failure to disclose that the President of Reliant, Scott Grady, was a disbarred lawyer, and the failure to disclose his relationship with Reliant and PFSI.

k.   Failure to provide proper audited reports, as required by law, for a comprehensive understanding of the investment.

l.   Failure to disclose fellow investors' names and contact information.

m.   Failure to advise Plaintiffs of the consequences of a limited reserve fund.

n.   Failure to disclose the acceptance of investors without having minimum net worth requirements.

o.   Orchestrating and manipulating false, deceptive, or incomplete reviews and ratings on their website.

p.   Failure to disclose their policy of preventing investors' knowledge of each other and thwarting transparency.

q.   Failure to advise or disclose their policy of letting certain individuals exit the investment.

r.   Providing misleading information about the risk of a premium call and the high percentage of policies paying out on time.

s.   Failing to supply Plaintiffs with the history of the actual performance and maturities of the life settlement products it sold.

t.   Failure to disclose that Defendants had not registered these investments and/or that the investments did not qualify for the exemptions under which they were being sold.

u.   Communicating false information that Plaintiffs relied on, such as the ability to withdraw money at any time.

v.   Failure to advise of the historical difficulties of predicting life expectancy and the

inadequacy of the premium reserve fund.

w.  Failure to explain the interrelationship between Reliant and PFSI.

85.    Defendants, by making false and misleading statements as outlined above, knowingly or negligently concealed material facts, creating a false light in which the investments were portrayed. This resulted in Plaintiffs lacking sufficient material facts to make informed decisions.

86.    Defendants intentionally failed to describe the investment and their business model truthfully, especially concerning the debilitating nature of premiums as the insured ages, the impact of rising premiums on the rate of return, and the ongoing premium obligations if the investment is passed to heirs, the risk of failure if the Defendants and fellow investors do not or cannot pay premium when due.  Additionally, crucial information regarding the history, culture, and legality of the sales force, as well as the unregistered and unqualified nature of the stock, was not disclosed.

87.    At all times mentioned herein, Defendants, and each of them, offered or sold securities to Plaintiffs within the meaning of California Corporations Code § 25019.  Said offers and sales were made directly or indirectly to Plaintiffs in the State of California.

88.    In connection with such offers and sales, Defendants, and each of them, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of California Corporations Code § 25401.

89.    Plaintiffs were not aware of the untruths or omissions at the time of purchasing the securities and justifiably relied on Defendants' representations and omissions in entering into the transaction.

90.    As a direct and proximate result of the unlawful conduct of Defendants, and each of them, Plaintiffs purchased securities from Defendants which Plaintiffs would not have purchased but for Defendants' violations of law.

91.    Pursuant to California Corporations Code § 25501, Plaintiffs are entitled to rescind the purchase of said securities and recover the consideration paid, with interest thereon, less the amount of any income received thereon, or, if Plaintiffs no longer own the securities, for damages in an amount equal to the consideration paid, with interest thereon, less the value of the securities when disposed of, plus reasonable attorneys' fees and costs.

92.    Selling securities or an investment opportunity under false pretenses, while omitting material facts and misrepresenting or concealing the business model, constitutes deception, misrepresentation, and a violation of the law.  Plaintiffs contributed money, believing they made an investment that would perform better, but Defendants' misstatements, deceit, and the unsupervised salesforce, allowed false expectations to occur.

93.    All Defendants listed above, including TUPLER, SANSOUCY, and PFSI, knew that they were part of a corrupt organization selling Plaintiffs the product while aware of all the above deficiencies and nuances that they failed to disclose or explain fully.  SANSOUCY and TUPLER were acting in the course and scope of their employment with PFSI when they sold life settlement product to Plaintiffs.  The material omissions and/or actionable deceit perpetrated by all named Defendants in this cause of action, as well as those detailed in the general allegations, are significant.  Plaintiffs needed proper and accurate information to invest in Reliant life settlements, and Defendants purposely, through deceit or gross negligence, did not disclose everything needed.  Each new premium payment constitutes a new securities violation requiring the same full disclosure, registration, and care.  This deceit and violation of regulations continue, making the violations ongoing.

94.    Plaintiffs relied upon the above information to make these investments, and the reliance was reasonable and justified based on their circumstances.

95.    By reason of the above, Plaintiffs are entitled to rescission and damages, or the damages set forth in Civil Codes sections 25501 or 25501.5, or according to all remedies available by law.

96.    If any of the named parties in this cause of action are not considered sellers, they are nonetheless liable pursuant to California Corporations Code Sections 25403, 25504, and 25504.1, by reason of being controlling broker-dealers or materially assisting in the above violations.

97.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs, constituting oppression, fraud, and malice, justifying punitive damages under either Civil Code 3294 or 3345 or both.

98.    Plaintiffs seek the return of the money they invested, plus interest.

99.    Plaintiffs seek costs of suit, investigation, and attorneys' fees as allowed by law.

100.    Plaintiffs seek attorney fees as provided by the parties' contract and also by statute.

**SECOND CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**AGAINST PFSI, TUPLER, SANSOUCY, AND DOES 1-10**

101.   Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

102.   This cause of action refers specifically to the Defendants listed in the title of this cause of action, namely TUPLER, SANSOUCY, PFSI, and DOES 1-10.

103.   Defendants, as operators of Reliant or PFSI, and as sellers of security products, owed a fiduciary duty to Plaintiffs, as potential buyers of the products they sold Plaintiff.  This duty extends to portraying the company and its business model properly in its communication to the people, including Plaintiffs. This duty also extends to running the company efficiently for the investors' benefit. Defendants SANSOUCY and TUPLER had a fiduciary duty as sellers of security products and investments to Plaintiffs, who are retail investors.  California law is clear that sellers of securities have fiduciary duties, as established in many leading cases, including *Duffy v. Cavalier*. PFSI also has a fiduciary duty to sellers.

104.   The product was not suitable for Plaintiff, and Defendants violated their fiduciary duty by prioritizing their economic interests over the best interests of customers, and not disclosing this was their business model.  There was an over concentration of Plaintiffs' assets in life settlement products based on Plaintiffs' net worth, eliminating proper diversity and exposing Plaintiffs to unnecessary risk, including the risk of being unable to pay premiums, creating a hardship that Plaintiffs should have been better informed of.  Defendants were engaged in an undisclosed conflict of interest, as they stood to profit if Plaintiffs ceased paying premiums and the policy reverted back to them. This recapture of policies was one of their primary profit centers, yet it was never fully disclosed.

105.   Under the circumstances, Defendants wrongfully took Plaintiffs' money, rendering it illiquid. Plaintiffs would not have consented to this if they had known all the facts and the full truth about this investment.  Defendants tricked Plaintiffs and subjected them to undue influence by not obtaining sufficient informed consent through full disclosures.  Fiduciaries have a duty not to make a sale when

the situation presents conflicts of interest, but Defendants did so to serve their financial interests. At the very least full disclosure of the conflict is required, which was not done in this case.

106.    Selling securities or an investment opportunity under false pretenses or while omitting material facts is a deception and involves misrepresentation of material facts, violating the law. Plaintiffs contributed money, believing they made an investment that would perform better than it was capable of performing due to Defendants' misstatements, concealment, deceit, and/or unsupervised negligence, all of which violate fiduciary duties.

107.    Incorporated by reference as though fully set forth herein are many of the untrue statements, concealments, and violations alleged before and after, including but not limited to:

a.    Failure to describe various aspects of the investment that made it unsuitable or not in the best interest of Plaintiffs, such as continuing premium calls, the potential longevity of the insured beyond Plaintiffs' expectations, and the inability of heirs to inherit without the ongoing premium obligations.

b.    Failure to provide accurate background information before the sale, including information about pending suits, prior investor returns, overall returns, complaints about premium calls, and any negative reviews.

c.    Failure to disclose Defendants' unlicensed.

d.    Failure to disclose that Defendants had not registered these investments and/or that the investments did not qualify for the exemptions under which they were being sold.

e.    Communicating false information that Plaintiffs relied on, such as the ability to withdraw money at any time.

f.    Failure to provide specific rates of return based on Reliant's previous ten-year history and lack of disclosure regarding the investments' liquidity and diversity.

g.    Failure to disclose information about the directors, officers, partners, members, or trustees of the issuer of these investments.

h.    Failure to advise Plaintiff Investors that the President of Reliant, Scott Grady, was a disbarred lawyer, and his relationship with Defendants.

i.    Failure to provide proper audited reports, as required by law, for a comprehensive

understanding of the investment.

j.  Failure to advise Plaintiff Investors of fellow investors' names and contact information.

k.  Failure to advise Plaintiffs of terms of how the insurance premiums operated, when they would likely go into effect, and the consequences of a limited reserve fund.

l.  Failure to advise that Defendants allowed persons to invest without meeting minimum net worth requirements, increasing the investment's risk.

m.  Failure to advise of the historical difficulties of predicting life expectancy and the inadequacy of the premium reserve fund.

n.  Failure to advise or disclose Defendants' policy of letting certain investors get out of the investment and not allowing others to get out.

o.  Failure to explain the interrelationship between Reliant and PFSI.

108.  All Defendants knew they were part of an organization selling Plaintiffs the product while knowing the above deficiencies and nuances, and purposefully not disclosing them to Plaintiffs.  All Defendants were all acting in the course and scope of their employment with Reliant and PFSI.  All the above constitutes material omissions of material facts and/or actionable deceit perpetrated by all named Defendants in the title of this cause of action against Plaintiffs.

109.  Plaintiffs were harmed due to the breach of fiduciary duty, causing substantial harm to Plaintiffs.  Each new premium payment is a new investment that required the same full disclosure, registration, and care, which was not provided.  The deceit and violations continue year after year and are still ongoing.

110.  Plaintiffs are entitled to the return of the money they invested, plus interest.

111.  Plaintiffs suffered pain, suffering, and mental anguish for which reimbursement is sought.

112.  Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs, constituting oppression, fraud, and malice.  Punitive damages are appropriate under either Civil Code 3294 or 3345 or both.

113.  Plaintiffs seek all other damages allowed by law for the above-mentioned

### THIRD CAUSE OF ACTION

### CONVERSION

### AGAINST PFSI, SANSOUCY, TRUSTEE DEFENDANTS, AND DOES 1-10

114. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

115. This cause of action refers specifically to the Defendants SANSOUCY, TRUSTEE DEFENDANTS, and PFSI listed in the title of this cause of action.

116. Defendants SANSOUCY, TRUSTEE DEFENDANTS, PFSI, and DOES 1-10 engaged in a course of conduct as described above by taking of Plaintiffs' money by swingle. At least one and likely more of Plaintiffs money, funded through YEYO LLC have matured, but not paid to Plaintiffs. The TRUSTEE DEFENDANTS held itself out as a trust company to assure payment upon maturity. The other Defendants touted this investment as payable upon maturity. The Defendants are responsible for not paying matured death benefits to Plaintiffs as promised and are therefore liable. Presently, Plaintiffs' investments are lost to their immediate use for all the reasons above and subsequently alleged.

117. The swindle is supported by the above facts but also by the fact that PFSI, in conjunction with other Defendants, are keeping the proceeds that were supposed to go to Plaintiffs (YEYO LLC). Plaintiffs have demanded the money back but except for the first policy which was reinvested with their consent, no further payments have been made. Plaintiffs have never received any money back except for the first policy even though the money was promised to be returned within 30 days of maturing, and that it would go to Plaintiffs automatically as part of TRUSTEE DEFENDANTS' duties. The TRUSTEE DEFENDANTS are liable for not paying out the monies and/or not advising Plaintiffs of this and/or cooperating with other Defendants in a way known to not be in the best interest of Plaintiffs.

118. The TRUSTEE DEFENDANTS were supposed to give Plaintiffs the proceeds of any matured policies. Upon information and belief, this has not happened, making the TRUSTEE DEFENDANTS responsible for this liable for the non-payments upon the policies that did mature. May take discovery to figure out which of the TRUSTEE DEFENDANTS are liable. Based on this

knowledge and the knowledge of the irregularities associated with RELIANT defalcation and dishonesty related to assets. The TRUSTEE DEFENDANTS should have known and communicated with BAEZA and his wife. Insufficient activity was undertaken and the effect is a breach of judiciary duty, aiding and abetting, and gross negligence.

119.    Plaintiffs seek all other damages allowed by law and/or the return of the money.

120.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs, and constitutes oppression, fraud, and malice, such that punitive damages are appropriate and requested.


**FOURTH CAUSE OF ACTION**

**NEGLIGENCE/GROSS NEGLIGENCE**

**AGAINST PFSI, SANSOUCY, TUPLER, AND DOES 1-10**

121.    Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

122.    This cause of action refers specifically to the Defendants SANSOUCY, TUPLER, PFSI, and DOES 1-10 listed in the title of this cause of action.  Each Defendant above was either a salesperson who committed negligence by giving out incomplete, false, or inaccurate information about this investment or is a person or entity in charge of training, supervising, and training salespersons how to sell properly and ethically but did not provide proper training and supervision.

123.    Defendants SANSOUCY, TUPLER, and PFSI were negligent for the reasons mentioned above because they failed to engage in conduct up to industry standards while selling securities to Plaintiffs, or in supervising and training salespersons. They were also negligent in failing to disclose the relationship between Reliant and PFSI.  In fact, what was done was so extreme that it constitutes gross negligence.  This investment should not have been sold to these Plaintiffs for all of the reasons set forth subsequently and for all of the reasons set forth in the general allegation section of this complaint.  The cumulative violations outlined above contributed to making this a negligent or grossly negligent operation, activity, and endeavor. Defendants carried out their negligence in association with each other, compounding the negligence. Each new premium payment is a new investment that required the

same full disclosure, registration, and care which was negligent and gross negligently, not provided and deprived Plaintiff of sufficient knowledge.

124.    SANSOUCY and TUPLER were negligent in seeing that suitability standards were not developed and/or enforced.  Suitability is a State and Federal requirement in the sale of securities and consistent with California Corporate Code 25102(q)(3)(B).  They were further negligent in failing to file audit reports and otherwise following laws cited earlier in this complaint and contained in Corp. Code §25102(q).

125.    As a result of the above-mentioned acts of the Defendants SANSOUCY, TUPLER, and PFSI, Plaintiffs bought this investment when they would not have had they had the correct knowledge and information.  They would not have suffered the losses of their investments, property, money, and expenses necessary to get this money back but for the above negligence/gross negligence, Plaintiff therefore seeks the return of their investments, plus interest.

126.    As a result of the above acts, Plaintiffs claim general damages for mental and emotional distress, pain, and suffering, caused by Defendants subject to proof at the time of trial.

127.    Defendants' conduct was a substantial factor in causing Plaintiffs harm as described above. Plaintiffs seek reimbursement for the costs and expenses of having to handle, figure out, and recover these investments, including legal fees incurred for having to do so.

128.    Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing including costs of suit, investigation, attorneys' fees, and especially the value of the loss of their investments.

129.    Plaintiffs seek attorney fees as it is provided by the parties' contract and also by statute.


**FIFTH CAUSE OF ACTION**

**VIOLATION OF CIVIL CODE § 3372**

**AGAINST TUPLER, SANSOUCY, AND DOES 1-10**

130.    Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

131.    This cause of action refers to Defendants TUPLER, SANSOUCY, and DOES 1-10 listed in the title to this cause of action who were all acting as salesmen and providing services covered by Civil Code § 3370.

132.    Defendants,' above listed, held themselves out as investment advisors, financial advisors, and related terms while selling this to them. Defendants held themselves out as persons engaged in the business of advising others for compensation and as experts with respect to investments, generally, and particularly in the life settlement space. Defendants did a poor job and allowed Plaintiffs to purchase unsuitable products that were not properly vetted and did not do what they were supposed to do. In particular, Defendants represented themselves to be an expert with respect to the investment decisions in such a life settlement space and implied that they were acting in the capacity of the terms listed in Civil Code §3372 such as financial adviser, financial counselor, or investment adviser. As a result, Defendants are liable to Plaintiffs under that law.

133.    Defendants obtained compensation as a result of the financial advice rendered to Plaintiffs, but they failed to render the financial advice with due care and skill reasonably expected of a person who is an expert as defined by and required by Civil Code §3372.  Defendants were not properly licensed and/or registered to act as an expert, as defined in Civil Code §3372, or as they represented or implied.  This is further against the law for which Defendants are liable.

134.    Plaintiffs relied on Defendants' services and advice to be at a level reasonably expected and set forth in Civil Code §3372.  Plaintiffs were damaged by reason of Plaintiffs' reliance on Defendants' services in the form of losing his entire principal invested.

135.    Defendants' services were not rendered with due care as reasonably expected because of the expertise they professed to possess.  Defendants' services were instead rendered through fraud, deceit, dishonesty, ignorance, and/or lack of due diligence.  Plaintiffs expected Defendants to render sound financial advice.  Defendants did not.

136.    Plaintiffs were to be the recipient of Defendants' advisory services as defined above by reason of the above-mentioned statute.  Defendants are liable to Plaintiffs for the damages caused to Plaintiffs to the tune of $5,000,000 or to be determined according to proof at trial.

137.    Plaintiffs also request all damages afforded by law, including disgorgement of fees covered

by this statute and/or as allowed by law, including attorney's fees and costs of suit, and including the return of all monies invested, plus interest.

138.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiff and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

**SIXTH CAUSE OF ACTION**

**BREACH OF CONTRACT/RESCISSION**

**AGAINST PFSI AND DOES 1-10**

139.    Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action. When PFSI is referenced, it includes DOES 1-10.

140.    PFSI is refusing to honor various promises and commitments made. PFSI promised a rate of return that cannot and is not being provided by the investment.

141.    Plaintiffs were promised, as additional consideration for doing business with PFSI, that they would be provided top-quality services with transparency and Defendants would be available at "maturity" to assist to make sure the customer was paid. In fact, the last policy to mature should have been paid to Plaintiffs by now and has not. This policy is believed to be one YEYO LLC invested in the amount of $450,000 in. Plaintiffs expected to receive invoices if premiums were due. However, no invoices were sent. If policies expired because Plaintiffs did not pay premiums, that is PFSI's breached its obligation to advise Plaintiffs of the premiums.

142.    Plaintiffs were promised a guaranteed fixed rate of return (profit) amounting to 6.7% return in all of the above-mentioned contracts, but that is not happening.

143.    Plaintiffs, entered into a contract where they were promised the return of the principle back at any time.  It is also contained in Exhibit 1, Page 1, in writing, but it was also referenced in a separate oral promise. Plaintiffs have requested their money back and Defendant PFSI refused. These contracts constitute subparts of one large global contract where a breach of one is a breach of all. Also, the breach

of one is an anticipatory breach as to all the others.

144.    It is alleged upon information and belief and herein alleged that Plaintiffs were promised the above as additional inducements to purchase their investment. Defendants have breached the last contract that matured by not giving Plaintiffs the proceeds. This is a breach of all contacts.

145.    All the promises were common to all contracts given by TUPLER and SANSOUCY.

146.    A copy of the contracts are set forth as Exhibits 1000, 1001, 1002, 1003, 1004, 1005.

147.    For all the reasons, the details of which are already set forth in this Complaint, there has been a failure of consideration and breach of contract as to all contracts.

148.    PFSI also breached the contract by not providing the necessary support services to Plaintiff Investors to validate the policies were good investments and had an appropriate amount of money in the premium reserve account.

149.    Plaintiffs had every reason to demand the return of their funds and to withhold further payment upon learning of Reliant and the multitude of problems associated with it.

150.    Plaintiffs have fully performed as much as they could and demanded performance from PFSI to no avail.  Therefore, Plaintiffs are excused from further performance.  PFSI is not performing their end of the deal.

151.    Plaintiff requests rescission of each one of their contracts or damages in an amount equal to their investment, plus interest.

152.    Plaintiffs seek the return of all monies paid, plus interest.

153.    Plaintiffs seek all damages allowed by law for breach of contract.  As another alternative, elects to void the contract and seek rescission.


## SEVENTH CAUSE OF ACTION

## BREACH OF APPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## AGAINST PFSI, MARK SANSOUCY, AND DOES 1-10

154.    Plaintiff ED BAEZA incorporates by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

155.    Defendants in this cause of action includes those in the title and DOES 1-10.

156.    Plaintiffs entered into contracts of investment through numerous purchase agreements with PFSI.  As part of the contract, PFSI orally told Plaintiffs that Plaintiffs, as part of the contract, could get their principal back at any time but would not obtain the upside that comes when someone dies.  It is alleged upon information and belief and herein alleged that Plaintiffs were promised this as an inducement to purchase their investment bargained for the benefit of the contract.  Other investors were promised this as part of their contracts during this same period.  These are promised in emails so it is a matter promised in writing.

157.    In every contract or purchase agreement, there is an implied promise of good faith and fair dealing.  This means that each party will not do anything unfairly, will not interfere with another party to receive the benefits of the contract, and will do their part to make sure the other party gets everything they are entitled to receive under the contract.

158.    Plaintiffs were prepared to do everything obligated them under the contract but were excused when information it became known that Defendants did not supply all the information that was known and available.  Defendants dropped the ball as far as providing information about their relationship with Reliant and status of the insureds and the premium reserves and was not paying their share of premiums. This was necessary to instill the confidence necessary for Plaintiffs to be willing to pay more money. Failure to do this was a violation of the implied promise of good faith and fair dealing.

159.    As noted above, all conditions required for Plaintiffs to perform in the contracts that needed to be performed were performed by Plaintiffs or were excused.

160.    Plaintiffs were harmed by Defendants' conduct that resulted in the loss of his investment. The contract between Plaintiffs and Defendants was consummated as each has been performed or has been excused.  However, Defendants did not perform their obligation to do all of the above, including but not limited to providing the proper status reports on the insureds and providing information about the policies and the premiums.

161.    Defendants unfairly interfered with Plaintiffs' right to receive the benefits of the contract by not being available or sharing necessary information to instill confidence for Plaintiffs to feel confident

to pay additional monies.

162.    Defendants deferred payments on premium calls for some but not others. This is a fact that jeopardized the investment and increased the risk.

163.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

164.    Plaintiffs seek all damages available by law for this cause of action.

## EIGHTH CAUSE OF ACTION

## UNFAIR COMPETITION AND VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, et seq.

## AGAINST PFSI, SANSOUCY, AND DOES 1-10

165.    Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

166.    This cause of action refers to the above-named Defendants listed in the title to this cause of action and DOES 1-10.

167.    The Defendants identified above acted unlawfully, unfairly, and fraudulently in their business practices by operating as unregistered broker-dealers and selling unregistered and unqualified securities without a valid exemption. Other businesses are required to comply with the law by registering as broker-dealers and offering only registered securities, yet Defendants sought to evade these requirements. As set forth above, including at ¶¶17-18, Defendants were not entitled to use exemptions it used in making the sales to Plaintiffs under securities law, and their conduct in doing so was both illegal and unfair. In addition, because these products were sold to out of state individuals, Federal registration was required, and not obtained. Failure to register is Federally illegal and a violation of the Law making an unlawful activity. Allowing these Defendants to operate outside the regulatory framework that governs every other broker-dealer and securities seller creates an unlevel playing field and undermines investor protection. Their sale of unregistered securities under the guise of

improper exemptions, along with the other misconduct detailed in this complaint, constitutes unfair business practices in violation of Business and Professions Code section 17200.

168.    As a result of this practice, Defendants have benefited from the use of Plaintiffs' money unfairly, which is equivalent to receiving ill-gotten gains.  It gives Defendants an unfair advantage in raising money compared to businesses that obey the law.

169.    It is unfair because it allows Defendants' businesses to reap the benefit of raising money unfairly from Plaintiffs.  This is money that could have gone to legitimate businesses that are registered and register their securities and would have protected Plaintiffs and the public from what happened here. Instead, Plaintiffs' money is tied up and as good as lost.

170.    The entire endeavor is also based upon a fraudulent/deceptive business model, not disclosed to Plaintiffs, which satisfied the fraud prong.

171.    It is further fraudulent because of the specific fraud allegations set forth above that surround the entire enterprise.

172.    There is a direct link between the alleged unfair competition including unlawful, unfair, or fraudulent business practices and being able to sell to Plaintiffs. Defendants' unethical and unfair conduct, along with their unfair competition tactics, induced Plaintiffs to purchase the product. As a result, Plaintiffs lost the use of their money and suffered a diminishment in its value. Had the funds been invested or loaned elsewhere—to a legitimate business registered as a broker-dealer that properly registered the stock it sold or qualified for a valid exemption—Plaintiffs money would have been better protected and likely would not have lost their money the way they did.

173.    As a further result, Plaintiffs have sustained harm due to the Defendants' actions as described throughout this complaint.

174.    Plaintiffs relied upon the legitimacy, identity, lawfulness, and truthfulness of Defendants' statements and activities to their detriment.

175.    Plaintiffs seek all other remedies allowed by law including restoration of lost monies or the value of the loss of monies or money lost including the loss of money Plaintiffs would have made if their money was placed in a proper (legal and non-fraudulent) investment, security, or business, plus interest.

176.    Plaintiffs seek restitution to be restored to the status as Plaintiffs would have been had their money not been placed in Defendants' unfair business endeavor.

177.    Plaintiffs seek equitable and injunctive remedies including attorney fees necessary to force Defendants to follow the law or obtain a proper closure.

178.    Plaintiffs seek all damages and relief allowed by law including punitive damages under either Civil Code 3294 or 3345 or both as allowed by law as Defendants action involved fraud, malice, and oppression.

179.    Plaintiffs also request all damages afforded by law including attorney's fees.

## NINTH CAUSE OF ACTION

## FINANCIAL ELDER ABUSE

## (Welfare and Institutions Code § 15600 et seq.)

## AGAINST PFSI, MARK SANSOUCY, LARRY TUPLER, AND DOES 1-10

180.    Plaintiff ED BAEZA incorporates by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

181.    Defendants refer to third mention in the title of this cause of action.

182.    As an "elder," within the meaning of Welfare & Institutions Code § 15610.27, ED BAEZA was entitled to the heightened rights and special statutory protections provided by California's Elder and Dependent Adult Civil Protection Act ("EADACPA"), set forth in Welfare & Institutions Code § 15600 et seq. Under Welfare & Institutions Code § 15610.30, a person is liable for financial elder abuse or for assisting financial elder abuse if they obtained the elder's property when they knew or should have known that the conduct is likely to be harmful to the elder, including: (1) hiding, taking, retaining, obtaining and/or misappropriating Plaintiffs' property, which is what has been alleged, or (2) assisting in doing the above. Defendants did not limit the sale to just one sale and to one senior; they conducted multiple sales to multiple persons.

183.    ED BAEZA was over the age of 65. The BAEZAS did not need investments that might not materialize in their lifetime and would burden them or their beneficiaries or heirs to pay ongoing,

multiple, and exorbitant ever-rising premiums to keep the investments alive. ED BAEZA did not need a policy that would take so long to mature, possibly outliving them without the use of their money for retirement needs. This sale is based on fraud and deceit, wrongdoing, lack of disclosure, and use of undue influence as set forth in the general allegations and prior causes of action. Under the circumstances, it was unconscionable and in bad faith to sell this product to this senior.

184.    Defendants are responsible for selling to ED BAEZA. These Defendants used a predatory and unfair practice employed to take advantage of and unduly influence vulnerable elderly persons for their own financial gain. The above actions of these Defendants were purposeful and designed to take advantage of these Plaintiffs instead of protecting them.

185.    The Center for Research at Boston College, Aging Brain, says that older people are particularly susceptible to deception and predatory practices. Many elderly adults (roughly half) suffer from cognitive decline, which impacts financial management skills, results in poor decision-making, leaving them particularly vulnerable to fraudulent marketing tactics.

186.    People who sell securities or investment products such as this one play a critical role in preventing financial abuse of elderly persons. Reputable broker-dealers or salespersons of securities or this kind of product need to follow the rules and regulations to prevent older people from buying investments that are not right for them or which might be onerous for them to maintain and deal with. It is believed that Defendant TUPLER and SANSOUCY were negligent or intentional in selling these products to ED BAEZA. PFSI and SANSOUCY were intentional in hiring and using unscrupulous salespersons and allowing these unscrupulous salespersons to use unscrupulous sales tactics against the public and Plaintiffs. PFSI and SANSOUCY did not monitor or prevent the preying upon these elderly gentlemen because it was their business model to take advantage of the elderly.

187.    Defendants also knew each sale was not suitable for ED BAEZA based upon his age, financial sophistication, finances, and needs. Defendants persisted to continue to sell (and/or allow the sales) to older persons. Defendants continued that course of conduct of extorting money from ED BAEZA. Defendants, by continuing to bill Plaintiffs for the above-mentioned premiums, are continuing their violations to this day. PFSI and SANSOUCY are responsible for the acts of its employees because they had knowledge of the unfitness of the above individual Defendants and

employed them with conscious disregard of the rights and safety of others. PFSI and SANSOUCY authorized the above individual Defendants wrongful acts and purposefully engaged in oppression, fraud, and/or malice.

188.    Despite being the only entity or persons in possession of the above facts, Defendants knowingly assisted and turned a blind eye and callous heart to the outrageous pilfering of ED BAEZA's money.  ED BAEZA's age should have been red flags to Defendants, but Defendants did not care and instead were happy to take advantage of them and condoned the sales to him.

189.    Defendants committed the above by knowingly assisting financial elder abuse.

190.    Defendants' financial abuse has caused ED BAEZA harm including emotional stress and frustration because of the loss of all the money he and his wife spent on this product.  This has deprived ED BAEZA or his beneficiaries or heirs of financial security.

191.    Defendants knew or should have known that their conduct was likely harmful to ED BAEZA all in violation of the Laws particularly Welfare and Institutions Code.  § 15600.30.

192.    Defendants or Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested.

193.    Plaintiffs seek the reimbursement of all the monies paid to Defendants, plus interest.

194.    Plaintiff ED BAEZA seeks all damages allowed by law including that damages be trebled, and attorney's fees allowed by statute and/or contract between the parties.  Defendants' conduct was in reckless disregard for the rights and safety of Plaintiff and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

## TENTH CAUSE OF ACTION

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY/CONVERSION

## AGAINST PFSI, SANSOUCY, TRUSTEE DEFENDANTS, AND DOES 1-10

195.    Plaintiff ED BAEZA incorporates by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

196.    Defendants did commit the above-mentioned breaches of fiduciary duty and conversion, as outlined in the General Allegations of this Complaint and particularly ¶14 and all paragraphs set forth in the second and third causes of action.

197.    MARK SANSOUCY is considered an aider and abettor to the breach of fiduciary duty and commission of fraud and securities violations.  He was in a supervisory or control position over Reliant and PFSI.  The other people who aided and abetted were TUPLER and the TRUSTEE DEFENDANTS. They aided and abetted by providing support services for these investments. They were contacted by disgruntled investors and knew about the fraudulent or deceptive practices and the flawed business model before selling to Plaintiffs. This means these Defendants knew of the irregularities, fraud, theft, and breach of fiduciary duties that were occurring to Plaintiffs in real time.

198.    The other Defendants knew that Reliant and PFSI were engaged in reselling interests in policies (death benefits) by way of a syndication deceptively in violation of full disclosure and against security law, registration, and licensing authority. The TRUSTEE DEFENDANTS took orders from PFSI and Reliant and allowed them to control the trust monies that should have gone to Plaintiffs under the circumstances that allowed defalcations by SANCOUCY.

199.    Defendants named above gave substantial assistance or encouragement to Reliant and PFSI. Defendants' actions allowed SANCOUCY to engage in defalcations. Defendants continued selling this product to vulnerable people even after knowing there were complaints and issues of wrongdoing associated with the manner, method, integrity, honesty, and type of activity that Reliant and PFSI were involved in. They were even allowing theft of the account. Instead of taking stock, the above-named Defendants continued to allow sales to go forward and allowed fraudulent or deceptive endeavors to happen involving breaches of fiduciary duties. In fact, Scott Grady was permitted by the TRUSTEE DEFENDANTS to withdraw money for his use, which was not authorized by the trust agreement, a matter that TRUSTEE DEFENDANTS should not have allowed.  The defalcation of the above could not happen without these Defendants participating and helping Reliant/PFSI commit the atrocities that led to the loss of these investments or without failure to pay Plaintiffs the amounts due.

200.    It is believed that UMB, FIRST WESTRN TRUST BANK, and BANK OF UTAH were TRUSTEES of various Statutory (Series) Trust and Declaration of Trust ("Trust Agreements").

RELIANT together with PFSI appointed the above as trustees of the Statutory Trust involved with ED BAEZA and his wife's investments. It is believed that UMD acted in this capacity until about June 29, 2022 when an instrument of resignation of appointment and acceptance ("Instrument of Resignation") to place appointing BANK OF UTAH as the successor trustee. On or about June 16, 2015, RELIANT and PFSI utilized FIRST WESTERN TRUST bank as trustee of a Statutory Trust Agreement and Declaration of trust hereinafter after "FIRST WESTERN BANK series to trust Agreement". It is believed that PFSI Group had similar trust agreement with the same TRUSTEE DEFENDANTS.

201.   At the very least the TRUSTEE DEFENDANTS aided, abetted, and participated by not advising their investors of issues that irregularities were going on or had been going on.

202.   Defendants' conduct was a substantial factor in causing harm to Plaintiffs.

203.   Plaintiffs seek the return of the money lost, plus interest.

204.   Plaintiffs seek compensation for pain, suffering and mental anguish.

205.   Defendants engaged in conduct that was in reckless disregard for the rights and safety of Plaintiff ED BAEZA and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested.

206.   Plaintiff ED BAEZA seeks all other damages allowed by law including as an alternative an accounting of all policies each Defendant associated with Reliant.

### ELEVENTH CAUSE OF ACTION

### VIOLATION OF CORPORATIONS CODE § 25504.1

### AGAINST SANSOUCY, TUPLER, AND DOES 1-10

207.   Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

208.   Defendants include all those set forth in the title to this cause of action.

209.   Plaintiff are informed and believe and thereon alleges that Defendants TUPLER and SANSOUCY materially assisted in the violations of California Corporate Code §§ 25401 and 25130, alleged herein with the intent of deceiving and defrauding Plaintiffs' and otherwise meet the

requirements set forth in California Corporate Code § 25504.1.

210.    As a result of the above, Defendants are jointly and severally liable, pursuant to California corporations code § 25504.1, for the violations of California corporate code §§ 25401 and 25501 which are alleged herein.

211.    By reason of the above, Plaintiffs are entitled to rescission and/or damages, against these Defendants for violations of California Corp.  Code § 25401 and § 25501.

212.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

213.    Plaintiffs seek the return of the money lost, plus interest.

214.    Plaintiffs seek all other damages allowed by law for the above-described wrongdoing including costs of suit, investigation, and attorneys' fees.

## TWELFTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY AND ACCOUNTING

## AGAINST TRUSTEE DEFENDANTS AND DOES 1-10

215.    Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

216.    This cause of action applies to the TRUSTEE DEFENDANTS and DOES 1-10.

217.    TRUSTEE DEFENDANTS were obligated to check on and prevent deception and defalcation from happening. They were further obligated to do this as trustees of monies, escrowed for the benefit of investors. The TRUSTEE DEFENDANTS did not advise Plaintiffs or take timely action to protect them after at least one policy matured.

218.    TRUSTEE DEFENDANTS have further fiduciary duties they have not complied with including above defalcation and other bad behavior to its Plaintiffs as beneficiaries of Trusts. They administered and allowed others to take the Plaintiffs' money. The TRUSTEE DEFENDANTS were supposed to be in charge of ensuring money gets to investors. They failed.

41
COMPLAINT

219.    It is also believed that TRUSTEE DEFENDANTS had, and still have, a duty to directly pay Plaintiffs their share of any monies upon the maturity of any policy Plaintiffs invested in.  Policies have matured so payments should have made to Plaintiffs, and they have not been made. See allegations at ¶14 and the second and third causes of action. That's a breach of a fiduciary on the part of TRUSTEE DEFENDANTS.  It is also a breach of a third-party beneficiary contract.

220.    Plaintiffs seek an accounting and judgement against the TRUSTEE DEFENDANTS for all losses Plaintiffs have suffered, plus interest and attorney fees, pain and suffering and mental anguish.

221.    Plaintiffs seek damages for all harm TRUSTEE DEFENDANTS have done in breach of the above duties and obligations and duties and responsibilities imposed by law.

222.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.


**THIRTHEENTH CAUSE OF ACTION**

**VIOLATION OF CORPORATIONS CODE §§ 25401 AND 25501**

**AGAINST PFSI, SANSOUCY, TUPLER, AND DOES 1-10**

223.    Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein, including each wrongdoing, deceit, and lack of disclosure already alleged in the general allegations section of this complaint and such allegations in any previous cause of action.

224.    Defendants include all those set forth in the title to this cause of action.

225.    At all times mentioned herein, Defendants, and each of them, offered or sold securities to Plaintiffs within the meaning of California Corporations Code § 25019.  Said offers and sales were made directly or indirectly to Plaintiffs in the State of California.

226.    In connection with such offers and sales, Defendants, and each of them, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, all in violation of California Corporations Code § 25401.

227.    Plaintiffs were not aware of the untruths or omissions at the time of purchasing the securities

and justifiably relied on Defendants' representations and omissions in entering into the transaction.

228.    As a direct and proximate result of the unlawful conduct of Defendants, and each of them, Plaintiffs purchased securities from Defendants which Plaintiffs would not have purchased but for Defendants' violations of law.

229.    Pursuant to California Corporations Code § 25501, Plaintiffs are entitled to rescind the purchase of said securities and recover the consideration paid, with interest thereon, less the amount of any income received thereon, or, if Plaintiffs no longer own the securities, for damages in an amount equal to the consideration paid, with interest thereon, less the value of the securities when disposed of, plus reasonable attorneys' fees and costs.

230.    Defendants, and each of them, are jointly and severally liable to Plaintiffs for such damages and equitable relief.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.    For compensatory damages;

2.    For special damages according to proof;

3.    For pain and suffering according to proof;

4.    For rescission, restitution, and disgorgement;

5.    For rescission of the securities transactions described herein, and for restitution to Plaintiffs of all consideration paid, with interest thereon, less any income received, as authorized by Corporations Code § 25501;

6.    In the alternative, for damages according to proof at trial, including but not limited to the consideration paid for the securities, with interest thereon, less the value of the securities when disposed of;

7.    For an accounting and injunctive or mandamus relief to protect Plaintiffs policies.

8.    For reasonable attorneys' fees and costs of suit, as permitted by statute;

9.    For prejudgment and post-judgment interest at the maximum legal rate; and

10.    For such other and further relief as the Court may deem just and proper.

Dated: November 3, 2025                    MURRIN LAW FIRM

_____
J.  Owen Murrin
Attorney for Plaintiffs YEYO LLC, et al.

## TOLLING AGREEMENT

This Agreement is made this day between the Plaintiffs listed below and Defendants. The Defendants to this agreement are Mark Sansoucy and Principle Financial Services, Inc. Plaintiffs and Defendants are together referred to as the "Parties."

Plaintiffs to this agreement represented by their attorney, J. Owen Murrin, the undersigned, has full authority to act on their behalf ("Plaintiffs"). They are:

> GWENDALYN DOUGLASS, as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST, and on behalf of RAYMOND E. DOUGLASS, as successor-in-interest, pursuant to CCP §377.11 et. sq.; ED BAEZA, an individual, and their companies GAMAN, LLC and YEYO, LLC; CONCEPCION BAEZA, an individual; BASSIR ANSARY, an individual; PAUL BUGLER, an individual; WALTER BUGLER, an individual; JAMES CIRILE, an individual; NATHAN COLEMAN, an individual; GENE GOLDEN, an individual; JOSEPH GOODALE, an individual; RACHEL GILA, an individual; TRUDY BELINDA JOHNSON, an individual; CHARLES LAWRENCE, an individual; ORSON K. LEONG, an individual; PETER J. LOWE, an individual; BARBARA THORSELL, an individual; MARK THORSELL, an individual; CLIFFORD RITZ, an individual; STEVEN C. ROEMER, an individual; GREG SCHMITT, an individual; JOHN STOCKSDALE, an individual; JENNIFER VANCE, an individual; BRIAN BONACUM, an individual; GEORGETA MASSON, an individual; as the surviving spouse and Successor-in-interest pursuant to CCP 377.11 et seq. on behalf of her husband Marc Weinstein; EZEKIEL ORTIZ, an individual.

**IN CONSIDERATION FOR THE MUTUAL PROMISES CONTAINED HEREIN,** and without admitting any liability of any type or nature, the Parties desire to toll all statutes of limitations, statutes of repose and claims of laches for two years until December 1, 2025 ("Tolling Period"). In addition, the following provisions are incorporated into this agreement.

1. Purpose. The purpose of this Agreement is to effect a tolling of all applicable statutes of limitation, and to preserve all claims, demands, causes of action, claims for relief, positions, rights, remedies, and defenses, in law and in equity, possessed by each of the Parties hereto as against each other. It is the intention of the Parties hereto that until termination of the tolling period, that the positions of each party shall be as they were upon the effective date of this Agreement and not be altered or prejudiced by the passage of time during the Tolling Period.

1

2. <u>No Waiver or Admission</u>. Nothing contained in this Agreement precludes any Party from initiating any litigation or otherwise asserting any claims, demands, causes of action or claims for relief against anyone who is or who is not a Party to this Agreement during the tolling period. Likewise, nothing contained in this Agreement shall constitute or be deemed to constitute a waiver of any defense or right that may be available before the termination of the tolling period.

3. <u>Tolling</u>. The Parties hereby agree that any and all statutes of limitations and/or repose and any equitable claim of laches, whether arising by contract, statute, common law or otherwise, which might be asserted against it relating or pertaining in any manner to (1) the alleged facts, circumstances, acts and omissions which gave rise to the claims asserted by any and all Parties in the cases known as *Douglas et all v. Reliant Life Shares, LLC (Case No: 2:23-cv-00460-SB-AGR)* and *Baeza v. Reliant Life Shares, LLC (*Case No. 2:23:cv-00474-SB-PD) (collectively "Consolidated Cases") and (2) all Parties' defenses of every type and nature whatsoever, which are based upon, arise from, or relate to or pertain to in any manner to the claims contained therein shall be tolled through the tolling time period of December 1, 2025. Nothing shall preclude any party from claiming the benefit of any doctrine under which any claim or defense is deemed to "relate back" to any prior date. The running of any statute of limitations applicable to any proceeding shall commence again after the end of the tolling period, unless there is an extension of the tolling period executed in writing by and on behalf of the Parties hereto. Nothing shall prevent any Plaintiff from pursing any tolled claim within the tolling period.

4. <u>Statute Preservation.</u> The Parties mutually agree to preserve any statute of limitations that was previously met by any Plaintiff in the Consolidated Cases until December 1, 2025. This means that until December 1, 2025, Plaintiffs retain the right to refile against Defendant for any claim that had been timely filed in the Consolidated Cases but is now subject to dismissal.

5. <u>Case Dismissal</u>. Plaintiff shall dismiss Defendant from the Consolidated Cases without prejudice immediately and without delay upon the mutual execution of this Agreement.

6. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which counterparts, when executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.

7. <u>Notices</u>. All notices required or allowed by this Agreement shall be given by certified U.S. mail, by facsimile with telecopy machine confirmation, or by personal delivery to the Parties through their counsel. Notices shall be deemed effective on the date notice is received, telecopy machine confirmation, or on the date of delivery, whichever is applicable.

8. <u>Amendment</u>. This Agreement may be amended from time to time but no amendment shall be effective unless it is in writing and duly executed by the Parties hereto.

9. <u>Warranty of Authority</u>. The undersigned counsel for Plaintiffs, J. Owen Murrin, represents and warrants that he has actual authority on behalf of each and every Plaintiff identified herein and is thereby empowered and authorized to execute this Agreement on their behalf. The undersigned defendants are relying upon Mr. Murrin's representations and warranties as a material component of this Agreement, which shall be binding and enforceable.

10. <u>Governing Law</u>. The terms, contract rights and contract obligations set forth in or created by this Agreement shall be construed in accordance with, and all disputes arising under this Agreement shall be governed by the laws of the State of California.

11. <u>Attorney's Fees</u>. Each party shall incur their own attorney fees to enforce or defend this Agreement.

12. <u>Facsimile Execution</u>. A facsimile signature to this Agreement shall be deemed, and may be relied upon as, an original. Likewise, transmission by telecopy of an executed counterpart of this Agreement shall be deemed delivery of an original, executed counterpart.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first hereinabove written.

Dated:

10 - 30 - 23

J. Owen Murrin
Attorney for Plaintiffs

Dated:

11/80/2023

Mark Sansoucy

Dated:

11/30/2023

Principle Financial Services, Inc.

Mark Sansovy - COO

3

DocuSign Envelope ID: 2D5C3F6C-6EEC-47CD-8B87-67DB4347EA49

## TOLLING AGREEMENT

This Agreement is made this day between the Plaintiffs listed below and Defendants. The Defendants to this agreement are Paul Roy Vince Bavino and Larry Tupler. Plaintiffs and Defendant are together referred to as the "Parties."

Plaintiffs to this agreement represented by their attorney, J. Owen Murrin, the undersigned, has full authority to act on their behalf ("Plaintiffs"). They are:

> GWENDALYN DOUGLASS, as Trustee of RAYMOND E. DOUGLASS REVOCABLE TRUST, and on behalf of RAYMOND E. DOUGLASS, as successor-in-interest, pursuant to CCP §377.11 et. sq.; ED BAEZA, an individual, and their companies GAMAN, LLC and YEYO, LLC; CONCEPCION BAEZA, an individual; BASSIR ANSARY, an individual; PAUL BUGLER, an individual; WALTER BUGLER, an individual; JAMES CIRILE, an individual; NATHAN COLEMAN, an individual; GENE GOLDEN, an individual; JOSEPH GOODALE, an individual; RACHEL GILA, an individual; TRUDY BELINDA JOHNSON, an individual; CHARLES LAWRENCE, an individual; ORSON K. LEONG, an individual; PETER J. LOWE, an individual; BARBARA THORSELL, an individual; MARK THORSELL, an individual; CLIFFORD RITZ, an individual; STEVEN C. ROEMER, an individual; GREG SCHMITT, an individual; JOHN STOCKSDALE, an individual; JENNIFER VANCE, an individual; BRIAN BONACUM, an individual; GEORGETA MASSON, an individual; as the surviving spouse and Successor-in-interest pursuant to CCP 377.11 et seq. on behalf of her husband Marc Weinstein; EZEKIEL ORTIZ, an individual.

**IN CONSIDERATION FOR THE MUTUAL PROMISES CONTAINED HEREIN,** and without admitting any liability of any type or nature, the Parties desire to toll all statutes of limitations, statutes of repose and claims of laches for two years until December 1, 2025 ("Tolling Period"). In addition, the following provisions are incorporated into this agreement.

    1. Purpose. The purpose of this Agreement is to effect a tolling of all applicable statutes of limitation, and to preserve all claims, demands, causes of action, claims for relief, positions, rights, remedies, and defenses, in law and in equity, possessed by each of the Parties hereto as against each other. It is the intention of the Parties hereto that until termination of the tolling period, that the positions of each party shall be as they were upon the effective date of this Agreement and not be altered or prejudiced by the passage of time during the Tolling Period.

1

Exhibit B, p. 1

DocuSign Envelope ID: 2D5C3F6C-6EEC-47CD-8B87-67DB4347EA49

2. <u>No Waiver or Admission</u>. Nothing contained in this Agreement precludes any Party from initiating any litigation or otherwise asserting any claims, demands, causes of action or claims for relief against anyone who is or who is not a Party to this Agreement during the tolling period. Likewise, nothing contained in this Agreement shall constitute or be deemed to constitute a waiver of any defense or right that may be available before the termination of the tolling period.

3. <u>Tolling</u>. The Parties hereby agree that any and all statutes of limitations and/or repose and any equitable claim of laches, whether arising by contract, statute, common law or otherwise, which might be asserted against it relating or pertaining in any manner to (1) the alleged facts, circumstances, acts and omissions which gave rise to the claims asserted by any and all Parties in the cases known as *Douglas et all v. Reliant Life Shares, LLC (Case No: 2:23-cv-00460-SB-AGR)* and *Baeza v. Reliant Life Shares, LLC (*Case No. 2:23:cv-00474-SB-PD) (collectively "Consolidated Cases") and (2) all Parties' defenses of every type and nature whatsoever, which are based upon, arise from, or relate to or pertain to in any manner to the claims contained therein shall be tolled through the tolling time period of December 1, 2025. Nothing shall preclude any party from claiming the benefit of any doctrine under which any claim or defense is deemed to "relate back" to any prior date. The running of any statute of limitations applicable to any proceeding shall commence again after the end of the tolling period, unless there is an extension of the tolling period executed in writing by and on behalf of the Parties hereto. Nothing shall prevent any Plaintiff from pursing any tolled claim within the tolling period.

4. <u>Statute Preservation.</u> The Parties mutually agree to preserve any statute of limitations that was previously met by any Plaintiff in the Consolidated Cases until December 1, 2025. This means that until December 1, 2025, Plaintiffs retain the right to refile against Defendant for any claim that had been timely filed in the Consolidated Cases but is now subject to dismissal.

5. <u>Case Dismissal</u>. Plaintiff shall dismiss Defendant from the Consolidated Cases without prejudice immediately and without delay upon the mutual execution of this Agreement.

6. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which counterparts, when executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.

7. <u>Notices</u>. All notices required or allowed by this Agreement shall be given by certified U.S. mail, by facsimile with telecopy machine confirmation, or by personal delivery to the Parties through their counsel. Notices shall be deemed effective on the date notice is received, telecopy machine confirmation, or on the date of delivery, whichever is applicable.

8. <u>Amendment</u>. This Agreement may be amended from time to time but no amendment shall be effective unless it is in writing and duly executed by the Parties hereto.

2

DocuSign Envelope ID: 2D5C3F6C-6EEC-47CD-8B87-67DB4347EA49

9.    Warranty of Authority. The undersigned counsel for Plaintiffs, J. Owen Murrin, represents and warrants that he has actual authority on behalf of each and every Plaintiff identified herein and is thereby empowered and authorized to execute this Agreement on their behalf. The undersigned defendants are relying upon Mr. Murrin's representations and warranties as a material component of this Agreement, which shall be binding and enforceable.

10.    Governing Law. The terms, contract rights and contract obligations set forth in or created by this Agreement shall be construed in accordance with, and all disputes arising under this Agreement shall be governed by the laws of the State of California.

11.    Attorney's Fees. Each party shall incur their own attorney fees to enforce or defend this Agreement.

12.    Facsimile Execution. A facsimile signature to this Agreement shall be deemed, and may be relied upon as, an original. Likewise, transmission by telecopy of an executed counterpart of this Agreement shall be deemed delivery of an original, executed counterpart.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first hereinabove written.

Dated: 11/30/23

J. Owen Murrin
Attorney for Plaintiffs

Dated: 11/30/2023

Paul Roy
Paul Roy

Dated: 11/30/2023

Vince Bavino
Vince Bavino

Dated: 11/30/2023

Larry Tupler

3

Exhibit B, p. 3



Customized Return Created for: **Mr & Mrs Baeza / YEYO & GAMMAN**

## Oct~Dec 2020 SPECIAL OFFERING: YEYO & GAMMAN

| OFFERING: ONE<br><br>Starting Principal | Fixed Return | RELIANT<br><br>Seven Year(s)<br>Compounded |
|---|---|---|
| YEO | | |
| $450,000.00 | $931,000.00 | $4,655,000.00 |
| PROFIT | $499,500.00 | $4,205,000.00 |
| GAMMAN | | |
| $350,000.00 | $738,500.00 | $3,392,500.00 |
| PROFIT | $388,500.00 | $3,342,500.00 |
| | FIXED | 7 Yearr Compound |
| Combined Total | $1,669,500.00 | $8,047,500.00 |
| PROFIT | $869,500.00 | $7,247,500.00 |

*"All RETURNS reflect profit & principal payout"*

Exhibit 1, p. 1

19

# M U R R I N   L A W   F I R M
— EST. 1977 —

Mailing address:
7040 E. Los Santos Drive
Long Beach, CA 90815
562-342-3011 (Office)
562-724-7007 (Fax)

J. Owen Murrin
www.murrinlawfirm.com
*jmurrin@murrinlawfirm.com*

Practicing law in California & North Dakota only.
Nationwide Securities Arbitration and Mediation Services.

Client Appointment Office:
5150 Pacific Coast Highway
Suite 200, Long Beach, CA 90804

July 19, 2022

### *Via Certified Mail and Email*

Reliant Life Shares, LLC, aka
Reliant Capital
Scott Grady, Founder & Pres.
15260 Ventura Blvd. Ste 1200
Sherman Oaks, CA 91403

RLS Financial Services, Inc
5805 SEPULVEDA BLVD.
STE 852,
SHERMAN OAKS, CA,
91411

RMS Trust
15260 Ventura Blvd.
Ste 1420  or Suite  1200
Sherman Oaks, CA 91403

Scott Grady, Founder & Pres.
15260 Ventura Blvd. Ste 1420
Sherman Oaks, CA 91403
Scott@reliantlifeshares.com

Andrew Murphy
Reliant Life Shares, LLC
15260 Ventura Blvd.,
Ste 1420  or Suite  1200
Sherman Oaks, CA 91403 •
Andrew@rellanUifeshares.com

Paul Roy
10153 Riverside Drive #535
Toluca Lake, CA 91602
Reliantpaul@gmail.com

David Underwood
Reliant Life Shares, LLC
15260 Ventura Blvd.,
Suite 1420, or Suite 1200
Sherman Oaks, CA91403
Dunderwood@Relaint
LifeShares.com

Shawn Davenport
Reliant Life Shares, LLC,
15260 Ventura Blvd.
Suite 1420 or Suite 1200
Sherman Oaks, CA 91403

Larry Bagby
Reliant Life Shares, LLC,
15260 Ventura Blvd.
Ste 1420 or Suite 1200
Sherman Oaks, CA 91403

Brent Borchert
2355 Westwood Blvd # 658,
Los Angeles, CA 90064-2109
brentborchert@protonmail.com

Mark Sansoucy
5805 Sepulveda Blvd. Ste 852,
Sherman Oaks, Ca, 91411

Larry Tupler
Reliant Life Shares, LLC,
15260 Ventura Blvd.
Ste 1420 or Suite 1200
Sherman Oaks, CA 91403
larrytreliant@gmail.com

Vincent Bovino
1097 Via Carillo
Thousand Oaks, CA
91320-6790

Principal Financial Services
5805 Sepulveda Blvd. Ste 852,
Sherman Oaks, Ca, 91411

Joel H Kleinfeld
275 Golden Hind Psge
Corte Madera, CA
94935-1953

1

Exhibit 121 p.1

Re:  Reliant Life Shares, LLC, aka Reliant Capital; RLS Financial Services, Inc.; RMS Trust; Scott Grady; Andrew Murphy; Paul Roy; David Underwood; Shawn Davenport; Larry Bagby; Brent Borchert; Mark Sansoucy; Larry Tupler; Joel H. Kleinfeld; Vincent Bovino; Principal Financial Services

**<u>NOTE: THIS DOCUMENT IS PRIVILEGED UNDER CALIFORNIA EVIDENCE CODE §1152 AND FEDERAL RULES OF EVIDENCE, §408</u>**

Dear Mr. Grady, Joel H. Kleinfeld and Representatives of the above-mentioned entities,

Please be advised that I represent the following persons and entities: Paul Bugler, Walter Bugler, Concepcion Baeza, Ed Baeza, James Cirile, Nathan Coleman, Gwen Douglass as Trustee of Raymond E. Douglass Revocable Trust, Gaman, LLC, Gene Golden, Joseph Goodale, Rachel Gila, Trudy Belinda Johnson, Charles Lawrence, Orson K. Leong, Barbara Thorsell, Mark Thorsell, Clifford Ritz, Steven C. Roemer, Greg Schmitt, John Stocksdale, Jenny Vance, and Yeyo, LLC regarding violations of California Consumers Legal Remedies Act.  Please be advised that pursuant to California Code of Civil Code §1782(a), this letter constitutes a 30-day notice that this office is pursuing the rights allowed by this section, and the above-named clients intend to commence an action for damages pursuant to this Act.

Pursuant to Civil Code §1770 (a)(1), and on behalf of these clients, you are hereby advised that you have violated various provisions of Civil Code §1770 et seq.  These violations of  Civil Code §1770 include unfair or deceptive acts or practices, including but not limited to Civil Code §1770(a)(1-5)(7)(14)(16)(19) and (26). These deceptive acts or practices arose out of your companies offering investment products and financial services to my clients. My clients bought your products and received your financial services and have been and now are customers of you or your entities above mentioned. You and your above-mentioned companies engaged in multiple violations. These violations include but are not limited to:

      1.      Violation of Civil Code §1770 (a)(1-5) and (14) by associating your product as being aligned and approved by Warren Buffet and/or Bill Gates.   We also believe it is a violation for you to represent to the above-named consumers/clients that the investments were approved, legitimatized, or used by Warren Buffett and/or Bill Gates. It appears consumers were led to believe that Warren Buffett invested hundreds of millions of dollars in similar investments, whereas it was not disclosed to the consumers herein, that neither Warren Buffett nor Bill Gates purchase fractional, syndicated, or pooled shares of life shares similar to what the above investors bought from you or the above-mentioned companies.

      2.      Violations of Civil Code §1770 (a)(1-5) and (16), as it is unclear who the company and/or person is in charge of your investment program.  It is unclear if it is Reliant Life Shares, Reliant Capital, RLS Financial Services, RMS Trust, LifeX Investments, and/or Principal Financial Services Inc.  It is unclear who obtains the money once the policies are sold who profits. The result is that the source, sponsorship,

2

Exhibit 121 p.2

status, or connection of each investment is blurred.  It is further confusing to the consumer that the names used above to promote this investment play into confusion. "Reliant Capital" is used in radio commercials although that is not even the name of a company used in any of the closing package documents. It is a bait and switch.  A Google search of Reliant Capital results in a company that is not you at all. Another deception are two of the purchases made by Mr. and Mrs. Baeza, who through their companies Yeyo LLC and Gaman LLC, signed one contract for a $350,000 purchase and another contract for $450,000 purchase based on the same type of agreement with the same type of products.  The first contract was with Reliant Life Shares and the second contract was with Principal Financial Services Inc. This is confusion created by you as to the source, sponsorship, status, or connection of each investment and is a violation of Civil Code §1770 (a)(1-5) and (16).

3.    Civil Code §1770(a) (26) prohibits "advertising, offering or selling a financial product that is illegal under State of Federal Law." Since you and your companies are selling these investments to my clients through a security that is neither registered nor exempt from registration, in violation of anti-fraud provision of the law,  that makes these investments illegal under State and Federal Law and under Civil Code §1770(a) (19).

4.    You have inserted unconscionable provisions in the contracts, these clauses are illegal to do under the law and pervade all aspects of the contractual relationship.

5.    You and your organizations are passing yourself off as selling a legitimate security with reputable security professionals selling the product.  You do not make it clear that you are not S.E.C. registered and cannot refer or even liken yourself as such. Full disclosure requires advising potential investors that the salesforce that you send out to customers are not security professionals and cannot give security advice and that customers need to seek that level of advice elsewhere.  Professional securities people provide safeguards and expertise that salespeople not registered through the S.E.C. cannot provide.  For example, S.E.C registered/sanctioned broker dealers and advisors provide third party due diligence prior to the offering/investments, they provide the consumers with individual attention. S.E.C sanctioned brokers and agents are supervised and comply with internal and external S.E.C requirements. They provide investor specific suitability analysis. Brokers and Advisors sanctioned by the S.E.C. are required to present the offering in a fair and balanced manner and not be misleading and at all times comply with S.E.C. rules and regulations. Persons or entities associated with your organization are illegally acting as a non-sanctioned S.E.C. broker by selling these investments without the proper S.E.C. credential.

6.    It appears that your organization is attempting to  masquerade as something you or your organization is not.  Upon information and belief, it has come to our attention that you or your organization has gone out of your way to prevent the investing public and future investors from knowing or getting the whole story and the truth, about you, your history, and your industry.  This includes offering to pay money to get rid of

3

Exhibit 121 p.3

bad reviews, and to intercept truthful information that is not flattering to the investment, and this industry. Your organization is attempting to control and wrongfully manipulate the narrative by eliminating bad reviews or negative information which deprives investors of getting a fair and balanced picture of this investment and associated persons and entities. That is not allowed in the securities industry because the securities world is about full disclosure. Creating a false narrative violates many of the provisions of Civil Code §1770(a) as well as other securities laws that will be the subject of a potential lawsuit if you do not make amends with the above investors and otherwise comply with the law set forth in Civil Code 1782 and other sections of this law (sometimes also referred to as the Deceptive Trade Practices Act).

7.    Most importantly, these clients are confused because you do not disclose the identity of the insured ostensibly for confidentiality reasons, but that vitiates the essence of investment and Securities law which requires full disclosure. It does not matter that it conflicts with HIPPA. Those are two different laws. It appears that if HIPPA prevents full disclosure of the insured that these clients invested in and if Securities laws require full disclosure, this situation makes these investments, *per se* or as a matter of law, improper and illegal. The same is true with insurance companies that are prohibited by law from giving out information about these insured to investors. Again, if this is the case, then doing an investment where full disclosure and verification cannot be obtained by the investors is flawed because it prevents the investor from full disclosure required by Securities law. This is a problem not just at the point of sale but is an ongoing problem as premiums come due and the investor wants to know the insured is not dead and that there is a policy out there and an insurance company that is ready, willing, and able to pay the death benefit. The problem with the program and why these investors are seeking legal advice is because none of this information is readily available to the investors. In fact our clients are being deprived this important information while still being on the hook for upcoming premiums. Some of the customers are paying premiums with no assurances that there is a policy in effect, and some customers have stopped paying premiums because of the lack of disclosure, transparency, and essential information. Customer investors need to continually know that the policy is in effect and that the insured has not since died. Your failure to provide full disclosure each day is a continuing violation of this and other laws. Unfortunately, your system of operating in secrecy is buttressed by your flawed belief that HIPPA confidentiality provisions allow you to withhold this information. This is not correct and is a problem. Not disclosing this basic information is per se deceptive and violates many provisions of Civil Code §1770(a), withholding information is unethical under Securities laws and Civil Code §1770, especially at (a). The above investors believe they have been deceived and want answers.

8.    There are inconsistencies in the calculations of the premium reserves needed for the same person in the same policy. These inconsistencies in the premium reserves needed to keep the policy in effect are based on the inconsistencies in the representation of the life expectancies of insureds for the same person in the same policy. This is form of misrepresentation and deception regarding the source of the investment.

4

Exhibit 121 p.4

Pursuant to Civil Code §1782, my clients hereby give you the 30-day notice to correct, repair, replace or otherwise rectify, including rescind, and return my client's principal prior interest (less payments, if any) for the violations of Civil Code §1770 mentioned above. If an appropriate correction, repair, replacement, or other remedy including rescission is not provided to my clients, then an action for injunctive relief and/or an action for damages will be brought under this section and other appropriate areas of the law. We have a draft of the complaint(s) available upon request.

In meantime and especially if you are not going to rectify the situation by refunding the money, we hereby request all records, accountings, financial statements related to this matter and your involvement in it. We would like all emails containing all professional data, documents, and materials that became this investment through today.

Very truly yours,

MURRIN LAW FIRM

J. Owen Murrin
JOM/rs

5

Exhibit 121 p.5



## Reliant Life Shares, LLC

**FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT**

**THIS FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT** ("Agreement") is made this <u>11th</u> day of <u>February</u>, 2020, by and between Reliant Life Shares, LLC ("RELIANT LIFE SHARES" or the "Seller"), and <u>Provident Trust Group FBO Concepcion Baeza IRA# 20020020</u> (the "Purchaser"). This Agreement covers the purchase of one or more interests in the death benefits of a life insurance policy insuring the life of an individual, or life settlement interests ("Interests").

**WHEREAS**, the Purchaser has reviewed and approves and adopts the criteria utilized by the Seller to purchase said Interests; and

**WHEREAS**, the Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with the Seller, and the Purchaser expressly waives any and all claims to the contrary; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth, each party hereby represents that it or its representatives has/have the requisite authority to enter into this Agreement and hereby agree as follows:

### 1. THE PURCHASE

(a)    The Purchaser hereby agrees to deposit the sum of:

$ <u>19,300</u> to acquire an Interest in Policy #: <u>156 222 969</u>. Total Fixed Return: <u>66%</u>

$ <u>19,500</u> to acquire an Interest in Policy #: <u>171977</u>. Total Fixed Return: <u>75%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>161217091</u>. Total Fixed Return: <u>52%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>BU783791</u>. Total Fixed Return: <u>71%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>198859</u>. Total Fixed Return: <u>78%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>BU1784205</u>. Total Fixed Return: <u>98%</u>

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

Page 1                                                           Purchaser's Initials: _CB_

$ _____ to acquire an Interest  in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest  in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest  in Policy #:_____. Total Fixed Return: _____

(b)    The Purchaser's deposit will be made simultaneous with the delivery of this executed Agreement to Seller, by delivering a check, or effecting a wire transfer, made payable to Seller's Escrow Agent, UMB – *Reliant Life Shares Subscription Escrow Account*. The Purchaser's deposit does not constitute a purchase or a commitment to purchase until five (5) business days after the Purchaser has received all of the disclosures required by California law.

(c)    Upon Seller's receipt of the executed Life Settlement Disclosure Form, but in no event sooner than five (5) days after Purchaser's receipt of the Life Settlement Disclosure Form, the Seller will obtain confirmation of the recording of a change of ownership of such Policy to Reliant Life Shares Series Statutory Trust ("RELIANT LIFE SHARES") and a confirmation of irrevocable beneficiary. In the case of a Group Policy, the Seller will obtain a confirmation of the recording of an absolute assignment of such Group Policy to the Reliant Life Shares Series Statutory Trust and a confirmation of the recording of a change of beneficiary under such Policy naming as beneficiary the Reliant Life Shares Series Statutory Trust. To the extent that the Seller does not at the date of this Agreement have available such policies, the Seller shall use its reasonable efforts to obtain a suitable policy(ies) as soon as practicable after the date of this Agreement.

(d)    Upon the maturity of the life insurance policy (ies) in which Purchaser has purchased a life settlement interest, the trustee (UMB Bank) shall file or cause to be filed a claim for the death benefits with the appropriate insurance company. When the Reliant Life Shares Series Statutory Trust receives payment of such claim, UMB Bank will pay the Purchaser directly it's pro rata share of the death benefits.

(1)    In the event of Purchaser's death before policy maturity, Purchaser designates (Please List: Name, Address and Phone)
Designated By the IRA
_____

_____

as Contingent beneficiary.  In the case that both Purchaser and Contingent Beneficiary die in the same accident, Contingent Beneficiary will be deemed to have died first and Purchaser therefore designates (Please List: Name, Address and Phone)

_____

_____

as Tertiary Beneficiary

Page 2                                                                     Purchaser's Initials: _CB_

    (e)    The owner of the life insurance policy in which Purchaser will obtain an interest will be a trust. The current trust is Reliant Life Shares Series Statutory Trust. The current Trustee of the Reliant Life Shares Series Statutory Trust is UMB Bank. The Trustee's sole responsibilities are to maintain accounts for the purpose of making the premium payments as more fully described in Section 2(b) of this Purchase Agreement, to be the beneficiary for the death benefits of the life insurance policy in which Purchaser obtains an Interest, and to disburse the death benefits in accordance with the assignments of benefits relating to that policy. Reliant Life Shares has contracted with UMB Bank to perform certain post-closing services as the Trustee, as more fully set forth in Paragraph 3(o) herein.

    (f)    The Seller's Escrow Agent is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

    (g)    The responsibilities of the Escrow Agent are:

1. To hold the funds forwarded by the Purchaser pursuant to this Agreement;
2. To hold the documents received from the Seller of a policy when required;
3. To receive and review written confirmation that the insurance company has accepted, recognized and,/or noted on its books and records the transfer of the policy ownership and the change of beneficiary(ies);
4. To make disbursements at the direction of the Trustee.

    (h)    The Escrow Agent is not representing the Purchaser in this transaction and has no responsibility to the Purchaser with regard to this transaction other than to hold the funds in escrow in accordance with Section 1(g).

    (i)    Purchaser recognizes that the Trustee and Escrow Agent shall not incur any liability to the Seller or to Purchaser for any damages, losses or expenses which either party may sustain or incur, unless the same is a direct result of the gross negligence or intentional misconduct of Trustee or Escrow Agent. Trustee and Escrow Agent shall be protected in any action taken or omitted in good faith with respect to their duties and responsibilities. Trustee and Escrow Agent shall be entitled to rely on any document(s) which Trustee and Escrow Agent reasonably believe satisfy the terms and conditions of the escrow. The Seller and Purchaser each hereby agree to indemnify and hold harmless Trustee and Escrow Agent from and against all losses, except those caused by gross negligence or intentional misconduct, claims, damages, liabilities and expenses which it may sustain or incur hereunder, including, without limitation, reasonable attorney's fees, which may be imposed upon Trustee or Escrow Agent or incurred by Trustee and Escrow Agent in connection with the performance of their duties.

    (j)    Seller may from time to time make available for purchase an Interest in a "second to die" life insurance policy. These policies typically insure the life of a husband and wife, and do not pay off until both insured's have died. In the event a second to die policy is offered for investment it will be disclosed that the policy is a second to die policy.

Purchaser's Initials: _____

## 2. THE SELLER'S OBLIGATIONS TO THE PURCHASER

(a)      The Seller represents and warrants to the Purchaser that:

(1) At the time of the original life settlement transaction between the insured and the buyer, the Insured's attending physician or other qualified third party confirmed in writing that the Insured was of sound mind and under no constraint or undue influence during the contracting process for the life insurance policies in which an Interest is being purchased.

(2) The life insurance policies in which an Interest is being purchased must be in effect and beyond their respective contestability and suicide periods.

(3) At the time Seller is provided the Life Settlement Disclosure Form, the insurance company that issued the policy must be a highly-rated, legal reserve U.S. life insurance company.

(b)      In the event that the Policy Maintenance Reserve account for a given policy is depleted, and in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser(s) of that policy to make pro rata payments on any policy in which they have an Interest to ensure the policy premium, trust fees and associated servicing fees are paid for until the policy matures and the carrier pays the death benefit. In that event the Purchaser shall be notified no less than 60 days before any policy maintenance payment becomes due.  If the Purchaser does not remit or cause to be remitted to Trustee, in immediately available funds, the required pro rata policy maintenance payments within the time frame stated in said notice to Purchaser, Purchaser shall immediately be divested of the Purchaser's Interest in said policy.

(c)      The Seller shall obtain a written release signed by all the present owners and beneficiaries under the Policy(ies), waiving any and all present and/or future rights to ownership and beneficial interests under the Policy(ies) and provide this information to the Trustee;

(d)      Seller shall obtain and provide to the Trustee the following documents:

    1.   Change of Ownership
    2.   Change of Beneficiary

(e)      In order to protect the confidentiality and privacy of insureds, their names will not be disclosed to the Purchasers. Insureds will be given a code number which will be recorded and maintained in the records of the Seller and the servicing company's databases. Any insurance company documents provided to the Purchaser will have any identifying information regarding the insured redacted and replaced with this code number.

(f)      Except as set forth in this Agreement, the Seller makes no representations or warranties of any kind, nature or description whatsoever that no representations or warranties have been made. The Seller is not liable or bound in any manner by express or implied warranties, guaranties, promises, statements or representations, not included within

Page 4                                       Purchaser's Initials: _C.B_

this Agreement, that are made or furnished by any broker, agent, employee, servant or other person purporting to represent the Seller.

### 3. DISCLOSURES TO LIFE SETTLEMENT PURCHASERS

(a)      The Seller is Reliant Life Shares, LLC, whose principal business and mailing address is 15260 Ventura Boulevard, Suite 1420, Sherman Oaks, CA 91403.

(b)      The suitability standards for prospective purchasers, set forth at California Corporations Code §25102(q)(1), are as follows:

(1)      Sales of securities described in this subdivision are made only to qualified purchasers or other persons the issuer reasonably believes, after reasonable inquiry, to be qualified purchasers. A corporation, partnership, or other organization specifically formed for the purpose of acquiring the securities offered by the issuer in reliance upon this exemption may be a qualified purchaser only if each of the equity owners of the corporation, partnership, or other organization is a qualified purchaser. Qualified purchasers include the following:

(A)      A person designated in Section 260.102.13 of Title 10 of the California Code of Regulations.

(B)      A person designated in subdivision (i) or any rule of the commissioner adopted thereunder.

(C)      A pension or profit-sharing trust of the issuer, a self-employed individual retirement plan, or an individual retirement account, if the investment decisions made on behalf of the trust, plan, or account are made solely by persons who are qualified purchasers.

(D)      An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, each with total assets in excess of five million dollars ($5,000,000) according to its most recent audited financial statements.

(E)      A natural person who is either an individual or an individual jointly with their spouse, they warrant that they are a qualified investor or (i) have a minimum net worth of one hundred fifty thousand dollars ($150,000) and have during the immediately preceding tax year, gross income in excess of one hundred thousand dollars ($100,000) and reasonably expect gross income in excess of one hundred thousand dollars ($100,000) during the current tax year or (ii) have a minimum net worth of two hundred fifty thousand dollars ($250,000).  "Net worth" shall be determined exclusive of home, home furnishings, and automobiles. Other assets included in the computation of net worth may be valued at fair market value.

Purchaser's Initials: _R.B_

Each natural person specified above, by reason of his or her business or financial experience, or the business or financial experience of his or her professional advisor, who is unaffiliated with and who is not compensated, directly or indirectly, by the Issuer of any affiliate or selling agent of the Issuer, can be reasonably assumed to have the capacity to protect his or her interests in connection with the transaction. The amount of investment of each natural person shall not exceed 10 percent of the net worth, as determined by this subdivision, of that natural person unless the investor is an accredited investor.

(F)     Any other purchaser designated as qualified by rule of the commissioner.

(c)     RELIANT LIFE SHARES is a limited liability company in the State of California.

(d)     RELIANT LIFE SHARES is in the business of facilitating the sale of interests in life settlements.

(e)     SLG Trust is the shareholder of RELIANT LIFE SHARES.

(f)     Under Section 25508.5 of the California Corporations Code, a person who purchases a life settlement contract or a fractionalized or pooled interest therein may rescind or cancel the purchase at any time before seven (7) calendar days after the date the person remits the required consideration to the issuer or the issuer's agent by giving written notice of rescission or cancellation to the issuer or the issuer's agent. No specific form is required for the rescission or cancellation. The notice is effective when personally delivered, deposited in the United States mail, or deposited with a commercial courier or delivery service. If the Purchaser rescinds or cancels the purchase, the Seller shall refund all of the Purchaser's money within seven (7) calendar days after receipt of the notice of rescission or cancellation.  No rescission or refunds are possible after seven (7) calendar days from the funding of the sale.

(g)     The life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed. The annualized rate of return would be higher if the actual life expectancy turns out to be less than the estimated life expectancy of the insured. The annualized rate of return would be lower if the actual life expectancy turns out to be more than the estimated life expectancy of the insured.

(1) Reliant Life Shares is not responsible for the accuracy of life expectancy reports.

(2) Reliant Life Shares generally does not purchase life expectancy reports, because it receives them from brokers in the life settlement market as part of an overall package when brokers try to sell policies in the secondary market.

(3) There may be other life expectancy reports outstanding on the very same insured(s) on which Reliant has purchased a policy.  These reports may have a higher or lower life expectancies than the data furnished to Reliant by the broker.

Page 6                                                        Purchaser's Initials: _L. B_

(4) As part of the due diligence process prior to the purchase of a policy, Reliant may use third party medical review experts and legal experts to investigate numerous aspects of the insureds health status and the origination of policies before purchase.

(h)  As of June 1, 2015, Reliant uses the *median* life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policies escrow reserve period. All life expectancies used for each policy are disclosed on the "Projection Sheet" published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.

(i)  The purchase of a fractional Life Settlement investment should not be considered a liquid purchase.  It is impossible to predict the exact time of the insured's death. No fixed date for the payment of the death benefit to Purchaser has been or can be determined at this time.  Once the rescission period has passed all of the Purchaser's funds are illiquid and will not be available until after the death of the insured. Purchaser acknowledges that he/she has sufficient financial resources to bear the risk associated with the purchase.

(j)  The Purchaser's annual rate of return on purchase decreases as the life of the insured continues. The Purchaser's annual rate of return on purchase may be further adversely affected by, without limitation, (i) the financial stability of the insurance companies issuing the Policies, or (ii) the payment limitations in effect from time to time set by the State Guarantee Funds of the states where the Policies were issued.

(k)  Each Purchaser should consult with his or her own tax advisor regarding the tax consequences of the purchase of a life settlement interest. If the Purchaser is using retirement funds or qualified tax deferred accounts for the purchase, they should ask his or her tax advisor whether or not any adverse tax consequences might result from the use of those funds for this purchase.

(l)  Purchasers should be aware that some types of group life insurance policies may contain limitations or caps in the amount of coverage that may be converted. Also, the conversion of a group policy to an individual policy may result in additional premium payments.

(m)  The Trustee is responsible for making the premium payments as outlined in Section 2(b) of this Agreement. The current Trustee is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(n)  A Life Settlement Disclosure Form containing specific information regarding the insurance policy(ies) in which the Purchaser may obtain an interest will be provided to the Purchaser at least five (5) business days prior to the closing of any purchase. The commitment to purchase an interest in the death benefits of a specific policy shall not be final until the Purchaser has received this

Purchaser's Initials: *LB*

information and been given the opportunity to advise the Seller if he/she wishes to decline the purchase.

(o)      There are certain post-closing servicing activities that must be undertaken, but are not performed by Seller. These servicing activities include but are not limited to maintaining contact with the insured, tracking the health status of the insured, monitoring the status of disability claims by insured, converting group policies to individual plans of insurance, obtaining required documents needed for filing a claim and filing claims for benefits with the insurance companies. To perform the above-described activities, the Seller has contracted Asset Servicing Group ITS.  Asset Servicing Group ITS is a leading policy servicing company and their responsibilities include all investor support related to policy maintenance and premium payments.

(p)      Selling expenses and commission may be paid by Reliant Life Shares LLC licensed sales agents.  All distributions costs are factored into the purchase of each policy and therefore 100% of each investors funds will be deposited and allocated toward the policies/trusts they select.

### 4. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that:

(a)      Purchaser is a resident of the State of California and the address and other information set forth herein are true and correct.

(b)      The Interest(s) is/are being acquired solely for the Purchaser's own account and not with a view to or for sale in connection with the distribution of the security.

(c)      Other than the Seller's agent, Purchaser has not dealt with any broker or finder in connection with the transaction set forth in this Agreement.

(d)      He/she is sophisticated in financial matters or has access to professional advice, has adequate means for providing for current financial needs and possible personal contingencies, is capable of evaluating the merits and risks of obtaining an Interest and also acknowledges that, once the transaction closes, the funds committed are not liquid and will not be available until the policy matures.

(e)      The Purchaser has been furnished with such information by the Seller as Purchaser requires and has requested regarding the Interest and has had any questions arising from such review answered by the Seller to Purchaser's satisfaction. Purchaser acknowledges, however, that Purchaser has not and will not be furnished with any information regarding the identity of the Insured(s) and purchases this Interest(s) with the expectation that the identity of the Insured will not be known. Purchaser has full legal capacity to enter into this Agreement.

(f)      Purchaser acknowledges that the Seller is willing to provide additional information regarding this transaction and the business of the Seller beyond that contained in any documentation previously provided. The Purchaser also acknowledges that he/she has also had the opportunity to evaluate the merits and risks of this transaction.

Page 8                                                    Purchaser's Initials: _LB_

(g)    Purchaser acknowledges that he/she understands the meaning and legal consequences of the above representations and warranties and that the Seller has relied on these representations and warranties in entering into this Agreement. Purchaser agrees to indemnify and hold harmless the Seller and its principals, agents, and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by Purchaser.

(h)    Purchaser authorizes the Seller to enter into any agreements or contracts which may be necessary in order to effectuate the purchase of Interests on behalf of the Purchaser.

(i)    Purchaser represents that he/she has completed a Suitability Questionnaire and that he/she understands that Seller will rely upon the representations made in that Suitability Questionnaire for the purpose of determining if the Purchaser is qualified.

(j)    Purchaser acknowledges that life expectancy reports are estimates and hereby expressly waives any action, agrees not to sue, and agrees to hold harmless the Seller and its principals, agents, and employees from any damage based on an insured living past the life expectancy date.

(k)    Purchaser acknowledges that the Life Agent conducting this transaction is an independent contractor with no authority to contractually bind Reliant Life Shares, LLC.  Any errors or omissions made by agent are the sole legal responsibility of the agent.

(l)    Purchaser acknowledges that Reliant utilizes the services of outside vendors who provide specific services which are necessary to ensure the safety, security and to ensure that in the event Reliant is unwilling or unable to perform any key activity,  that the appropriate vendors are in place to perform all necessary functions to maintain the investment operations . These vendors include, trustee and escrow agents, policy servicers, and outside actuaries who compute policy premiums and project future cash flows. To offset these policy expenses the servicer will charge one hundred and fifty dollar per client per year which will be billed only once a policy extends past the Policy Maintenance Reserve Period.

(m)    Purchaser acknowledges and understands that fractional life settlement investments are illiquid investments and therefore any client holding the investment in a self-directed IRA account should consider future required minimum distributions when considering the purchase of this investment.

## 5. MISCELLANEOUS.

(a)    **Entire Agreement.**  This Agreement constitutes the entire agreement between the Seller and Purchaser. No change, modification, termination or amendment of this Agreement shall be valid unless it is in writing and signed by both the Seller and Purchaser.

(b)    **Section Headings.** The section headings contained in this Agreement are for reference only and shall not in any way affect the meaning or interpretation of this Agreement.

Page 9                                        Purchaser's Initials: _C.B._

(c)     **Gender**. Pronouns shall be deemed to include masculine, feminine and neuter genders and singular or plural numbers as appropriate.

(d)     **Venue for Disputes.**    <u>Arbitration</u>.  Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration administered by Judicial Arbitration and Mediation Services ("JAMS") in its Los Angeles County office.  Each of the Parties reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the Investor may be entitled may be rendered ineffectual in the absence of such relief.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The award of the arbitrator shall be binding, final, and non-appealable.  The Parties may obtain discovery in aid of the arbitration to the fullest extent permitted under law, including California Code of Civil Procedure Section 1283.05.  All discovery disputes shall be resolved by the arbitrator.  The costs of the arbitration, including any JAMS administration fee, and arbitrator's fee, and costs of the use of facilities during the hearings, shall be borne equally by the Parties.  Reasonable attorney's fees and costs shall be awarded to the prevailing party.

(e)     **No Third Party Benefited**. This Agreement is solely for the benefit of the parties hereto, and no other person or entity shall have any right, benefit, priority or interest under this Agreement, or because of the existence of this Agreement.

(f)     **Notices**. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered, certified, or electronic mail, or recognized overnight delivery service to the parties at their respective addresses set forth below or to such other address as either party may designate by notice given in accordance with this Agreement.

<u>Seller</u>

Reliant Life Shares, LLC
15260 Ventura Blvd., Suite 1420
Sherman Oaks, CA  91403

<u>Purchaser:</u>  Purchaser agrees to receive all correspondence via electronic mail.  Otherwise, Check this box and insert the info below.

☐

Concepcion Baeza
5238 Live Oak View Ave
Los Angeles, CA 90041

(g)     **Non Waiver**. No failure on the Seller's part to exercise, and no delay in exercising, any right, power or remedy under this Agreement or under applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further

Page 10

Purchaser's Initials: _C.B._

exercise thereof or the exercise of any other right. All of Purchaser's rights and remedies under this Agreement or arising under applicable law are separate and cumulative and may be pursued separately, successively or concurrently, or not pursued, without affecting or limiting any other right of Purchaser.

(h)    **Invalidity and Severability.** If any provisions of this Agreement are held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, and to that extent, the provisions of this Agreement are intended to be and shall be deemed severable.

(i)    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the heirs, legal and personal representatives, successors, and assignees of the Purchaser.

**WARNING: THE RETURN ON INVESTMENT FOR FRACTIONAL LIFE SETTLEMENTS IS HIGHLY DEPENDENT ON THE LONGEVITY OF THE INSURED. A POLICY TAKING LONGER TO MATURE, ALONG WITH ANY ADDITIONAL PREMIUMS WHICH MUST BE PAID, WILL RESULT IN LOWER TOTAL ANNUAL RETURNS.  LIFE EXPECTANCIES ARE MERELY ESTIMATES; NO ONE KNOWS WHEN AN INSURED INDIVIDUAL WILL PASS.  IF THE INSURED LIVES LONGER THAN THE PREMIUM RESERVE PERIOD STATED IN THE CONTRACT, ALL INVESTORS MUST MAKE A "PRO RATA" PREMIUM PAYMENT.  FAILURE TO DO SO WILL CAUSE AN INVESTOR'S BENEFICAL INTEREST TO BE FORFEITED. FOR MORE INFORMATION ON THE RISKS ASSOCIATED WITH THIS PRODUCT PLEASE SEE THE "RISK ADDENDUM" ATTACHED HERETO.**

Purchaser's Initials: _LB_

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**RELIANT LIFE SHARES, LLC**

By: _Sean L. Gerd_

Date: _4/7/2020_

**LIFE SETTLEMENT PURCHASER(S)**

_____
Signature

_Concepcion Baeza_
Signature

Provident Trust Group FBO Concepcion Baeza IRA# 200200120
Printed Name

**Concepcion Baeza**
Printed Name

_____
Social Security or Tax ID#

_571- 85- 8142_
Social Security or Tax ID#

8880 W. Sunset Road, Ste. 250
Address

5238 Live Oak View Ave
Address

Las Vegas, NV 89148
City, State, Zip

Los Angeles, CA 90041
City, State, Zip

702-522-2155
Telephone Number

(323) 972-6827
Telephone number

Page 12

Purchaser's Initials: _C.B_

Exhibit 1000, p. 12

**RELIANT LIFE SHARES, LLC**

**RISK DISCLOSURE**

**WARNING: Do not sign this Agreement unless you wish to be legally bound. This Agreement is subject to the laws of California and the United States. You are urged to read the entirety of this document. If you are in any doubt regarding the contents of this document and what action you should take, seek your own independent legal advice.**

Potential purchasers of Fractional Life Settlements should understand the risks related to the transaction.  All purchases possess the combined elements of risks and rewards.

Life Settlements can deliver an attractive rate of return but are not without a degree of risk.  The risks are described by category.  Some of the risks described in this section are very remote and some are more likely.  This list of risks is not necessarily comprehensive but in the interest of completeness, even risks which are relatively rare are listed.  Not every policy will carry every possible risk since Reliant offers different types of policies.  We try to provide as much information about the risks as possible but additional risks not contained in this Risk Disclosure may exist.

To aid in the explanation, the most frequently offered type of policy, Universal Life Insurance, is the example used in the following paragraphs. Universal Life policies make up 99% of the policies sold and in the event Reliant chooses to sell a policy that is not a UL policy any additional risks associated will be outlined in the policy disclosure package for that specific policy.

**Liquidity Risk**:  A Life Settlement is the purchase of all of or a portion of the death benefit of a life insurance policy.  In order for the death benefit to be paid, a demise (or death) of the insured must occur.  Until then, the original amount paid and the gain or profit to be earned is not available.  This is known as being illiquid.  It means Reliant cannot and will not refund Investor's money no matter how much Investor may need it.  Therefore, an Investor must not use any funds, which Investor may possibly need during the life expectancy of the insured and for some period afterward.  It must be stressed that the death benefit amount received upon maturity of the policy is a known certain amount but it will occur at an uncertain time, almost always earlier or later than the projected life expectancy.  The investors' financial objective should be long term capital appreciation and capital preservation. Fractional Life Settlements should not be purchased for speculation or for trading such as stocks or mutual funds. As of this writing, there is no organized secondary market trading in these positions, therefore investors need to consider the purchase of fractional life settlements as a buy and hold investment.

Purchaser's Initials: *C.B*

**Longevity Risk**: Longevity Risk is typically defined as the insured outliving the life expectancy estimate.

All policies are purchased using a deterministic model based upon a medical and actuarial life expectancy developed by an independent third party medical laboratory specializing in such forecasts. To help reduce the concentration of risk associated with the specific laboratories used, Reliant uses multiple life expectancy estimates from different life expectancy providers. Since California does not currently license life expectancy underwriters, Reliant wants to ensure that it only uses the most qualified laboratories available. Consequently, Reliant only uses life expectancy providers approved and licensed to do business in Texas or Florida - two large states that regulate life expectancy providers. If California were to license life expectancy underwriters, Reliant would then look to such licensed providers in California.

As of June 1, 2015, Reliant chooses to use the median life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policy maintenance reserve period. This is a critical issue and ensures a fair period of time is being used to determine the amount of funds to set aside to pay for the premiums, trust and escrow fees as well as the servicing fees on the policy before an investor needs to begin paying these fees out of pocket. By using three different estimates, Reliant also reduces any concentration of risk associated with using only one life expectancy provider's methodology. All life expectancies used for each policy are disclosed on the projection sheet published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.  It is because of this uncertainty and the aforementioned lack of liquidity that life settlements pay much higher returns than that of government bonds and other investment grade investments.

The effect of an insured living beyond life expectancy is a lowering of the annual rate of return and could possibly require an investor to pay additional policy maintenance payments to keep the policy in force. Take for example, a policy with a three-year life expectancy paying a total fixed return of 36%. Its annualized return would pay 12% simple interest per year if the policy matured as expected. However, if the insured lived 4 years instead of 3 years, the fixed total return would still be 36% but the simple annual return would be 9% instead of 12%. If payment of additional policy maintenance payments is necessary on a pro-rata basis, the return is further reduced. In simple terms, the longer an insured lives, the lower the annual return. A further element of this Longevity Risk is associated with the expiration of the policy coverage. Universal Life Policies typically have an expiration age at which time the policy may only pay out the cash value which may exist in the policy. Each Universal Life Policy is different but the most common age of expiration is 100 years old.  This may be mitigated if the policy has a rider which extends this age.

Any projected rate of return to the investor from the purchase of a fractionalized interest in a life settlement is based on an estimated life expectancy for the person insured under the life insurance

Page 14                                         Purchaser's Initials: _L B_

policy. The return on the purchase may vary substantially from the expected rate of return based on the actual life expectancy of the insured that may be less than, equal to or may greatly exceed the estimated life expectancy. *The rate of return will likely be higher if the actual life expectancy was less than, and lower if the actual life expectancy was greater than, the estimated life expectancy of the insured at the time the life settlement transaction closed.*

**Policy Maintenance/Premium Reserve Risk**: Upon purchase of a policy from a seller, Reliant establishes an escrow reserve account for the payment of premiums, trust fees and servicing fees for a specific period of time. Once the time period is determined, Reliant utilizes the services of an independent firm who specializes in premium estimation, Cost of Insurance estimates and insurance policy construction, to determine the exact dollar amount necessary to be funded into the Policies Maintenance Reserve Account in order to pay for the policy and expenses through the given period of time. These services are provided by an actuarial firm who is a specialist in this field with a track record of service. Once a policy's escrow period has passed or the policy reserve funds are exhausted, it is the Investor's responsibility to pay additional payments based upon the percentage of the policy the Investor owns. Although this outside firm specializes in providing this type of service there is the risk that its estimates are wrong. This account is funded as Investors purchase fractional interests in each policy.  If an adequate amount of certificates are not sold there is the risk that the policy reserve account will not be sufficient to fund the policy premiums during the Policy's Reserve Period. Typically this policy reserve period provides for the payment of premiums for each year of life expectancy but, at times, Reliant may choose to provide a policy reserve which is longer than the life expectancy, therefore the exact policy reserve period for each policy is disclosed in the Contract and Policy Disclosure Package.

**Premium Call Risk: (Applicable only if the insured lives past the Policy's Reserve Period)** Once the Policy's Reserve Period has ended and, if, the insured is still alive, it is the responsibility of each Investor to pay for their pro rata portion of the expenses to keep the policy and Trust in force along with ensuring the third party servicing company is paid.  Reliant, through our servicing partner Asset Servicing Group ITS, will send to the Investors in each policy a Policy Maintenance Invoice, which details all expenses due.  An early warning notice (usually some months in advance), and then an invoice for each Investor's share of the premiums, trust fees and policy servicing costs attributable to the purchasers pro-rata portion of the policies they own after the original Policy Reserve Escrow funds are depleted.  The Investor must pay this Policy Maintenance Invoice.  It is part of the agreement.  *If the Investor does not pay the Policy Maintenance Invoice, the Investor will forfeit their beneficial interest in the policy in order to protect other Investors in the policy.*

**Insurance Policy Construction and Performance**:  When a Policy's maintenance reserve escrow amount is established by Reliant's outside vendor who specializes in such service, they take many factors into consideration. If cost of insurance charges increase there is no guarantee that the Policy Maintenance Reserve that is established is sufficient to fund the policy through the Policy's Reserve Period. Mortality charges increase dramatically with age.  Each policy and each life insurance company charge differently. In the analysis of each policy, Reliant commonly obtains an in-force illustration produced by the life insurance company. Premiums on life insurance policies vary in many ways. A Universal Life Insurance policy typically has a flexible premium payment and can accumulate cash values within the policy. In

Purchaser's Initials: *L.B.*

some policies this cash value may be used to offset future premiums. Other times the policy Surrender Charge may be higher than the cash value, rendering any cash value useless. The cash values in a policy also may differ from policy to policy. The life insurance company may have enjoyed a profitable year and the interest rate provided on the cash value of the policy may exceed the guaranteed rate thus amplifying the account value. The life insurance company may be a mutual company and have declared a dividend to policyholders. Mortality changes may increase or decrease based upon loss experience. All of these events can affect the policy performance.

Year-by-year projections are impacted by several key assumptions:

A.     The current account value.

B.     The charges against this account for mortality and other expenses.

C.     The interest earnings credited based upon the earnings from the invested account value and the premiums paid.

D.     The premiums necessary to keep the policy in force for every year remaining in the policy life.

These assumptions can change on a year by year basis, and are only valid if the premiums are paid as illustrated.

**Policy Seller Rescission Risk**:  The insured who sold their policy is afforded a 'rescission period' to change their mind and keep the policy.  This period varies from state to state.  However, this risk is mitigated by the fact that the rescission period has expired on ALL policies Reliant sells to investors.

**Taxation Risk**:  The purchase and resale of life insurance policy is a Transfer for Value.  Reliant recognizes this and pays taxes on profits, which it earns by arranging such transactions. Neither Reliant nor its employees, independent contractors or sales representatives are authorized to give tax advice.

The investor should consult with their own tax advisor regarding (i) the tax consequences of the purchase of the fractionalized interest in a life settlement and (ii) if the investor is using retirement funds or accounts for such purchase, whether or not any adverse tax consequences might result from the use of those funds for the purchase of the certificates.

**Insurable Interest Risk**: A life insurance carrier can rescind a policy for lack of insurable interest until the claim is paid.  Insurable Interest is a fundamental element unique to a life insurance contract. This means the person acquiring the contract (the applicant or the original beneficiary) must be subject to loss upon the death of the person being insured.  This interest must exist at the inception of the policy. It does not have to continue and that is the basis for the life settlement industry. Though laws differ slightly from state to state, in general the following types of relationships automatically carry insurable interest:

-An individual has as insurable interest in his or her own life.

-A husband or wife has an insurable interest in a spouse.

Page 16                                          Purchaser's Initials: _C.B_

-A parent has an insurable interest in his or her child.

-A business has an insurable interest in the lives of its officers, directors and other key employees.

-Business partners have an insurable interest in each other.

-A creditor has an insurable interest in the life of a debtor but only to the extent of the debt.

In 2002, life insurance policies began to be sold to wealthy individuals for the purposes of estate planning using non-recourse premium finance contracts. Estate planning is a United States death tax strategy, which has a definite insurable interest on the part of the insured. However, some of these contracts were issued to individuals who entered into them solely for the purpose of resale. When this happens, it changes the life insurance policy from a contract at risk to a purchase contract. This violates the principal of insurable interest. The life insurance company may choose to contest the death benefit of such contracts and if it prevails, is only obligated to return the premiums paid during the life of the contract. This would have the effect of dramatically lowering the Investor's overall return and a probable loss of all or part of the Investor's principal. While Reliant's underwriting procedures are extremely thorough, it may not identify a policy such as this and a life insurance company may uncover such a policy and may choose to contest it. If such an event took place, Reliant would seek a refund of all premiums paid and the purchase price paid to the seller.

**Contestability Risk**: Every life insurance policy has a contestability period. This is typically 24 months after the issue date. During this period, the life insurance company has the right to cancel the policy and return any premiums paid. This is often known as a "suicide clause" although the company can cancel the policy if it suspects malfeasance in the application or for other reasons. As a business practice, Reliant does not purchase or arrange the purchase of polices while they are in the contestable period The effect of a cancellation during contestability is the extinguishments of the death benefit obligation on the part of the insurance company and the loss of the purchased policy.

**Insurance Company Insolvency Risk**: On occasion in the United States, a life insurance company becomes insolvent. If it were to do so and there was no regulatory intervention, the company would be unable to pay its death benefit obligations. There exists a framework of regulatory measurements and controls, reinsurance, resale options as well as special funds employed by the State Insurance Commissioners to significantly reduce this possibility. A. M. Best Company is the premier insurance rating company. It publishes financial strength ratings for all life, health and casualty insurance companies. Reliant will purchase or arrange the purchase only of policies issued by life insurance companies with ratings of B+ or above.

**Regulatory Risk (US)**: The majority of the states in the US regulate the life settlement industry on a state-by-state basis. Many of these regulations mirror or closely follow the NAIC Model Viatical Settlements Act. The life insurance companies have been active in attempting to promote changes in the law which would make life settlements less attractive or even illegal. The life settlement industry association LISA (Life Insurance Settlement Association) has been robustly and successfully combating these attempts. The fundamental argument offered by LISA is that a policy holder has a constitutional

Page 17                                                                 Purchaser's Initials: *L.B.*

right to dispose of their assets as they see fit; be that a home, an automobile, a stock portfolio or a life insurance policy.   So far, lawmakers have agreed with this position and all attempts have been struck down in both the legislatures and in the courts.  There is no guarantee however that this will remain the case and laws or regulations may be enacted which adversely affect the continuance of the industry or the profitability of the transaction.  The impact of these changes is impossible to speculate upon but it is very unlikely that they would be applied retroactively.

In addition, the life settlement industry had been the subject of investigations by various state and Federal governmental entities.  In 2010, the Life Settlements Task Force of the Securities and Exchange Commission issued a staff report discussing life settlements, practices in the life settlements market, regulation of the life settlements market and related recommendations.  Such recommendations included (i) recommending to Congress that the definition of 'security' under Federal securities laws include life settlements, (ii) continue monitoring that legal standards are being met by brokers and providers, (iii) monitor the development of a life settlement securitization market, (iv) encourage Congress and state legislators to consider more significant and consistent regulation of life expectancy underwriters and (v) consider issuing an investor bulletin regarding investments in life settlements.

Likely as a result of this increased industry scrutiny, the Securities and Exchange Commission recently brought a case against Pacific West Capital Group and others in U.S. District Court in the Central District of California.  In this case, the Securities and Exchange Commission alleges, among other things, that (i) the issuer issued securities with the proceeds used to pay returns to original investors (i.e. a Ponzi scheme), (ii) the issuer misrepresented annual returns and stressed that returns had no relation to the issuer, (iii) the securities were not issued through broker-dealers, (iv) actuarial-based estimates were not given to investors, (v) the trust agreement was not provided to investors, (vi) reserve funding mechanics were not adequately explained to investors, (vii) policies were purchased even if not sufficiently funded, (viii) the increase in premiums for the policies were not adequately disclosed to investors, and (ix) the securities were not registered.  These allegations do not relate to Reliant and the certificates; the broker-dealer and registration issues are dealt with under the captions 'Securities Risk (CA)' and 'Securities Risk (US)' below.

**Regulatory Risk (CA):** Reliant operates under California Corporations Code Section 25102(q) established to regulate the fractionalized life settlement Industry in California.  This statute and related regulations may change without notice and at any time preventing Reliant from operating as currently structured.

**Securities Risk (CA):**  Fractional Life Settlements are a security under California law but are exempt from registration under California law if offered through a life agent licensed in California subject to numerous requirements including, among other things, that they only be sold to qualified purchasers as defined under the California Corporations Code. Reliant relies on this state securities exemption to market this security in California.

**Securities Risk (US):**  Under Federal law, it is not fully settled law whether Fractional Life Settlements, each backed by a single policy, are securities.

Page 18

Purchaser's Initials: _L.B._

If considered to be securities under Federal law, Reliant would be able to look to several exemptions from registration including: (i) intrastate exemption under Rule 147 of the Securities Act of 1933, as amended (the "Securities Act") where all of the certificates are sold to persons resident within a single state (in our instance, California) and where the issuer is a person resident and doing business within such state, (ii) limited offering exemption under Rule 505 of the Securities Act for sales of securities not exceeding $5 million which limits sales to thirty-five (35) non-accredited investors and (iii) Rule 506 of the Securities Act for sales of securities to accredited investors. The Securities Act defines 'issuer' as either the depositor or manager pursuant to the trust agreement and, it is Reliant's belief, that it is the issuer as depositor and manager of the program under the trust agreement. However, the Securities and Exchange Commission and the courts could determine that the trustee is the sole issuer for purposes of Rule 147. In such an event, the Investors could not rely on the Rule 147 exemption since the Trustee's principal place of business is not in California.

As a result, our offerings have not been and, absent a change in Federal law or interpretation of Federal law, will not be registered under the Securities Act or any foreign securities law.

It should be noted that even if either the exemptions under Rule 505 or Rule 506 of the Securities Act are met, the broker arranging the Fractionalized Life Settlements must be registered broker-dealers; life agents licensed in California relate only to California securities law and not Federal securities law (*see* 'Securities Risk (CA)' above.

**Insolvency Risk:** The possibility exists that Reliant Life Shares, LLC, could become insolvent. While Reliant considers that we enjoy a prosperous and growing position in our industry, we, like all businesses are exposed to events which may be beyond our control and which could alter our destiny. We take comfort in the fact that our business practices employ the concept of naming an independent trust established on the Investor's behalf as the direct beneficiary of the death benefit purchased. This means that the obligation to pay rests solely on the life insurance company and the independent trustee and not on Reliant. Further, the policy maintenance reserves established for the payment of the premiums and other expenses are held in an escrow account under the control of a third-party Trustee. Reliant pays certain maintenance, servicing costs and Trust fees that would have to be paid by investors in the case of insolvency. The likely impact of Reliant's insolvency will be a degree of confusion as to communication with the Investor and the possible substitution of another issuer to replace Reliant and, if no replacement is quickly found, the possible resignation of the current Trustee. Certain contingency plans are in place to minimize this confusion. The Trustee of the Trust enjoys a wide degree of latitude to address this situation and has access to each policy's reserve account to pay the costs associated with maintaining and servicing the policy until the policy maintenance reserves are exhausted and at that point moving forward the investor understands they are responsible for the policy maintenance expenses including servicing costs and trust fees which will be invoiced from the servicer. In the event the policy maintenance reserve period has elapsed, then Investors have the duty to pay their Policy Maintenance Invoices from which the Trustee will pay the continued operational expenses. Should these expenses increase, investors may pay up to three hundred dollars per policy per year for additional servicing responsibilities by the servicer. These expenses will be part of the Policy Maintenance invoices once the policy maintenance reserve is exhausted.

**Line of Business or Acquisition Risk:** For a number of reasons, Reliant may discontinue a product offering, a line of business or its shares, its assets or the business itself may be sold. While this would not

Purchaser's Initials: _ℓ.B._

affect the Investor's purchase per se, it would force the Investor to deal with an unknown third-party entity for its management of the policies.

**Summary: Reliant has attempted to list the main risks associated with our product.  It is difficult to predict future scenarios not contained herein.  However, if a material change occurs, Reliant shall attempt to assess its impact (if any) on the Investor's position.  If there is such an impact or if there is any doubt, Reliant will send an update of this Risk Disclosure to the Investor.**

Purchaser's Initials: *L.B.*



# Reliant Life Shares, LLC

### FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT

THIS FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT ("Agreement") is made this __2nd__ day of __October__, 2020, by and between Reliant Life Shares, LLC ("RELIANT LIFE SHARES" or the "Seller"), and __Provident Trust Group FBO Concepcion Baeza IRA# 200200120__ (the "Purchaser"). This Agreement covers the purchase of one or more interests in the death benefits of a life insurance policy insuring the life of an individual, or life settlement interests ("Interests").

**WHEREAS,** the Purchaser has reviewed and approves and adopts the criteria utilized by the Seller to purchase said Interests; and

**WHEREAS,** the Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with the Seller, and the Purchaser expressly waives any and all claims to the contrary; and

**NOW THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, each party hereby represents that it or its representatives has/have the requisite authority to enter into this Agreement and hereby agree as follows:

### 1. THE PURCHASE

(a)     The Purchaser hereby agrees to deposit the sum of:

$ __17,184.45__ to acquire an Interest in Policy #:__7396208 & 73689651__. Total Fixed Return: __76%__

$ __17,184.46__ to acquire an Interest in Policy #:__B00815053__. Total Fixed Return: __111%__

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

Page 1                                                           Purchaser's Initials: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

(b)    The Purchaser's deposit will be made simultaneous with the delivery of this executed Agreement to Seller, by delivering a check, or effecting a wire transfer, made payable to Seller's Escrow Agent, UMB – *Reliant Life Shares Subscription Escrow Account*. The Purchaser's deposit does not constitute a purchase or a commitment to purchase until five (5) business days after the Purchaser has received all of the disclosures required by California law.

(c)    Upon Seller's receipt of the executed Life Settlement Disclosure Form, but in no event sooner than five (5) days after Purchaser's receipt of the Life Settlement Disclosure Form, the Seller will obtain confirmation of the recording of a change of ownership of such Policy to Reliant Life Shares Series Statutory Trust ("RELIANT LIFE SHARES") and a confirmation of irrevocable beneficiary. In the case of a Group Policy, the Seller will obtain a confirmation of the recording of an absolute assignment of such Group Policy to the Reliant Life Shares Series Statutory Trust and a confirmation of the recording of a change of beneficiary under such Policy naming as beneficiary the Reliant Life Shares Series Statutory Trust. To the extent that the Seller does not at the date of this Agreement have available such policies, the Seller shall use its reasonable efforts to obtain a suitable policy(ies) as soon as practicable after the date of this Agreement.

(d)    Upon the maturity of the life insurance policy (ies) in which Purchaser has purchased a life settlement interest, the trustee (UMB Bank) shall file or cause to be filed a claim for the death benefits with the appropriate insurance company. When the Reliant Life Shares Series Statutory Trust receives payment of such claim, UMB Bank will pay the Purchaser directly it's pro rata share of the death benefits.

(1)    In the event of Purchaser's death before policy maturity, Purchaser designates (Please List: Name, Address and Phone)
Designated By the IRA
_____

_____

as Contingent beneficiary. In the case that both Purchaser and Contingent Beneficiary die in the same accident, Contingent Beneficiary will be deemed to have died first and Purchaser therefore designates (Please List: Name, Address and Phone)

_____

_____

as Tertiary Beneficiary

Purchaser's Initials: _____

Exhibit 1001, p. 2

(e)      The owner of the life insurance policy in which Purchaser will obtain an interest will be a trust. The current trust is Reliant Life Shares Series Statutory Trust. The current Trustee of the Reliant Life Shares Series Statutory Trust is UMB Bank. The Trustee's sole responsibilities are to maintain accounts for the purpose of making the premium payments as more fully described in Section 2(b) of this Purchase Agreement, to be the beneficiary for the death benefits of the life insurance policy in which Purchaser obtains an Interest, and to disburse the death benefits in accordance with the assignments of benefits relating to that policy. Reliant Life Shares has contracted with UMB Bank to perform certain post-closing services as the Trustee, as more fully set forth in Paragraph 3(o) herein.

(f)      The Seller's Escrow Agent is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(g)      The responsibilities of the Escrow Agent are:

1.  To hold the funds forwarded by the Purchaser pursuant to this Agreement;
2.  To hold the documents received from the Seller of a policy when required;
3.  To receive and review written confirmation that the insurance company has accepted, recognized and,/or noted on its books and records the transfer of the policy ownership and the change of beneficiary(ies);
4.  To make disbursements at the direction of the Trustee.

(h)      The Escrow Agent is not representing the Purchaser in this transaction and has no responsibility to the Purchaser with regard to this transaction other than to hold the funds in escrow in accordance with Section 1(g).

(i)      Purchaser recognizes that the Trustee and Escrow Agent shall not incur any liability the Seller or to Purchaser for any damages, losses or expenses which either party may sustain or incur, unless the same is a direct result of the gross negligence or intentional misconduct of Trustee or Escrow Agent. Trustee and Escrow Agent shall be protected in any action taken or omitted in good faith with respect to their duties and responsibilities. Trustee and Escrow Agent shall be entitled to rely on any document(s) which Trustee and Escrow Agent reasonably believe satisfy the terms and conditions of the escrow. The Seller and Purchaser each hereby agree to indemnify and hold harmless Trustee and Escrow Agent from and against all losses, except those caused by gross negligence or intentional misconduct, claims, damages, liabilities and expenses which it may sustain or incur hereunder, including, without limitation, reasonable attorney's fees, which may be imposed upon Trustee or Escrow Agent or incurred by Trustee and Escrow Agent in connection with the performance of their duties.

(j)      Seller may from time to time make available for purchase an Interest in a "second to die" life insurance policy. These policies typically insure the life of a husband and wife, and do not pay off until both insured's have died. In the event a second to die policy is offered for investment it will be disclosed that the policy is a second to die policy.

Page 3

Purchaser's Initials: _____

## 2. THE SELLER'S OBLIGATIONS TO THE PURCHASER

(a)    The Seller represents and warrants to the Purchaser that:

(1) At the time of the original life settlement transaction between the insured and the buyer, the Insured's attending physician or other qualified third party confirmed in writing that the Insured was of sound mind and under no constraint or undue influence during the contracting process for the life insurance policies in which an Interest is being purchased.

(2) The life insurance policies in which an Interest is being purchased must be in effect and beyond their respective contestability and suicide periods.

(3) At the time Seller is provided the Life Settlement Disclosure Form, the insurance company that issued the policy must be a highly-rated, legal reserve U.S. life insurance company.

(b)    In the event that the Policy Maintenance Reserve account for a given policy is depleted, and in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser(s) of that policy to make pro rata payments on any policy in which they have an Interest to ensure the policy premium, trust fees and associated servicing fees are paid for until the policy matures and the carrier pays the death benefit. In that event the Purchaser shall be notified no less than 60 days before any policy maintenance payment becomes due.  If the Purchaser does not remit or cause to be remitted to Trustee, in immediately available funds, the required pro rata policy maintenance payments within the time frame stated in said notice to Purchaser, Purchaser shall immediately be divested of the Purchaser's Interest in said policy.

(c)    The Seller shall obtain a written release signed by all the present owners and beneficiaries under the Policy(ies), waiving any and all present and/or future rights to ownership and beneficial interests under the Policy(ies) and provide this information to the Trustee;

(d)    Seller shall obtain and provide to the Trustee the following documents:

1.    Change of Ownership
2.    Change of Beneficiary

(e)    In order to protect the confidentiality and privacy of insureds, their names will not be disclosed to the Purchasers. Insureds will be given a code number which will be recorded and maintained in the records of the Seller and the servicing company's databases. Any insurance company documents provided to the Purchaser will have any identifying information regarding the insured redacted and replaced with this code number.

(f)    Except as set forth in this Agreement, the Seller makes no representations or warranties of any kind, nature or description whatsoever and Purchaser expressly acknowledges that no representations or warranties have been made. The Seller is not liable or bound in any manner by express or implied warranties, guaranties, promises, statements or representations, not included within

Purchaser's Initials: _____



Exhibit 1001, p. 4

this Agreement, that are made or furnished by any broker, agent, employee, servant or other person purporting to represent the Seller.

### 3. DISCLOSURES TO LIFE SETTLEMENT PURCHASERS

(a)    The Seller is Reliant Life Shares, LLC, whose principal business and mailing address is 15260 Ventura Boulevard, Suite 1420, Sherman Oaks, CA 91403.

(b)    The suitability standards for prospective purchasers, set forth at California Corporations Code §25102(q)(1), are as follows:

(1)    Sales of securities described in this subdivision are made only to qualified purchasers or other persons the issuer reasonably believes, after reasonable inquiry, to be qualified purchasers. A corporation, partnership, or other organization specifically formed for the purpose of acquiring the securities offered by the issuer in reliance upon this exemption may be a qualified purchaser only if each of the equity owners of the corporation, partnership, or other organization is a qualified purchaser. Qualified purchasers include the following:

(A)    A person designated in Section 260.102.13 of Title 10 of the California Code of Regulations.

(B)    A person designated in subdivision (i) or any rule of the commissioner adopted thereunder.

(C)    A pension or profit-sharing trust of the issuer, a self-employed individual retirement plan, or an individual retirement account, if the investment decisions made on behalf of the trust, plan, or account are made solely by persons who are qualified purchasers.

(D)    An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, each with total assets in excess of five million dollars ($5,000,000) according to its most recent audited financial statements.

(E)    A natural person who is either an individual or an individual jointly with their spouse, they warrant that they are a qualified investor or (i) have a minimum net worth of one hundred fifty thousand dollars ($150,000) and have during the immediately preceding tax year, gross income in excess of one hundred thousand dollars ($100,000) and reasonably expect gross income in excess of one hundred thousand dollars ($100,000) during the current tax year or (ii) have a minimum net worth of two hundred fifty thousand dollars ($250,000).  "Net worth" shall be determined exclusive of home, home furnishings, and automobiles. Other assets included in the computation of net worth may be valued at fair market value.

Page 5                                                      Purchaser's Initials: _____

Each natural person specified above, by reason of his or her business or financial experience, or the business or financial experience of his or her professional advisor, who is unaffiliated with and who is not compensated, directly or indirectly, by the Issuer of any affiliate or selling agent of the Issuer, can be reasonably assumed to have the capacity to protect his or her interests in connection with the transaction. The amount of investment of each natural person shall not exceed 10 percent of the net worth, as determined by this subdivision, of that natural person unless the investor is an accredited investor.

(F)     Any other purchaser designated as qualified by rule of the commissioner.

(c)     RELIANT LIFE SHARES is a limited liability company in the State of California.

(d)     RELIANT LIFE SHARES is in the business of facilitating the sale of interests in life settlements.

(e)     SLG Trust is the shareholder of RELIANT LIFE SHARES.

(f)     Under Section 25508.5 of the California Corporations Code, a person who purchases a life settlement contract or a fractionalized or pooled interest therein may rescind or cancel the purchase at any time before seven (7) calendar days after the date the person remits the required consideration to the issuer or the issuer's agent by giving written notice of rescission or cancellation to the issuer or the issuer's agent. No specific form is required for the rescission or cancellation. The notice is effective when personally delivered, deposited in the United States mail, or deposited with a commercial courier or delivery service. If the Purchaser rescinds or cancels the purchase, the Seller shall refund all of the Purchaser's money within seven (7) calendar days after receipt of the notice of rescission or cancellation.  No rescission or refunds are possible after seven (7) calendar days from the funding of the sale.

(g)     The life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed. The annualized rate of return would be higher if the actual life expectancy turns out to be less than the estimated life expectancy of the insured. The annualized rate of return would be lower if the actual life expectancy turns out to be more than the estimated life expectancy of the insured.

(1)  Reliant Life Shares is not responsible for the accuracy of life expectancy reports.

(2)  Reliant Life Shares generally does not purchase life expectancy reports, because it receives them from brokers in the life settlement market as part of an overall package when brokers try to sell policies in the secondary market.

(3)  There may be other life expectancy reports outstanding on the very same insured(s) on which Reliant has purchased a policy.  These reports may have a higher or lower life expectancies than the data furnished to Reliant by the broker.

Page 6                                              Purchaser's Initials: _____



(4) As part of the due diligence process prior to the purchase of a policy, Reliant may use third party medical review experts and legal experts to investigate numerous aspects of the insureds health status and the origination of policies before purchase.

(h)  As of June 1, 2015, Reliant uses the *median* life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policies escrow reserve period. All life expectancies used for each policy are disclosed on the "Projection Sheet" published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.

(i)  The purchase of a fractional Life Settlement investment should not be considered a liquid purchase.  It is impossible to predict the exact time of the insured's death. No fixed date for the payment of the death benefit to Purchaser has been or can be determined at this time.  Once the rescission period has passed all of the Purchaser's funds are illiquid and will not be available until after the death of the insured. Purchaser acknowledges that he/she has sufficient financial resources to bear the risk associated with the purchase.

(j)  The Purchaser's annual rate of return on purchase decreases as the life of the insured continues. The Purchaser's annual rate of return on purchase may be further adversely affected by, without limitation, (i) the financial stability of the insurance companies issuing the Policies, or (ii) the payment limitations in effect from time to time set by the State Guarantee Funds of the states where the Policies were issued.

(k)  Each Purchaser should consult with his or her own tax advisor regarding the tax consequences of the purchase of a life settlement interest. If the Purchaser is using retirement funds or qualified tax deferred accounts for the purchase, they should ask his or her tax advisor whether or not any adverse tax consequences might result from the use of those funds for this purchase.

(l)  Purchasers should be aware that some types of group life insurance policies may contain limitations or caps in the amount of coverage that may be converted. Also, the conversion of a group policy to an individual policy may result in additional premium payments.

(m)  The Trustee is responsible for making the premium payments as outlined in Section 2(b) of this Agreement. The current Trustee is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(n)  A Life Settlement Disclosure Form containing specific information regarding the insurance policy(ies) in which the Purchaser may obtain an interest will be provided to the Purchaser at least five (5) business days prior to the closing of any purchase. The commitment to purchase an interest in the death benefits of a specific policy shall not be final until the Purchaser has received this

Page 7                                                    Purchaser's Initials: _____

information and been given the opportunity to advise the Seller if he/she wishes to decline the purchase.

(o)    There are certain post-closing servicing activities that must be undertaken, but are not performed by Seller. These servicing activities include but are not limited to maintaining contact with the insured, tracking the health status of the insured, monitoring the status of disability claims by insured, converting group policies to individual plans of insurance, obtaining required documents needed for filing a claim and filing claims for benefits with the insurance companies. To perform the above-described activities, the Seller has contracted Asset Servicing Group ITS.  Asset Servicing Group ITS is a leading policy servicing company and their responsibilities include all investor support related to policy maintenance and premium payments.

(p)    Selling expenses and commission may be paid by Reliant Life Shares LLC licensed sales agents.  All distributions costs are factored into the purchase of each policy and therefore 100% of each investors funds will be deposited and allocated toward the policies/trusts they select.

**4. REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller that:

(a)    Purchaser is a resident of the State of California and the address and other information set forth herein are true and correct.

(b)    The Interest(s) is/are being acquired solely for the Purchaser's own account and not with a view to or for sale in connection with the distribution of the security.

(c)    Other than the Seller's agent, Purchaser has not dealt with any broker or finder in connection with the transaction set forth in this Agreement.

(d)    He/she is sophisticated in financial matters or has access to professional advice, has adequate means for providing for current financial needs and possible personal contingencies, is capable of evaluating the merits and risks of obtaining an Interest and also acknowledges that, once the transaction closes, the funds committed are not liquid and will not be available until the policy matures.

(e)    The Purchaser has been furnished with such information by the Seller as Purchaser requires and has requested regarding the Interest and has had any questions arising from such review answered by the Seller to Purchaser's satisfaction. Purchaser acknowledges, however, that Purchaser has not and will not be furnished with any information regarding the identity of the Insured(s) and purchases this Interest(s) with the expectation that the identity of the Insured will not be known. Purchaser has full legal capacity to enter into this Agreement.

(f)    Purchaser acknowledges that the Seller is willing to provide additional information regarding this transaction and the business of the Seller beyond that contained in any documentation previously provided. The Purchaser also acknowledges that he/she has also had the opportunity to evaluate the merits and risks of this transaction.

Page 8                                                    Purchaser's Initials: _____

Exhibit 1001, p. 8

(g)      Purchaser acknowledges that he/she understands the meaning and legal consequences of the above representations and warranties and that the Seller has relied on these representations and warranties in entering into this Agreement. Purchaser agrees to indemnify and hold harmless the Seller and its principals, agents, and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by Purchaser.

(h)      Purchaser authorizes the Seller to enter into any agreements or contracts which may be necessary in order to effectuate the purchase of Interests on behalf of the Purchaser.

(i)      Purchaser represents that he/she has completed a Suitability Questionnaire and that he/she understands that Seller will rely upon the representations made in that Suitability Questionnaire for the purpose of determining if the Purchaser is qualified.

(j)      Purchaser acknowledges that life expectancy reports are estimates and hereby expressly waives any action, agrees not to sue, and agrees to hold harmless the Seller and its principals, agents, and employees from any damage based on an insured living past the life expectancy date.

(k)      Purchaser acknowledges that the Life Agent conducting this transaction is an independent contractor with no authority to contractually bind Reliant Life Shares, LLC.  Any errors or omissions made by agent are the sole legal responsibility of the agent.

(l)      Purchaser acknowledges that Reliant utilizes the services of outside vendors who provide specific services which are necessary to ensure the safety, security and to ensure that in the event Reliant is unwilling or unable to perform any key activity,  that the appropriate vendors are in place to perform all necessary functions to maintain the investment operations .  These vendors include, trustee and escrow agents, policy servicers, and outside actuaries who compute policy premiums and project future cash flows. To offset these policy expenses the servicer will charge one hundred and fifty dollar per client per year which will be billed only once a policy extends past the Policy Maintenance Reserve Period.

(m)      Purchaser acknowledges and understands that fractional life settlement investments are illiquid investments and therefore any client holding the investment in a self-directed IRA account should consider future required minimum distributions when considering the purchase of this investment.


### 5. MISCELLANEOUS.

(a)      **Entire Agreement**.  This Agreement constitutes the entire agreement between the Seller and Purchaser. No change, modification, termination or amendment of this Agreement shall be valid unless it is in writing and signed by both the Seller and Purchaser.

(b)      **Section Headings**. The section headings contained in this Agreement are for reference only and shall not in any way affect the meaning or interpretation of this Agreement.

Purchaser's Initials: _____



Exhibit 1001, p. 9

(c)     **Gender.** Pronouns shall be deemed to include masculine, feminine and neuter genders and singular or plural numbers as appropriate.

(d)     **Venue for Disputes.**    <u>Arbitration.</u>  Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration administered by Judicial Arbitration and Mediation Services ("JAMS") in its Los Angeles County office.  Each of the Parties reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the Investor may be entitled may be rendered ineffectual in the absence of such relief.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The award of the arbitrator shall be binding, final, and non-appealable.  The Parties may obtain discovery in aid of the arbitration to the fullest extent permitted under law, including California Code of Civil Procedure Section 1283.05.  All discovery disputes shall be resolved by the arbitrator.  The costs of the arbitration, including any JAMS administration fee, and arbitrator's fee, and costs of the use of facilities during the hearings, shall be borne equally by the Parties.  Reasonable attorney's fees and costs shall be awarded to the prevailing party.

(e)     **No Third Party Benefited.** This Agreement is solely for the benefit of the parties hereto, and no other person or entity shall have any right, benefit, priority or interest under this Agreement, or because of the existence of this Agreement.

(f)     **Notices.** Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered, certified, or electronic mail, or recognized overnight delivery service to the parties at their respective addresses set forth below or to such other address as either party may designate by notice given in accordance with this Agreement.

<u>Seller</u>

Reliant Life Shares, LLC
15260 Ventura Blvd., Suite 1420
Sherman Oaks, CA  91403

<u>Purchaser:</u>  Purchaser agrees to receive all correspondence via electronic mail.  Otherwise, Check this box and insert the info below.

☐

Concepcion Baeza
5238 Live Oak View Ave
Los Angeles, CA 90041

(g)     **Non Waiver.** No failure on the Seller's part to exercise, and no delay in exercising, any right, power or remedy under this Agreement or under applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further

Purchaser's Initials: _____

exercise thereof or the exercise of any other right. All of Purchaser's rights and remedies under this Agreement or arising under applicable law are separate and cumulative and may be pursued separately, successively or concurrently, or not pursued, without affecting or limiting any other right of Purchaser.

(h)    **Invalidity and Severability**. If any provisions of this Agreement are held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, and to that extent, the provisions of this Agreement are intended to be and shall be deemed severable.

(i)    **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the heirs, legal and personal representatives, successors, and assignees of the Purchaser.

**WARNING: THE RETURN ON INVESTMENT FOR FRACTIONAL LIFE SETTLEMENTS IS HIGHLY DEPENDENT ON THE LONGEVITY OF THE INSURED. A POLICY TAKING LONGER TO MATURE, ALONG WITH ANY ADDITIONAL PREMIUMS WHICH MUST BE PAID, WILL RESULT IN LOWER TOTAL ANNUAL RETURNS.  LIFE EXPECTANCIES ARE MERELY ESTIMATES; NO ONE KNOWS WHEN AN INSURED INDIVIDUAL WILL PASS.  IF THE INSURED LIVES LONGER THAN THE PREMIUM RESERVE PERIOD STATED IN THE CONTRACT, ALL INVESTORS MUST MAKE A "PRO RATA" PREMIUM PAYMENT.  FAILURE TO DO SO WILL CAUSE AN INVESTOR'S BENEFICAL INTEREST TO BE FORFEITED. FOR MORE INFORMATION ON THE RISKS ASSOCIATED WITH THIS PRODUCT PLEASE SEE THE "RISK ADDENDUM" ATTACHED HERETO.**

Page 11

Purchaser's Initials: _____

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

RELIANT LIFE SHARES, LLC

By: _____

Date: _____ 10/14/2020 _____

LIFE SETTLEMENT PURCHASER(S)

_____
Signature

Provident Trust Group FBO Concepcion Baeza IRA# 200200120
Printed Name

_____
Social Security or Tax ID#

8880 W. Sunset Road, Ste. 250
Address

Las Vegas, NV 89148
City, State, Zip

702-522-2155
Telephone Number

_____
Signature

Concepcion Baeza
Printed Name

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
Social Security or Tax ID#

5238 Live Oak View Ave
Address

Los Angeles, CA 90041
City, State, Zip

(323) 972-6827
Telephone number

Purchaser's Initials: _____



Exhibit 1001, p. 12

**RELIANT LIFE SHARES, LLC**

**RISK DISCLOSURE**

<u>**WARNING: Do not sign this Agreement unless you wish to be legally bound. This Agreement is subject to the laws of California and the United States. You are urged to read the entirety of this document. If you are in any doubt regarding the contents of this document and what action you should take, seek your own independent legal advice.**</u>

Potential purchasers of Fractional Life Settlements should understand the risks related to the transaction. All purchases possess the combined elements of risks and rewards.

Life Settlements can deliver an attractive rate of return but are not without a degree of risk. The risks are described by category. Some of the risks described in this section are very remote and some are more likely. This list of risks is not necessarily comprehensive but in the interest of completeness, even risks which are relatively rare are listed. Not every policy will carry every possible risk since Reliant offers different types of policies. We try to provide as much information about the risks as possible but additional risks not contained in this Risk Disclosure may exist.

To aid in the explanation, the most frequently offered type of policy, Universal Life Insurance, is the example used in the following paragraphs. Universal Life policies make up 99% of the policies sold and in the event Reliant chooses to sell a policy that is not a UL policy any additional risks associated will be outlined in the policy disclosure package for that specific policy.

<u>**Liquidity Risk**</u>: A Life Settlement is the purchase of all of or a portion of the death benefit of a life insurance policy. In order for the death benefit to be paid, a demise (or death) of the insured must occur. Until then, the original amount paid and the gain or profit to be earned is not available. This is known as being illiquid. It means Reliant cannot and will not refund Investor's money no matter how much Investor may need it. Therefore, an Investor must not use any funds, which Investor may possibly need during the life expectancy of the insured and for some period afterward. It must be stressed that the death benefit amount received upon maturity of the policy is a known certain amount but it will occur at an uncertain time, almost always earlier or later than the projected life expectancy. The investors' financial objective should be long term capital appreciation and capital preservation. Fractional Life Settlements should not be purchased for speculation or for trading such as stocks or mutual funds. As of this writing, there is no organized secondary market trading in these positions, therefore investors need to consider the purchase of fractional life settlements as a buy and hold investment.

Page 13

Purchaser's Initials: _____



**Longevity Risk**: Longevity Risk is typically defined as the insured outliving the life expectancy estimate.

All policies are purchased using a deterministic model based upon a medical and actuarial life expectancy developed by an independent third party medical laboratory specializing in such forecasts. To help reduce the concentration of risk associated with the specific laboratories used, Reliant uses multiple life expectancy estimates from different life expectancy providers. Since California does not currently license life expectancy underwriters, Reliant wants to ensure that it only uses the most qualified laboratories available. Consequently, Reliant only uses life expectancy providers approved and licensed to do business in Texas or Florida - two large states that regulate life expectancy providers. If California were to license life expectancy underwriters, Reliant would then look to such licensed providers in California.

As of June 1, 2015, Reliant chooses to use the median life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policy maintenance reserve period. This is a critical issue and ensures a fair period of time is being used to determine the amount of funds to set aside to pay for the premiums, trust and escrow fees as well as the servicing fees on the policy before an investor needs to begin paying these fees out of pocket. By using three different estimates, Reliant also reduces any concentration of risk associated with using only one life expectancy provider's methodology. All life expectancies used for each policy are disclosed on the projection sheet published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.  It is because of this uncertainty and the aforementioned lack of liquidity that life settlements pay much higher returns than that of government bonds and other investment grade investments.

The effect of an insured living beyond life expectancy is a lowering of the annual rate of return and could possibly require an investor to pay additional policy maintenance payments to keep the policy in force. Take for example, a policy with a three-year life expectancy paying a total fixed return of 36%. Its annualized return would pay 12% simple interest per year if the policy matured as expected. However, if the insured lived 4 years instead of 3 years, the fixed total return would still be 36% but the simple annual return would be 9% instead of 12%. If payment of additional policy maintenance payments is necessary on a pro-rata basis, the return is further reduced. In simple terms, the longer an insured lives, the lower the annual return. A further element of this Longevity Risk is associated with the expiration of the policy coverage. Universal Life Policies typically have an expiration age at which time the policy may only pay out the cash value which may exist in the policy. Each Universal Life Policy is different but the most common age of expiration is 100 years old.  This may be mitigated if the policy has a rider which extends this age.

Any projected rate of return to the investor from the purchase of a fractionalized interest in a life settlement is based on an estimated life expectancy for the person insured under the life insurance

Purchaser's Initials: _____



policy. The return on the purchase may vary substantially from the expected rate of return based on the actual life expectancy of the insured that may be less than, equal to or may greatly exceed the estimated life expectancy. *The rate of return will likely be higher if the actual life expectancy was less than, and lower if the actual life expectancy was greater than, the estimated life expectancy of the insured at the time the life settlement transaction closed.*

**Policy Maintenance/Premium Reserve Risk**: Upon purchase of a policy from a seller, Reliant establishes an escrow reserve account for the payment of premiums, trust fees and servicing fees for a specific period of time. Once the time period is determined, Reliant utilizes the services of an independent firm who specializes in premium estimation, Cost of Insurance estimates and insurance policy construction, to determine the exact dollar amount necessary to be funded into the Policies Maintenance Reserve Account in order to pay for the policy and expenses through the given period of time. These services are provided by an actuarial firm who is a specialist in this field with a track record of service.  Once a policy's escrow period has passed or the policy reserve funds are exhausted, it is the Investor's responsibility to pay additional payments based upon the percentage of the policy the Investor owns. Although this outside firm specializes in providing this type of service there is the risk that its estimates are wrong. This account is funded as Investors purchase fractional interests in each policy.  If an adequate amount of certificates are not sold there is the risk that the policy reserve account will not be sufficient to fund the policy premiums during the Policy's Reserve Period. Typically this policy reserve period provides for the payment of premiums for each year of life expectancy but, at times, Reliant may choose to provide a policy reserve which is longer than the life expectancy, therefore the exact policy reserve period for each policy is disclosed in the Contract and Policy Disclosure Package.

**Premium Call Risk: (Applicable only if the insured lives past the Policy's Reserve Period)** Once the Policy's Reserve Period has ended and, if, the insured is still alive, it is the responsibility of each Investor to pay for their pro rata portion of the expenses to keep the policy and Trust in force along with ensuring the third party servicing company is paid.  Reliant, through our servicing partner Asset Servicing Group ITS, will send to the Investors in each policy a Policy Maintenance Invoice, which details all expenses due.  An early warning notice (usually some months in advance), and then an invoice for each Investor's share of the premiums, trust fees and policy servicing costs attributable to the purchasers pro-rata portion of the policies they own after the original Policy Reserve Escrow funds are depleted.  The Investor must pay this Policy Maintenance Invoice.  It is part of the agreement.  *If the Investor does not pay the Policy Maintenance Invoice, the Investor will forfeit their beneficial interest in the policy in order to protect other Investors in the policy.*

**Insurance Policy Construction and Performance**:  When a Policy's maintenance reserve escrow amount is established by Reliant's outside vendor who specializes in such service, they take many factors into consideration. If cost of insurance charges increase there is no guarantee that the Policy Maintenance Reserve that is established is sufficient to fund the policy through the Policy's Reserve Period. Mortality charges increase dramatically with age.  Each policy and each life insurance company charge differently. In the analysis of each policy, Reliant commonly obtains an in-force illustration produced by the life insurance company. Premiums on life insurance policies vary in many ways. A Universal Life Insurance policy typically has a flexible premium payment and can accumulate cash values within the policy. In

Purchaser's Initials: _____



some policies this cash value may be used to offset future premiums. Other times the policy Surrender Charge may be higher than the cash value, rendering any cash value useless. The cash values in a policy also may differ from policy to policy. The life insurance company may have enjoyed a profitable year and the interest rate provided on the cash value of the policy may exceed the guaranteed rate thus amplifying the account value. The life insurance company may be a mutual company and have declared a dividend to policyholders. Mortality changes may increase or decrease based upon loss experience. All of these events can affect the policy performance.

Year-by-year projections are impacted by several key assumptions:

A.      The current account value.

B.      The charges against this account for mortality and other expenses.

C.      The interest earnings credited based upon the earnings from the invested account value and the premiums paid.

D.      The premiums necessary to keep the policy in force for every year remaining in the policy life.

These assumptions can change on a year by year basis, and are only valid if the premiums are paid as illustrated.

**Policy Seller Rescission Risk**:  The insured who sold their policy is afforded a 'rescission period' to change their mind and keep the policy.  This period varies from state to state.  However, this risk is mitigated by the fact that the rescission period has expired on ALL policies Reliant sells to investors.

**Taxation Risk**:  The purchase and resale of life insurance policy is a Transfer for Value.  Reliant recognizes this and pays taxes on profits, which it earns by arranging such transactions. Neither Reliant nor its employees, independent contractors or sales representatives are authorized to give tax advice.

The investor should consult with their own tax advisor regarding (i) the tax consequences of the purchase of the fractionalized interest in a life settlement and (ii) if the investor is using retirement funds or accounts for such purchase, whether or not any adverse tax consequences might result from the use of those funds for the purchase of the certificates.

**Insurable Interest Risk**: A life insurance carrier can rescind a policy for lack of insurable interest until the claim is paid.  Insurable Interest is a fundamental element unique to a life insurance contract. This means the person acquiring the contract (the applicant or the original beneficiary) must be subject to loss upon the death of the person being insured.  This interest must exist at the inception of the policy. It does not have to continue and that is the basis for the life settlement industry. Though laws differ slightly from state to state, in general the following types of relationships automatically carry insurable interest:

-An individual has as insurable interest in his or her own life.

-A husband or wife has an insurable interest in a spouse.

Page 16                                                            Purchaser's Initials: _____

-A parent has an insurable interest in his or her child.

-A business has an insurable interest in the lives of its officers, directors and other key employees.

-Business partners have an insurable interest in each other.

-A creditor has an insurable interest in the life of a debtor but only to the extent of the debt.

In 2002, life insurance policies began to be sold to wealthy individuals for the purposes of estate planning using non-recourse premium finance contracts. Estate planning is a United States death tax strategy, which has a definite insurable interest on the part of the insured. However, some of these contracts were issued to individuals who entered into them solely for the purpose of resale. When this happens, it changes the life insurance policy from a contract at risk to a purchase contract. This violates the principal of insurable interest. The life insurance company may choose to contest the death benefit of such contracts and if it prevails, is only obligated to return the premiums paid during the life of the contract. This would have the effect of dramatically lowering the Investor's overall return and a probable loss of all or part of the Investor's principal. While Reliant's underwriting procedures are extremely thorough, it may not identify a policy such as this and a life insurance company may uncover such a policy and may choose to contest it. If such an event took place, Reliant would seek a refund of all premiums paid and the purchase price paid to the seller.

**Contestability Risk**: Every life insurance policy has a contestability period. This is typically 24 months after the issue date. During this period, the life insurance company has the right to cancel the policy and return any premiums paid. This is often known as a "suicide clause" although the company can cancel the policy if it suspects malfeasance in the application or for other reasons. As a business practice, Reliant does not purchase or arrange the purchase of polices while they are in the contestable period The effect of a cancellation during contestability is the extinguishments of the death benefit obligation on the part of the insurance company and the loss of the purchased policy.

**Insurance Company Insolvency Risk**: On occasion in the United States, a life insurance company becomes insolvent. If it were to do so and there was no regulatory intervention, the company would be unable to pay its death benefit obligations. There exists a framework of regulatory measurements and controls, reinsurance, resale options as well as special funds employed by the State Insurance Commissioners to significantly reduce this possibility. A. M. Best Company is the premier insurance rating company. It publishes financial strength ratings for all life, health and casualty insurance companies. Reliant will purchase or arrange the purchase only of policies issued by life insurance companies with ratings of B+ or above.

**Regulatory Risk (US)**: The majority of the states in the US regulate the life settlement industry on a state-by-state basis. Many of these regulations mirror or closely follow the NAIC Model Viatical Settlements Act. The life insurance companies have been active in attempting to promote changes in the law which would make life settlements less attractive or even illegal. The life settlement industry association LISA (Life Insurance Settlement Association) has been robustly and successfully combating these attempts. The fundamental argument offered by LISA is that a policy holder has a constitutional

Purchaser's Initials: _____



Exhibit 1001, p. 17

right to dispose of their assets as they see fit; be that a home, an automobile, a stock portfolio or a life insurance policy. So far, lawmakers have agreed with this position and all attempts have been struck down in both the legislatures and in the courts. There is no guarantee however that this will remain the case and laws or regulations may be enacted which adversely affect the continuance of the industry or the profitability of the transaction. The impact of these changes is impossible to speculate upon but it is very unlikely that they would be applied retroactively.

In addition, the life settlement industry had been the subject of investigations by various state and Federal governmental entities. In 2010, the Life Settlements Task Force of the Securities and Exchange Commission issued a staff report discussing life settlements, practices in the life settlements market, regulation of the life settlements market and related recommendations. Such recommendations included (i) recommending to Congress that the definition of 'security' under Federal securities laws include life settlements, (ii) continue monitoring that legal standards are being met by brokers and providers, (iii) monitor the development of a life settlement securitization market, (iv) encourage Congress and state legislators to consider more significant and consistent regulation of life expectancy underwriters and (v) consider issuing an investor bulletin regarding investments in life settlements.

Likely as a result of this increased industry scrutiny, the Securities and Exchange Commission recently brought a case against Pacific West Capital Group and others in U.S. District Court in the Central District of California. In this case, the Securities and Exchange Commission alleges, among other things, that (i) the issuer issued securities with the proceeds used to pay returns to original investors (i.e. a Ponzi scheme), (ii) the issuer misrepresented annual returns and stressed that returns had no relation to the issuer, (iii) the securities were not issued through broker-dealers, (iv) actuarial-based estimates were not given to investors, (v) the trust agreement was not provided to investors, (vi) reserve funding mechanics were not adequately explained to investors, (vii) policies were purchased even if not sufficiently funded, (viii) the increase in premiums for the policies were not adequately disclosed to investors, and (ix) the securities were not registered. These allegations do not relate to Reliant and the certificates; the broker-dealer and registration issues are dealt with under the captions 'Securities Risk (CA)' and 'Securities Risk (US)' below.

**Regulatory Risk (CA):** Reliant operates under California Corporations Code Section 25102(q) established to regulate the fractionalized life settlement Industry in California. This statute and related regulations may change without notice and at any time preventing Reliant from operating as currently structured.

**Securities Risk (CA):** Fractional Life Settlements are a security under California law but are exempt from registration under California law if offered through a life agent licensed in California subject to numerous requirements including, among other things, that they only be sold to qualified purchasers as defined under the California Corporations Code. Reliant relies on this state securities exemption to market this security in California.

**Securities Risk (US):** Under Federal law, it is not fully settled law whether Fractional Life Settlements, each backed by a single policy, are securities.

Page 18

Purchaser's Initials: _____



Exhibit 1001, p. 18

If considered to be securities under Federal law, Reliant would be able to look to several exemptions from registration including: (i) intrastate exemption under Rule 147 of the Securities Act of 1933, as amended (the "Securities Act") where all of the certificates are sold to persons resident within a single state (in our instance, California) and where the issuer is a person resident and doing business within such state, (ii) limited offering exemption under Rule 505 of the Securities Act for sales of securities not exceeding $5 million which limits sales to thirty-five (35) non-accredited investors and (iii) Rule 506 of the Securities Act for sales of securities to accredited investors. The Securities Act defines 'issuer' as either the depositor or manager pursuant to the trust agreement and, it is Reliant's belief, that it is the issuer as depositor and manager of the program under the trust agreement. However, the Securities and Exchange Commission and the courts could determine that the trustee is the sole issuer for purposes of Rule 147. In such an event, the Investors could not rely on the Rule 147 exemption since the Trustee's principal place of business is not in California.

As a result, our offerings have not been and, absent a change in Federal law or interpretation of Federal law, will not be registered under the Securities Act or any foreign securities law.

It should be noted that even if either the exemptions under Rule 505 or Rule 506 of the Securities Act are met, the broker arranging the Fractionalized Life Settlements must be registered broker-dealers; life agents licensed in California relate only to California securities law and not Federal securities law (*see* 'Securities Risk (CA)' above).

**Insolvency Risk:** The possibility exists that Reliant Life Shares, LLC, could become insolvent. While Reliant considers that we enjoy a prosperous and growing position in our industry, we, like all businesses are exposed to events which may be beyond our control and which could alter our destiny. We take comfort in the fact that our business practices employ the concept of naming an independent trust established on the Investor's behalf as the direct beneficiary of the death benefit purchased. This means that the obligation to pay rests solely on the life insurance company and the independent trustee and not on Reliant. Further, the policy maintenance reserves established for the payment of the premiums and other expenses are held in an escrow account under the control of a third-party Trustee. Reliant pays certain maintenance, servicing costs and Trust fees that would have to be paid by investors in the case of insolvency. The likely impact of Reliant's insolvency will be a degree of confusion as to communication with the Investor and the possible substitution of another issuer to replace Reliant and, if no replacement is quickly found, the possible resignation of the current Trustee. Certain contingency plans are in place to minimize this confusion. The Trustee of the Trust enjoys a wide degree of latitude to address this situation and has access to each policy's reserve account to pay the costs associated with maintaining and servicing the policy until the policy maintenance reserves are exhausted and at that point moving forward the investor understands they are responsible for the policy maintenance expenses including servicing costs and trust fees which will be invoiced from the servicer. In the event the policy maintenance reserve period has elapsed, then Investors have the duty to pay their Policy Maintenance Invoices from which the Trustee will pay the continued operational expenses. Should these expenses increase, investors may pay up to three hundred dollars per policy per year for additional servicing responsibilities by the servicer. These expenses will be part of the Policy Maintenance invoices once the policy maintenance reserve is exhausted.

**Line of Business or Acquisition Risk:** For a number of reasons, Reliant may discontinue a product offering, a line of business or its shares, its assets or the business itself may be sold. While this would not

Purchaser's Initials: _____



affect the Investor's purchase per se, it would force the Investor to deal with an unknown third-party entity for its management of the policies.

**Summary: Reliant has attempted to list the main risks associated with our product. It is difficult to predict future scenarios not contained herein. However, if a material change occurs, Reliant shall attempt to assess its impact (if any) on the Investor's position. If there is such an impact or if there is any doubt, Reliant will send an update of this Risk Disclosure to the Investor.**

Purchaser's Initials: _____

Exhibit 1001, p. 20



## Reliant Life Shares, LLC

**FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT**

**THIS FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT** ("Agreement") is made this <u>2nd</u> day of <u>October</u>, 2020, by and between Reliant Life Shares, LLC ("RELIANT LIFE SHARES" or the "Seller"), and <u>Provident Trust Group FBO Ed Baeza IRA# 200200121</u> (the "Purchaser"). This Agreement covers the purchase of one or more interests in the death benefits of a life insurance policy insuring the life of an individual, or life settlement interests ("Interests").

**WHEREAS,** the Purchaser has reviewed and approves and adopts the criteria utilized by the Seller to purchase said Interests; and

**WHEREAS,** the Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with the Seller, and the Purchaser expressly waives any and all claims to the contrary; and

**NOW THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, each party hereby represents that it or its representatives has/have the requisite authority to enter into this Agreement and hereby agree as follows:

### 1. THE PURCHASE

(a)    The Purchaser hereby agrees to deposit the sum of:

$ <u>17,184.45</u> to acquire an Interest in Policy #: <u>7396208 & 73689651</u>. Total Fixed Return: <u>76%</u>

$ <u>17,184.46</u> to acquire an Interest in Policy #: <u>B00815053</u>. Total Fixed Return: <u>111%</u>

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

Page 1                                                        Purchaser's Initials: _E.B_

$ _____ to acquire an Interest  in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest  in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest  in Policy #:_____. Total Fixed Return: _____

       (b)     The Purchaser's deposit will be made simultaneous with the delivery of this executed Agreement to Seller, by delivering a check, or effecting a wire transfer, made payable to Seller's Escrow Agent, UMB – *Reliant Life Shares Subscription Escrow Account*. The Purchaser's deposit does not constitute a purchase or a commitment to purchase until five (5) business days after the Purchaser has received all of the disclosures required by California law.

       (c)     Upon Seller's receipt of the executed Life Settlement Disclosure Form, but in no event sooner than five (5) days after Purchaser's receipt of the Life Settlement Disclosure Form, the Seller will obtain confirmation of the recording of a change of ownership of such Policy to Reliant Life Shares Series Statutory Trust ("RELIANT LIFE SHARES") and a confirmation of irrevocable beneficiary. In the case of a Group Policy, the Seller will obtain a confirmation of the recording of an absolute assignment of such Group Policy to the Reliant Life Shares Series Statutory Trust and a confirmation of the recording of a change of beneficiary under such Policy naming as beneficiary the Reliant Life Shares Series Statutory Trust. To the extent that the Seller does not at the date of this Agreement have available such policies, the Seller shall use its reasonable efforts to obtain a suitable policy(ies) as soon as practicable after the date of this Agreement.

       (d)     Upon the maturity of the life insurance policy (ies) in which Purchaser has purchased a life settlement interest, the trustee (UMB Bank) shall file or cause to be filed a claim for the death benefits with the appropriate insurance company. When the Reliant Life Shares Series Statutory Trust receives payment of such claim, UMB Bank will pay the Purchaser directly it's pro rata share of the death benefits.

       (1)     In the event of Purchaser's death before policy maturity, Purchaser designates (Please List: Name, Address and Phone)
Designated By the IRA
_____

_____

as Contingent beneficiary.  In the case that both Purchaser and Contingent Beneficiary die in the same accident, Contingent Beneficiary will be deemed to have died first and Purchaser therefore designates (Please List: Name, Address and Phone)

_____

_____

as Tertiary Beneficiary

                         Purchaser's Initials: _____

Exhibit 1002, p. 2

(e)      The owner of the life insurance policy in which Purchaser will obtain an interest will be a trust. The current trust is Reliant Life Shares Series Statutory Trust. The current Trustee of the Reliant Life Shares Series Statutory Trust is UMB Bank. The Trustee's sole responsibilities are to maintain accounts for the purpose of making the premium payments as more fully described in Section 2(b) of this Purchase Agreement, to be the beneficiary for the death benefits of the life insurance policy in which Purchaser obtains an Interest, and to disburse the death benefits in accordance with the assignments of benefits relating to that policy. Reliant Life Shares has contracted with UMB Bank to perform certain post-closing services as the Trustee, as more fully set forth in Paragraph 3(o) herein.

(f)      The Seller's Escrow Agent is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(g)      The responsibilities of the Escrow Agent are:

1.  To hold the funds forwarded by the Purchaser pursuant to this Agreement;
2.  To hold the documents received from the Seller of a policy when required;
3.  To receive and review written confirmation that the insurance company has accepted, recognized and,/or noted on its books and records the transfer of the policy ownership and the change of beneficiary(ies);
4.  To make disbursements at the direction of the Trustee.

(h)      The Escrow Agent is not representing the Purchaser in this transaction and has no responsibility to the Purchaser with regard to this transaction other than to hold the funds in escrow in accordance with Section 1(g).

(i)      Purchaser recognizes that the Trustee and Escrow Agent shall not incur any liability the Seller or to Purchaser for any damages, losses or expenses which either party may sustain or incur, unless the same is a direct result of the gross negligence or intentional misconduct of Trustee or Escrow Agent. Trustee and Escrow Agent shall be protected in any action taken or omitted in good faith with respect to their duties and responsibilities. Trustee and Escrow Agent shall be entitled to rely on any document(s) which Trustee and Escrow Agent reasonably believe satisfy the terms and conditions of the escrow. The Seller and Purchaser each hereby agree to indemnify and hold harmless Trustee and Escrow Agent from and against all losses, except those caused by gross negligence or intentional misconduct, claims, damages, liabilities and expenses which it may sustain or incur hereunder, including, without limitation, reasonable attorney's fees, which may be imposed upon Trustee or Escrow Agent or incurred by Trustee and Escrow Agent in connection with the performance of their duties.

(j)      Seller may from time to time make available for purchase an Interest in a "second to die" life insurance policy. These policies typically insure the life of a husband and wife, and do not pay off until both insured's have died. In the event a second to die policy is offered for investment it will be disclosed that the policy is a second to die policy.

Purchaser's Initials: _____

## 2. THE SELLER'S OBLIGATIONS TO THE PURCHASER

(a)      The Seller represents and warrants to the Purchaser that:

(1) At the time of the original life settlement transaction between the insured and the buyer, the Insured's attending physician or other qualified third party confirmed in writing that the Insured was of sound mind and under no constraint or undue influence during the contracting process for the life insurance policies in which an Interest is being purchased.

(2) The life insurance policies in which an Interest is being purchased must be in effect and beyond their respective contestability and suicide periods.

(3) At the time Seller is provided the Life Settlement Disclosure Form, the insurance company that issued the policy must be a highly-rated, legal reserve U.S. life insurance company.

(b)      In the event that the Policy Maintenance Reserve account for a given policy is depleted, and in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser(s) of that policy to make pro rata payments on any policy in which they have an Interest to ensure the policy premium, trust fees and associated servicing fees are paid for until the policy matures and the carrier pays the death benefit. In that event the Purchaser shall be notified no less than 60 days before any policy maintenance payment becomes due.  If the Purchaser does not remit or cause to be remitted to Trustee, in immediately available funds, the required pro rata policy maintenance payments within the time frame stated in said notice to Purchaser, Purchaser shall immediately be divested of the Purchaser's Interest in said policy.

(c)      The Seller shall obtain a written release signed by all the present owners and beneficiaries under the Policy(ies), waiving any and all present and/or future rights to ownership and beneficial interests under the Policy(ies) and provide this information to the Trustee;

(d)      Seller shall obtain and provide to the Trustee the following documents:

1.   Change of Ownership
2.   Change of Beneficiary

(e)      In order to protect the confidentiality and privacy of insureds, their names will not be disclosed to the Purchasers. Insureds will be given a code number which will be recorded and maintained in the records of the Seller and the servicing company's databases. Any insurance company documents provided to the Purchaser will have any identifying information regarding the insured redacted and replaced with this code number.

(f)      Except as set forth in this Agreement, the Seller makes no representations or warranties of any kind, nature or description whatsoever and Purchaser expressly acknowledges that no representations or warranties have been made. The Seller is not liable or bound in any manner by express or implied warranties, guaranties, promises, statements or representations, not included within

Page 4                                                          Purchaser's Initials: _____

Exhibit 1002, p. 4

this Agreement, that are made or furnished by any broker, agent, employee, servant or other person purporting to represent the Seller.

### 3. DISCLOSURES TO LIFE SETTLEMENT PURCHASERS

      (a)     The Seller is Reliant Life Shares, LLC, whose principal business and mailing address is 15260 Ventura Boulevard, Suite 1420, Sherman Oaks, CA 91403.

      (b)     The suitability standards for prospective purchasers, set forth at California Corporations Code §25102(q)(1), are as follows:

      (1)     Sales of securities described in this subdivision are made only to qualified purchasers or other persons the issuer reasonably believes, after reasonable inquiry, to be qualified purchasers. A corporation, partnership, or other organization specifically formed for the purpose of acquiring the securities offered by the issuer in reliance upon this exemption may be a qualified purchaser only if each of the equity owners of the corporation, partnership, or other organization is a qualified purchaser. Qualified purchasers include the following:

      (A)     A person designated in Section 260.102.13 of Title 10 of the California Code of Regulations.

      (B)     A person designated in subdivision (i) or any rule of the commissioner adopted thereunder.

      (C)     A pension or profit-sharing trust of the issuer, a self-employed individual retirement plan, or an individual retirement account, if the investment decisions made on behalf of the trust, plan, or account are made solely by persons who are qualified purchasers.

      (D)     An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, each with total assets in excess of five million dollars ($5,000,000) according to its most recent audited financial statements.

      (E)     A natural person who is either an individual or an individual jointly with their spouse, they warrant that they are a qualified investor or (i) have a minimum net worth of one hundred fifty thousand dollars ($150,000) and have during the immediately preceding tax year, gross income in excess of one hundred thousand dollars ($100,000) and reasonably expect gross income in excess of one hundred thousand dollars ($100,000) during the current tax year or (ii) have a minimum net worth of two hundred fifty thousand dollars ($250,000). "Net worth" shall be determined exclusive of home, home furnishings, and automobiles. Other assets included in the computation of net worth may be valued at fair market value.

Purchaser's Initials: _____



Each natural person specified above, by reason of his or her business or financial experience, or the business or financial experience of his or her professional advisor, who is unaffiliated with and who is not compensated, directly or indirectly, by the Issuer of any affiliate or selling agent of the Issuer, can be reasonably assumed to have the capacity to protect his or her interests in connection with the transaction. The amount of investment of each natural person shall not exceed 10 percent of the net worth, as determined by this subdivision, of that natural person unless the investor is an accredited investor.

(F)    Any other purchaser designated as qualified by rule of the commissioner.

(c)    RELIANT LIFE SHARES is a limited liability company in the State of California.

(d)    RELIANT LIFE SHARES is in the business of facilitating the sale of interests in life settlements.

(e)    SLG Trust is the shareholder of RELIANT LIFE SHARES.

(f)    Under Section 25508.5 of the California Corporations Code, a person who purchases a life settlement contract or a fractionalized or pooled interest therein may rescind or cancel the purchase at any time before seven (7) calendar days after the date the person remits the required consideration to the issuer or the issuer's agent by giving written notice of rescission or cancellation to the issuer or the issuer's agent. No specific form is required for the rescission or cancellation. The notice is effective when personally delivered, deposited in the United States mail, or deposited with a commercial courier or delivery service. If the Purchaser rescinds or cancels the purchase, the Seller shall refund all of the Purchaser's money within seven (7) calendar days after receipt of the notice of rescission or cancellation.  No rescission or refunds are possible after seven (7) calendar days from the funding of the sale.

(g)    The life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed. The annualized rate of return would be higher if the actual life expectancy turns out to be less than the estimated life expectancy of the insured. The annualized rate of return would be lower if the actual life expectancy turns out to be more than the estimated life expectancy of the insured.

(1) Reliant Life Shares is not responsible for the accuracy of life expectancy reports.

(2) Reliant Life Shares generally does not purchase life expectancy reports, because it receives them from brokers in the life settlement market as part of an overall package when brokers try to sell policies in the secondary market.

(3) There may be other life expectancy reports outstanding on the very same insured(s) on which Reliant has purchased a policy.  These reports may have a higher or lower life expectancies than the data furnished to Reliant by the broker.

Page 6                                                    Purchaser's Initials: _____



Exhibit 1002, p. 6

(4) As part of the due diligence process prior to the purchase of a policy, Reliant may use third party medical review experts and legal experts to investigate numerous aspects of the insureds health status and the origination of policies before purchase.

(h)  As of June 1, 2015, Reliant uses the *median* life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policies escrow reserve period. All life expectancies used for each policy are disclosed on the "Projection Sheet" published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.

(i)  The purchase of a fractional Life Settlement investment should not be considered a liquid purchase.  It is impossible to predict the exact time of the insured's death. No fixed date for the payment of the death benefit to Purchaser has been or can be determined at this time.  Once the rescission period has passed all of the Purchaser's funds are illiquid and will not be available until after the death of the insured. Purchaser acknowledges that he/she has sufficient financial resources to bear the risk associated with the purchase.

(j)  The Purchaser's annual rate of return on purchase decreases as the life of the insured continues. The Purchaser's annual rate of return on purchase may be further adversely affected by, without limitation, (i) the financial stability of the insurance companies issuing the Policies, or (ii) the payment limitations in effect from time to time set by the State Guarantee Funds of the states where the Policies were issued.

(k)  Each Purchaser should consult with his or her own tax advisor regarding the tax consequences of the purchase of a life settlement interest. If the Purchaser is using retirement funds or qualified tax deferred accounts for the purchase, they should ask his or her tax advisor whether or not any adverse tax consequences might result from the use of those funds for this purchase.

(l)  Purchasers should be aware that some types of group life insurance policies may contain limitations or caps in the amount of coverage that may be converted. Also, the conversion of a group policy to an individual policy may result in additional premium payments.

(m)  The Trustee is responsible for making the premium payments as outlined in Section 2(b) of this Agreement. The current Trustee is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(n)  A Life Settlement Disclosure Form containing specific information regarding the insurance policy(ies) in which the Purchaser may obtain an interest will be provided to the Purchaser at least five (5) business days prior to the closing of any purchase. The commitment to purchase an interest in the death benefits of a specific policy shall not be final until the Purchaser has received this

Page 7                                                                 Purchaser's Initials: _____

Exhibit 1002, p. 7

information and been given the opportunity to advise the Seller if he/she wishes to decline the purchase.

(o)     There are certain post-closing servicing activities that must be undertaken, but are not performed by Seller. These servicing activities include but are not limited to maintaining contact with the insured, tracking the health status of the insured, monitoring the status of disability claims by insured, converting group policies to individual plans of insurance, obtaining required documents needed for filing a claim and filing claims for benefits with the insurance companies. To perform the above-described activities, the Seller has contracted Asset Servicing Group ITS.  Asset Servicing Group ITS is a leading policy servicing company and their responsibilities include all investor support related to policy maintenance and premium payments.

(p)     Selling expenses and commission may be paid by Reliant Life Shares LLC licensed sales agents.  All distributions costs are factored into the purchase of each policy and therefore 100% of each investors funds will be deposited and allocated toward the policies/trusts they select.

### 4. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that:

(a)     Purchaser is a resident of the State of California and the address and other information set forth herein are true and correct.

(b)     The Interest(s) is/are being acquired solely for the Purchaser's own account and not with a view to or for sale in connection with the distribution of the security.

(c)     Other than the Seller's agent, Purchaser has not dealt with any broker or finder in connection with the transaction set forth in this Agreement.

(d)     He/she is sophisticated in financial matters or has access to professional advice, has adequate means for providing for current financial needs and possible personal contingencies, is capable of evaluating the merits and risks of obtaining an Interest and also acknowledges that, once the transaction closes, the funds committed are not liquid and will not be available until the policy matures.

(e)     The Purchaser has been furnished with such information by the Seller as Purchaser requires and has requested regarding the Interest and has had any questions arising from such review answered by the Seller to Purchaser's satisfaction. Purchaser acknowledges, however, that Purchaser has not and will not be furnished with any information regarding the identity of the Insured(s) and purchases this Interest(s) with the expectation that the identity of the Insured will not be known. Purchaser has full legal capacity to enter into this Agreement.

(f)     Purchaser acknowledges that the Seller is willing to provide additional information regarding this transaction and the business of the Seller beyond that contained in any documentation previously provided. The Purchaser also acknowledges that he/she has also had the opportunity to evaluate the merits and risks of this transaction.

Purchaser's Initials: _____

Exhibit 1002, p. 8

(g)    Purchaser acknowledges that he/she understands the meaning and legal consequences of the above representations and warranties and that the Seller has relied on these representations and warranties in entering into this Agreement. Purchaser agrees to indemnify and hold harmless the Seller and its principals, agents, and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by Purchaser.

(h)    Purchaser authorizes the Seller to enter into any agreements or contracts which may be necessary in order to effectuate the purchase of Interests on behalf of the Purchaser.

(i)    Purchaser represents that he/she has completed a Suitability Questionnaire and that he/she understands that Seller will rely upon the representations made in that Suitability Questionnaire for the purpose of determining if the Purchaser is qualified.

(j)    Purchaser acknowledges that life expectancy reports are estimates and hereby expressly waives any action, agrees not to sue, and agrees to hold harmless the Seller and its principals, agents, and employees from any damage based on an insured living past the life expectancy date.

(k)    Purchaser acknowledges that the Life Agent conducting this transaction is an independent contractor with no authority to contractually bind Reliant Life Shares, LLC.  Any errors or omissions made by agent are the sole legal responsibility of the agent.

(l)    Purchaser acknowledges that Reliant utilizes the services of outside vendors who provide specific services which are necessary to ensure the safety, security and to ensure that in the event Reliant is unwilling or unable to perform any key activity,  that the appropriate vendors are in place to perform all necessary functions to maintain the investment operations . These vendors include, trustee and escrow agents, policy servicers, and outside actuaries who compute policy premiums and project future cash flows. To offset these policy expenses the servicer will charge one hundred and fifty dollar per client per year which will be billed only once a policy extends past the Policy Maintenance Reserve Period.

(m)    Purchaser acknowledges and understands that fractional life settlement investments are illiquid investments and therefore any client holding the investment in a self-directed IRA account should consider future required minimum distributions when considering the purchase of this investment.


## 5. MISCELLANEOUS.

(a)    **Entire Agreement**.  This Agreement constitutes the entire agreement between the Seller and Purchaser. No change, modification, termination or amendment of this Agreement shall be valid unless it is in writing and signed by both the Seller and Purchaser.

(b)    **Section Headings**. The section headings contained in this Agreement are for reference only and shall not in any way affect the meaning or interpretation of this Agreement.

Page 9                                                                Purchaser's Initials: _____



Exhibit 1002, p. 9

(c)    **Gender.** Pronouns shall be deemed to include masculine, feminine and neuter genders and singular or plural numbers as appropriate.

(d)    **Venue for Disputes.**    <u>Arbitration</u>. Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration administered by Judicial Arbitration and Mediation Services ("JAMS") in its Los Angeles County office. Each of the Parties reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the Investor may be entitled may be rendered ineffectual in the absence of such relief. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The award of the arbitrator shall be binding, final, and non-appealable. The Parties may obtain discovery in aid of the arbitration to the fullest extent permitted under law, including California Code of Civil Procedure Section 1283.05. All discovery disputes shall be resolved by the arbitrator. The costs of the arbitration, including any JAMS administration fee, and arbitrator's fee, and costs of the use of facilities during the hearings, shall be borne equally by the Parties. Reasonable attorney's fees and costs shall be awarded to the prevailing party.

(e)    **No Third Party Benefited.** This Agreement is solely for the benefit of the parties hereto, and no other person or entity shall have any right, benefit, priority or interest under this Agreement, or because of the existence of this Agreement.

(f)    **Notices.** Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered, certified, or electronic mail, or recognized overnight delivery service to the parties at their respective addresses set forth below or to such other address as either party may designate by notice given in accordance with this Agreement.

<u>Seller</u>

Reliant Life Shares, LLC
15260 Ventura Blvd., Suite 1420
Sherman Oaks, CA 91403

<u>Purchaser</u>: Purchaser agrees to receive all correspondence via electronic mail. Otherwise, Check this box and insert the info below.

☐

Ed Baeza
5238 Live Oak View Ave
Los Angeles, CA 90041

(g)    **Non Waiver.** No failure on the Seller's part to exercise, and no delay in exercising, any right, power or remedy under this Agreement or under applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further

Purchaser's Initials: _____

exercise thereof or the exercise of any other right. All of Purchaser's rights and remedies under this Agreement or arising under applicable law are separate and cumulative and may be pursued separately, successively or concurrently, or not pursued, without affecting or limiting any other right of Purchaser.

        (h)    **Invalidity and Severability**. If any provisions of this Agreement are held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, and to that extent, the provisions of this Agreement are intended to be and shall be deemed severable.

        (i)    **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the heirs, legal and personal representatives, successors, and assignees of the Purchaser.

**WARNING: THE RETURN ON INVESTMENT FOR FRACTIONAL LIFE SETTLEMENTS IS HIGHLY DEPENDENT ON THE LONGEVITY OF THE INSURED. A POLICY TAKING LONGER TO MATURE, ALONG WITH ANY ADDITIONAL PREMIUMS WHICH MUST BE PAID, WILL RESULT IN LOWER TOTAL ANNUAL RETURNS. LIFE EXPECTANCIES ARE MERELY ESTIMATES; NO ONE KNOWS WHEN AN INSURED INDIVIDUAL WILL PASS. IF THE INSURED LIVES LONGER THAN THE PREMIUM RESERVE PERIOD STATED IN THE CONTRACT, ALL INVESTORS MUST MAKE A "PRO RATA" PREMIUM PAYMENT. FAILURE TO DO SO WILL CAUSE AN INVESTOR'S BENEFICAL INTEREST TO BE FORFEITED. FOR MORE INFORMATION ON THE RISKS ASSOCIATED WITH THIS PRODUCT PLEASE SEE THE "RISK ADDENDUM" ATTACHED HERETO.**

Purchaser's Initials: _____

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

RELIANT LIFE SHARES, LLC

By: _____

Date: _____10/14/2020_____

**LIFE SETTLEMENT PURCHASER(S)**

_____
Signature

Provident Trust Group FBO Ed Baeza IRA# 200200121
Printed Name

_____
Social Security or Tax ID#

8880 W. Sunset Road, Ste. 250
Address

Las Vegas, NV 89148
City, State, Zip

702-522-2155
Telephone Number

_____
Signature

Ed Baeza
Printed Name

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
Social Security or Tax ID#

5238 Live Oak View Ave
Address

Los Angeles, CA 90041
City, State, Zip

(323) 972-6827
Telephone number

Purchaser's Initials: _EB_

Exhibit 1002, p. 12

**RELIANT LIFE SHARES, LLC**

**RISK DISCLOSURE**

**WARNING: Do not sign this Agreement unless you wish to be legally bound. This Agreement is subject to the laws of California and the United States. You are urged to read the entirety of this document. If you are in any doubt regarding the contents of this document and what action you should take, seek your own independent legal advice.**

Potential purchasers of Fractional Life Settlements should understand the risks related to the transaction. All purchases possess the combined elements of risks and rewards.

Life Settlements can deliver an attractive rate of return but are not without a degree of risk. The risks are described by category. Some of the risks described in this section are very remote and some are more likely. This list of risks is not necessarily comprehensive but in the interest of completeness, even risks which are relatively rare are listed. Not every policy will carry every possible risk since Reliant offers different types of policies. We try to provide as much information about the risks as possible but additional risks not contained in this Risk Disclosure may exist.

To aid in the explanation, the most frequently offered type of policy, Universal Life Insurance, is the example used in the following paragraphs. Universal Life policies make up 99% of the policies sold and in the event Reliant chooses to sell a policy that is not a UL policy any additional risks associated will be outlined in the policy disclosure package for that specific policy.

**Liquidity Risk:** A Life Settlement is the purchase of all of or a portion of the death benefit of a life insurance policy. In order for the death benefit to be paid, a demise (or death) of the insured must occur. Until then, the original amount paid and the gain or profit to be earned is not available. This is known as being illiquid. It means Reliant cannot and will not refund Investor's money no matter how much Investor may need it. Therefore, an Investor must not use any funds, which Investor may possibly need during the life expectancy of the insured and for some period afterward. It must be stressed that the death benefit amount received upon maturity of the policy is a known certain amount but it will occur at an uncertain time, almost always earlier or later than the projected life expectancy. The investors' financial objective should be long term capital appreciation and capital preservation. Fractional Life Settlements should not be purchased for speculation or for trading such as stocks or mutual funds. As of this writing, there is no organized secondary market trading in these positions, therefore investors need to consider the purchase of fractional life settlements as a buy and hold investment.

Page 13                                                    Purchaser's Initials: _____



Exhibit 1002, p. 13

**Longevity Risk**: Longevity Risk is typically defined as the insured outliving the life expectancy estimate.

All policies are purchased using a deterministic model based upon a medical and actuarial life expectancy developed by an independent third party medical laboratory specializing in such forecasts. To help reduce the concentration of risk associated with the specific laboratories used, Reliant uses multiple life expectancy estimates from different life expectancy providers. Since California does not currently license life expectancy underwriters, Reliant wants to ensure that it only uses the most qualified laboratories available. Consequently, Reliant only uses life expectancy providers approved and licensed to do business in Texas or Florida - two large states that regulate life expectancy providers. If California were to license life expectancy underwriters, Reliant would then look to such licensed providers in California.

As of June 1, 2015, Reliant chooses to use the median life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policy maintenance reserve period. This is a critical issue and ensures a fair period of time is being used to determine the amount of funds to set aside to pay for the premiums, trust and escrow fees as well as the servicing fees on the policy before an investor needs to begin paying these fees out of pocket. By using three different estimates, Reliant also reduces any concentration of risk associated with using only one life expectancy provider's methodology. All life expectancies used for each policy are disclosed on the projection sheet published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.  It is because of this uncertainty and the aforementioned lack of liquidity that life settlements pay much higher returns than that of government bonds and other investment grade investments.

The effect of an insured living beyond life expectancy is a lowering of the annual rate of return and could possibly require an investor to pay additional policy maintenance payments to keep the policy in force. Take for example, a policy with a three-year life expectancy paying a total fixed return of 36%. Its annualized return would pay 12% simple interest per year if the policy matured as expected. However, if the insured lived 4 years instead of 3 years, the fixed total return would still be 36% but the simple annual return would be 9% instead of 12%. If payment of additional policy maintenance payments is necessary on a pro-rata basis, the return is further reduced. In simple terms, the longer an insured lives, the lower the annual return. A further element of this Longevity Risk is associated with the expiration of the policy coverage. Universal Life Policies typically have an expiration age at which time the policy may only pay out the cash value which may exist in the policy. Each Universal Life Policy is different but the most common age of expiration is 100 years old.  This may be mitigated if the policy has a rider which extends this age.

Any projected rate of return to the investor from the purchase of a fractionalized interest in a life settlement is based on an estimated life expectancy for the person insured under the life insurance

Purchaser's Initials: _____



policy. The return on the purchase may vary substantially from the expected rate of return based on the actual life expectancy of the insured that may be less than, equal to or may greatly exceed the estimated life expectancy. *The rate of return will likely be higher if the actual life expectancy was less than, and lower if the actual life expectancy was greater than, the estimated life expectancy of the insured at the time the life settlement transaction closed.*

**Policy Maintenance/Premium Reserve Risk:** Upon purchase of a policy from a seller, Reliant establishes an escrow reserve account for the payment of premiums, trust fees and servicing fees for a specific period of time. Once the time period is determined, Reliant utilizes the services of an independent firm who specializes in premium estimation, Cost of Insurance estimates and insurance policy construction, to determine the exact dollar amount necessary to be funded into the Policies Maintenance Reserve Account in order to pay for the policy and expenses through the given period of time. These services are provided by an actuarial firm who is a specialist in this field with a track record of service. Once a policy's escrow period has passed or the policy reserve funds are exhausted, it is the Investor's responsibility to pay additional payments based upon the percentage of the policy the Investor owns. Although this outside firm specializes in providing this type of service there is the risk that its estimates are wrong. This account is funded as Investors purchase fractional interests in each policy. If an adequate amount of certificates are not sold there is the risk that the policy reserve account will not be sufficient to fund the policy premiums during the Policy's Reserve Period. Typically this policy reserve period provides for the payment of premiums for each year of life expectancy but, at times, Reliant may choose to provide a policy reserve which is longer than the life expectancy, therefore the exact policy reserve period for each policy is disclosed in the Contract and Policy Disclosure Package.

**Premium Call Risk: (Applicable only if the insured lives past the Policy's Reserve Period)** Once the Policy's Reserve Period has ended and, if, the insured is still alive, it is the responsibility of each Investor to pay for their pro rata portion of the expenses to keep the policy and Trust in force along with ensuring the third party servicing company is paid. Reliant, through our servicing partner Asset Servicing Group ITS, will send to the Investors in each policy a Policy Maintenance Invoice, which details all expenses due. An early warning notice (usually some months in advance), and then an invoice for each Investor's share of the premiums, trust fees and policy servicing costs attributable to the purchasers pro-rata portion of the policies they own after the original Policy Reserve Escrow funds are depleted. The Investor must pay this Policy Maintenance Invoice. It is part of the agreement. *If the Investor does not pay the Policy Maintenance Invoice, the Investor will forfeit their beneficial interest in the policy in order to protect other Investors in the policy.*

**Insurance Policy Construction and Performance:** When a Policy's maintenance reserve escrow amount is established by Reliant's outside vendor who specializes in such service, they take many factors into consideration. If cost of insurance charges increase there is no guarantee that the Policy Maintenance Reserve that is established is sufficient to fund the policy through the Policy's Reserve Period. Mortality charges increase dramatically with age. Each policy and each life insurance company charge differently. In the analysis of each policy, Reliant commonly obtains an in-force illustration produced by the life insurance company. Premiums on life insurance policies vary in many ways. A Universal Life Insurance policy typically has a flexible premium payment and can accumulate cash values within the policy. In

Purchaser's Initials: _____



Exhibit 1002, p. 15

some policies this cash value may be used to offset future premiums. Other times the policy Surrender Charge may be higher than the cash value, rendering any cash value useless. The cash values in a policy also may differ from policy to policy. The life insurance company may have enjoyed a profitable year and the interest rate provided on the cash value of the policy may exceed the guaranteed rate thus amplifying the account value. The life insurance company may be a mutual company and have declared a dividend to policyholders. Mortality changes may increase or decrease based upon loss experience. All of these events can affect the policy performance.

Year-by-year projections are impacted by several key assumptions:

A.      The current account value.

B.      The charges against this account for mortality and other expenses.

C.      The interest earnings credited based upon the earnings from the invested account value and the premiums paid.

D.      The premiums necessary to keep the policy in force for every year remaining in the policy life.

These assumptions can change on a year by year basis, and are only valid if the premiums are paid as illustrated.

**Policy Seller Rescission Risk**:  The insured who sold their policy is afforded a 'rescission period' to change their mind and keep the policy.  This period varies from state to state.  However, this risk is mitigated by the fact that the rescission period has expired on ALL policies Reliant sells to investors.

**Taxation Risk**:  The purchase and resale of life insurance policy is a Transfer for Value.  Reliant recognizes this and pays taxes on profits, which it earns by arranging such transactions. Neither Reliant nor its employees, independent contractors or sales representatives are authorized to give tax advice.

The investor should consult with their own tax advisor regarding (i) the tax consequences of the purchase of the fractionalized interest in a life settlement and (ii) if the investor is using retirement funds or accounts for such purchase, whether or not any adverse tax consequences might result from the use of those funds for the purchase of the certificates.

**Insurable Interest Risk**: A life insurance carrier can rescind a policy for lack of insurable interest until the claim is paid.  Insurable Interest is a fundamental element unique to a life insurance contract. This means the person acquiring the contract (the applicant or the original beneficiary) must be subject to loss upon the death of the person being insured.  This interest must exist at the inception of the policy. It does not have to continue and that is the basis for the life settlement industry. Though laws differ slightly from state to state, in general the following types of relationships automatically carry insurable interest:

-An individual has as insurable interest in his or her own life.

-A husband or wife has an insurable interest in a spouse.

Page 16                                                              Purchaser's Initials: _____

-A parent has an insurable interest in his or her child.

-A business has an insurable interest in the lives of its officers, directors and other key employees.

-Business partners have an insurable interest in each other.

-A creditor has an insurable interest in the life of a debtor but only to the extent of the debt.

In 2002, life insurance policies began to be sold to wealthy individuals for the purposes of estate planning using non-recourse premium finance contracts. Estate planning is a United States death tax strategy, which has a definite insurable interest on the part of the insured. However, some of these contracts were issued to individuals who entered into them solely for the purpose of resale. When this happens, it changes the life insurance policy from a contract at risk to a purchase contract. This violates the principal of insurable interest. The life insurance company may choose to contest the death benefit of such contracts and if it prevails, is only obligated to return the premiums paid during the life of the contract. This would have the effect of dramatically lowering the Investor's overall return and a probable loss of all or part of the Investor's principal. While Reliant's underwriting procedures are extremely thorough, it may not identify a policy such as this and a life insurance company may uncover such a policy and may choose to contest it. If such an event took place, Reliant would seek a refund of all premiums paid and the purchase price paid to the seller.

**Contestability Risk**: Every life insurance policy has a contestability period. This is typically 24 months after the issue date. During this period, the life insurance company has the right to cancel the policy and return any premiums paid. This is often known as a "suicide clause" although the company can cancel the policy if it suspects malfeasance in the application or for other reasons. As a business practice, Reliant does not purchase or arrange the purchase of polices while they are in the contestable period The effect of a cancellation during contestability is the extinguishments of the death benefit obligation on the part of the insurance company and the loss of the purchased policy.

**Insurance Company Insolvency Risk**: On occasion in the United States, a life insurance company becomes insolvent. If it were to do so and there was no regulatory intervention, the company would be unable to pay its death benefit obligations. There exists a framework of regulatory measurements and controls, reinsurance, resale options as well as special funds employed by the State Insurance Commissioners to significantly reduce this possibility. A. M. Best Company is the premier insurance rating company. It publishes financial strength ratings for all life, health and casualty insurance companies. Reliant will purchase or arrange the purchase only of policies issued by life insurance companies with ratings of B+ or above.

**Regulatory Risk (US)**: The majority of the states in the US regulate the life settlement industry on a state-by-state basis. Many of these regulations mirror or closely follow the NAIC Model Viatical Settlements Act. The life insurance companies have been active in attempting to promote changes in the law which would make life settlements less attractive or even illegal. The life settlement industry association LISA (Life Insurance Settlement Association) has been robustly and successfully combating these attempts. The fundamental argument offered by LISA is that a policy holder has a constitutional

Purchaser's Initials: _____

right to dispose of their assets as they see fit; be that a home, an automobile, a stock portfolio or a life insurance policy.  So far, lawmakers have agreed with this position and all attempts have been struck down in both the legislatures and in the courts.  There is no guarantee however that this will remain the case and laws or regulations may be enacted which adversely affect the continuance of the industry or the profitability of the transaction.  The impact of these changes is impossible to speculate upon but it is very unlikely that they would be applied retroactively.

In addition, the life settlement industry had been the subject of investigations by various state and Federal governmental entities.  In 2010, the Life Settlements Task Force of the Securities and Exchange Commission issued a staff report discussing life settlements, practices in the life settlements market, regulation of the life settlements market and related recommendations.  Such recommendations included (i) recommending to Congress that the definition of 'security' under Federal securities laws include life settlements, (ii) continue monitoring that legal standards are being met by brokers and providers, (iii) monitor the development of a life settlement securitization market, (iv) encourage Congress and state legislators to consider more significant and consistent regulation of life expectancy underwriters and (v) consider issuing an investor bulletin regarding investments in life settlements.

Likely as a result of this increased industry scrutiny, the Securities and Exchange Commission recently brought a case against Pacific West Capital Group and others in U.S. District Court in the Central District of California. In this case, the Securities and Exchange Commission alleges, among other things, that (i) the issuer issued securities with the proceeds used to pay returns to original investors (i.e. a Ponzi scheme), (ii) the issuer misrepresented annual returns and stressed that returns had no relation to the issuer, (iii) the securities were not issued through broker-dealers, (iv) actuarial-based estimates were not given to investors, (v) the trust agreement was not provided to investors, (vi) reserve funding mechanics were not adequately explained to investors, (vii) policies were purchased even if not sufficiently funded, (viii) the increase in premiums for the policies were not adequately disclosed to investors, and (ix) the securities were not registered.  These allegations do not relate to Reliant and the certificates; the broker-dealer and registration issues are dealt with under the captions 'Securities Risk (CA)' and 'Securities Risk (US)' below.

**Regulatory Risk (CA):** Reliant operates under California Corporations Code Section 25102(q) established to regulate the fractionalized life settlement Industry in California.  This statute and related regulations may change without notice and at any time preventing Reliant from operating as currently structured.

**Securities Risk (CA):**  Fractional Life Settlements are a security under California law but are exempt from registration under California law if offered through a life agent licensed in California subject to numerous requirements including, among other things, that they only be sold to qualified purchasers as defined under the California Corporations Code. Reliant relies on this state securities exemption to market this security in California.

**Securities Risk (US):**  Under Federal law, it is not fully settled law whether Fractional Life Settlements, each backed by a single policy, are securities.

Purchaser's Initials: _____

If considered to be securities under Federal law, Reliant would be able to look to several exemptions from registration including: (i) intrastate exemption under Rule 147 of the Securities Act of 1933, as amended (the "Securities Act") where all of the certificates are sold to persons resident within a single state (in our instance, California) and where the issuer is a person resident and doing business within such state, (ii) limited offering exemption under Rule 505 of the Securities Act for sales of securities not exceeding $5 million which limits sales to thirty-five (35) non-accredited investors and (iii) Rule 506 of the Securities Act for sales of securities to accredited investors. The Securities Act defines 'issuer' as either the depositor or manager pursuant to the trust agreement and, it is Reliant's belief, that it is the issuer as depositor and manager of the program under the trust agreement. However, the Securities and Exchange Commission and the courts could determine that the trustee is the sole issuer for purposes of Rule 147. In such an event, the Investors could not rely on the Rule 147 exemption since the Trustee's principal place of business is not in California.

As a result, our offerings have not been and, absent a change in Federal law or interpretation of Federal law, will not be registered under the Securities Act or any foreign securities law.

It should be noted that even if either the exemptions under Rule 505 or Rule 506 of the Securities Act are met, the broker arranging the Fractionalized Life Settlements must be registered broker-dealers; life agents licensed in California relate only to California securities law and not Federal securities law (*see* 'Securities Risk (CA)' above.

**Insolvency Risk**: The possibility exists that Reliant Life Shares, LLC, could become insolvent. While Reliant considers that we enjoy a prosperous and growing position in our industry, we, like all businesses are exposed to events which may be beyond our control and which could alter our destiny. We take comfort in the fact that our business practices employ the concept of naming an independent trust established on the Investor's behalf as the direct beneficiary of the death benefit purchased. This means that the obligation to pay rests solely on the life insurance company and the independent trustee and not on Reliant. Further, the policy maintenance reserves established for the payment of the premiums and other expenses are held in an escrow account under the control of a third-party Trustee. Reliant pays certain maintenance, servicing costs and Trust fees that would have to be paid by investors in the case of insolvency. The likely impact of Reliant's insolvency will be a degree of confusion as to communication with the Investor and the possible substitution of another issuer to replace Reliant and, if no replacement is quickly found, the possible resignation of the current Trustee. Certain contingency plans are in place to minimize this confusion. The Trustee of the Trust enjoys a wide degree of latitude to address this situation and has access to each policy's reserve account to pay the costs associated with maintaining and servicing the policy until the policy maintenance reserves are exhausted and at that point moving forward the investor understands they are responsible for the policy maintenance expenses including servicing costs and trust fees which will be invoiced from the servicer. In the event the policy maintenance reserve period has elapsed, then Investors have the duty to pay their Policy Maintenance Invoices from which the Trustee will pay the continued operational expenses. Should these expenses increase, investors may pay up to three hundred dollars per policy per year for additional servicing responsibilities by the servicer. These expenses will be part of the Policy Maintenance invoices once the policy maintenance reserve is exhausted.

**Line of Business or Acquisition Risk**: For a number of reasons, Reliant may discontinue a product offering, a line of business or its shares, its assets or the business itself may be sold. While this would not

Purchaser's Initials: _____



affect the Investor's purchase per se, it would force the Investor to deal with an unknown third-party entity for its management of the policies.

**Summary: Reliant has attempted to list the main risks associated with our product. It is difficult to predict future scenarios not contained herein. However, if a material change occurs, Reliant shall attempt to assess its impact (if any) on the Investor's position. If there is such an impact or if there is any doubt, Reliant will send an update of this Risk Disclosure to the Investor.**

Purchaser's Initials: _____



# Reliant Life Shares, LLC

### FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT

**THIS FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT** ("Agreement") is made this <u>11th</u> day of <u>February</u>, 2020, by and between Reliant Life Shares, LLC ("RELIANT LIFE SHARES" or the "Seller"), and <u>Provident Trust Group FBO Ed Baeza IRA# 200200121</u> (the "Purchaser"). This Agreement covers the purchase of one or more interests in the death benefits of a life insurance policy insuring the life of an individual, or life settlement interests ("Interests").

**WHEREAS,** the Purchaser has reviewed and approves and adopts the criteria utilized by the Seller to purchase said Interests; and

**WHEREAS,** the Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with the Seller, and the Purchaser expressly waives any and all claims to the contrary; and

**NOW THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, each party hereby represents that it or its representatives has/have the requisite authority to enter into this Agreement and hereby agree as follows:

### 1. THE PURCHASE

(a) The Purchaser hereby agrees to deposit the sum of:

$ <u>19,300</u> to acquire an Interest in Policy #: <u>156 222 969</u>. Total Fixed Return: <u>66%</u>

$ <u>19,500</u> to acquire an Interest in Policy #: <u>171977</u>. Total Fixed Return: <u>75%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>161217091</u>. Total Fixed Return: <u>52%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>BU1783741</u>. Total Fixed Return: <u>71%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>198859</u>. Total Fixed Return: <u>78%</u>

$ <u>19,300</u> to acquire an Interest in Policy #: <u>BU1784205</u>. Total Fixed Return: <u>98%</u>

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____. Total Fixed Return: _____

Page 1                                                          Purchaser's Initials: <u>E. B</u>

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

(b)      The Purchaser's deposit will be made simultaneous with the delivery of this executed Agreement to Seller, by delivering a check, or effecting a wire transfer, made payable to Seller's Escrow Agent, UMB – *Reliant Life Shares Subscription Escrow Account*. The Purchaser's deposit does not constitute a purchase or a commitment to purchase until five (5) business days after the Purchaser has received all of the disclosures required by California law.

(c)      Upon Seller's receipt of the executed Life Settlement Disclosure Form, but in no event sooner than five (5) days after Purchaser's receipt of the Life Settlement Disclosure Form, the Seller will obtain confirmation of the recording of a change of ownership of such Policy to Reliant Life Shares Series Statutory Trust ("RELIANT LIFE SHARES") and a confirmation of irrevocable beneficiary. In the case of a Group Policy, the Seller will obtain a confirmation of the recording of an absolute assignment of such Group Policy to the Reliant Life Shares Series Statutory Trust and a confirmation of the recording of a change of beneficiary under such Policy naming as beneficiary the Reliant Life Shares Series Statutory Trust. To the extent that the Seller does not at the date of this Agreement have available such policies, the Seller shall use its reasonable efforts to obtain a suitable policy(ies) as soon as practicable after the date of this Agreement.

(d)      Upon the maturity of the life insurance policy (ies) in which Purchaser has purchased a life settlement interest, the trustee (UMB Bank) shall file or cause to be filed a claim for the death benefits with the appropriate insurance company. When the Reliant Life Shares Series Statutory Trust receives payment of such claim, UMB Bank will pay the Purchaser directly it's pro rata share of the death benefits.

(1)      In the event of Purchaser's death before policy maturity, Purchaser designates (Please List: Name, Address and Phone)
Designated By the IRA
_____

_____

as Contingent beneficiary.  In the case that both Purchaser and Contingent Beneficiary die in the same accident, Contingent Beneficiary will be deemed to have died first and Purchaser therefore designates (Please List: Name, Address and Phone)
_____

_____

as Tertiary Beneficiary

Purchaser's Initials: *C. B*

(e)    The owner of the life insurance policy in which Purchaser will obtain an interest will be a trust. The current trust is Reliant Life Shares Series Statutory Trust. The current Trustee of the Reliant Life Shares Series Statutory Trust is UMB Bank. The Trustee's sole responsibilities are to maintain accounts for the purpose of making the premium payments as more fully described in Section 2(b) of this Purchase Agreement, to be the beneficiary for the death benefits of the life insurance policy in which Purchaser obtains an Interest, and to disburse the death benefits in accordance with the assignments of benefits relating to that policy. Reliant Life Shares has contracted with UMB Bank to perform certain post-closing services as the Trustee, as more fully set forth in Paragraph 3(o) herein.

(f)    The Seller's Escrow Agent is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(g)    The responsibilities of the Escrow Agent are:

1. To hold the funds forwarded by the Purchaser pursuant to this Agreement;
2. To hold the documents received from the Seller of a policy when required;
3. To receive and review written confirmation that the insurance company has accepted, recognized and,/or noted on its books and records the transfer of the policy ownership and the change of beneficiary(ies);
4. To make disbursements at the direction of the Trustee.

(h)    The Escrow Agent is not representing the Purchaser in this transaction and has no responsibility to the Purchaser with regard to this transaction other than to hold the funds in escrow in accordance with Section 1(g).

(i)    Purchaser recognizes that the Trustee and Escrow Agent shall not incur any liability the Seller or to Purchaser for any damages, losses or expenses which either party may sustain or incur, unless the same is a direct result of the gross negligence or intentional misconduct of Trustee or Escrow Agent. Trustee and Escrow Agent shall be protected in any action taken or omitted in good faith with respect to their duties and responsibilities. Trustee and Escrow Agent shall be entitled to rely on any document(s) which Trustee and Escrow Agent reasonably believe satisfy the terms and conditions of the escrow. The Seller and Purchaser each hereby agree to indemnify and hold harmless Trustee and Escrow Agent from and against all losses, except those caused by gross negligence or intentional misconduct, claims, damages, liabilities and expenses which it may sustain or incur hereunder, including, without limitation, reasonable attorney's fees, which may be imposed upon Trustee or Escrow Agent or incurred by Trustee and Escrow Agent in connection with the performance of their duties.

(j)    Seller may from time to time make available for purchase an Interest in a "second to die" life insurance policy. These policies typically insure the life of a husband and wife, and do not pay off until both insured's have died. In the event a second to die policy is offered for investment it will be disclosed that the policy is a second to die policy.

Purchaser's Initials: _C. B_

## 2. THE SELLER'S OBLIGATIONS TO THE PURCHASER

(a)      The Seller represents and warrants to the Purchaser that:

(1) At the time of the original life settlement transaction between the insured and the buyer, the Insured's attending physician or other qualified third party confirmed in writing that the Insured was of sound mind and under no constraint or undue influence during the contracting process for the life insurance policies in which an Interest is being purchased.

(2) The life insurance policies in which an Interest is being purchased must be in effect and beyond their respective contestability and suicide periods.

(3) At the time Seller is provided the Life Settlement Disclosure Form, the insurance company that issued the policy must be a highly-rated, legal reserve U.S. life insurance company.

(b)      In the event that the Policy Maintenance Reserve account for a given policy is depleted, and in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser(s) of that policy to make pro rata payments on any policy in which they have an Interest to ensure the policy premium, trust fees and associated servicing fees are paid for until the policy matures and the carrier pays the death benefit. In that event the Purchaser shall be notified no less than 60 days before any policy maintenance payment becomes due.  If the Purchaser does not remit or cause to be remitted to Trustee, in immediately available funds, the required pro rata policy maintenance payments within the time frame stated in said notice to Purchaser, Purchaser shall immediately be divested of the Purchaser's Interest in said policy.

(c)      The Seller shall obtain a written release signed by all the present owners and beneficiaries under the Policy(ies), waiving any and all present and/or future rights to ownership and beneficial interests under the Policy(ies) and provide this information to the Trustee;

(d)      Seller shall obtain and provide to the Trustee the following documents:

1.  Change of Ownership
2.  Change of Beneficiary

(e)      In order to protect the confidentiality and privacy of insureds, their names will not be disclosed to the Purchasers. Insureds will be given a code number which will be recorded and maintained in the records of the Seller and the servicing company's databases. Any insurance company documents provided to the Purchaser will have any identifying information regarding the insured redacted and replaced with this code number.

(f)      Except as set forth in this Agreement, the Seller makes no representations or warranties of any kind, nature or description whatsoever and Purchaser expressly acknowledges that no representations or warranties have been made. The Seller is not liable or bound in any manner by express or implied warranties, guaranties, promises, statements or representations, not included within

Purchaser's Initials: 

this Agreement, that are made or furnished by any broker, agent, employee, servant or other person purporting to represent the Seller.

### 3. DISCLOSURES TO LIFE SETTLEMENT PURCHASERS

(a)    The Seller is Reliant Life Shares, LLC, whose principal business and mailing address is 15260 Ventura Boulevard, Suite 1420, Sherman Oaks, CA 91403.

(b)    The suitability standards for prospective purchasers, set forth at California Corporations Code §25102(q)(1), are as follows:

(1)    Sales of securities described in this subdivision are made only to qualified purchasers or other persons the issuer reasonably believes, after reasonable inquiry, to be qualified purchasers. A corporation, partnership, or other organization specifically formed for the purpose of acquiring the securities offered by the issuer in reliance upon this exemption may be a qualified purchaser only if each of the equity owners of the corporation, partnership, or other organization is a qualified purchaser. Qualified purchasers include the following:

(A)    A person designated in Section 260.102.13 of Title 10 of the California Code of Regulations.

(B)    A person designated in subdivision (i) or any rule of the commissioner adopted thereunder.

(C)    A pension or profit-sharing trust of the issuer, a self-employed individual retirement plan, or an individual retirement account, if the investment decisions made on behalf of the trust, plan, or account are made solely by persons who are qualified purchasers.

(D)    An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, each with total assets in excess of five million dollars ($5,000,000) according to its most recent audited financial statements.

(E)    A natural person who is either an individual or an individual jointly with their spouse, they warrant that they are a qualified investor or (i) have a minimum net worth of one hundred fifty thousand dollars ($150,000) and have during the immediately preceding tax year, gross income in excess of one hundred thousand dollars ($100,000) and reasonably expect gross income in excess of one hundred thousand dollars ($100,000) during the current tax year or (ii) have a minimum net worth of two hundred fifty thousand dollars ($250,000). "Net worth" shall be determined exclusive of home, home furnishings, and automobiles. Other assets included in the computation of net worth may be valued at fair market value.

Purchaser's Initials: *E. B*

Each natural person specified above, by reason of his or her business or financial experience, or the business or financial experience of his or her professional advisor, who is unaffiliated with and who is not compensated, directly or indirectly, by the Issuer of any affiliate or selling agent of the Issuer, can be reasonably assumed to have the capacity to protect his or her interests in connection with the transaction. The amount of investment of each natural person shall not exceed 10 percent of the net worth, as determined by this subdivision, of that natural person unless the investor is an accredited investor.

(F)     Any other purchaser designated as qualified by rule of the commissioner.

(c)     RELIANT LIFE SHARES is a limited liability company in the State of California.

(d)     RELIANT LIFE SHARES is in the business of facilitating the sale of interests in life settlements.

(e)     SLG Trust is the shareholder of RELIANT LIFE SHARES.

(f)     Under Section 25508.5 of the California Corporations Code, a person who purchases a life settlement contract or a fractionalized or pooled interest therein may rescind or cancel the purchase at any time before seven (7) calendar days after the date the person remits the required consideration to the issuer or the issuer's agent by giving written notice of rescission or cancellation to the issuer or the issuer's agent. No specific form is required for the rescission or cancellation. The notice is effective when personally delivered, deposited in the United States mail, or deposited with a commercial courier or delivery service. If the Purchaser rescinds or cancels the purchase, the Seller shall refund all of the Purchaser's money within seven (7) calendar days after receipt of the notice of rescission or cancellation.  No rescission or refunds are possible after seven (7) calendar days from the funding of the sale.

(g)     The life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed. The annualized rate of return would be higher if the actual life expectancy turns out to be less than the estimated life expectancy of the insured. The annualized rate of return would be lower if the actual life expectancy turns out to be more than the estimated life expectancy of the insured.

(1) Reliant Life Shares is not responsible for the accuracy of life expectancy reports.

(2) Reliant Life Shares generally does not purchase life expectancy reports, because it receives them from brokers in the life settlement market as part of an overall package when brokers try to sell policies in the secondary market.

(3) There may be other life expectancy reports outstanding on the very same insured(s) on which Reliant has purchased a policy.  These reports may have a higher or lower life expectancies than the data furnished to Reliant by the broker.

Page 6                                                      Purchaser's Initials: *E. B*



**RELIANT LIFE SHARES, LLC**

**PURCHASER SUITABILITY QUESTIONNAIRE**

Please read and complete this Purchaser Suitability Questionnaire (this "Questionnaire") in its entirety.

If anyone else is signing the same Life Settlement Purchase Agreement (the "Agreement") that you are signing, please specify the name(s) of these individuals in the space provided below:

If a corporation, partnership, or other organization specifically formed for the purpose of acquiring a Life Settlement Interest has signed the Purchase Agreement, each equity owner of the corporation, partnership, or other organization must complete a separate Questionnaire.

We recognize that the information requested below is information that you might consider to be private. Please be assured that we are obtaining this information because we are required to make reasonable and diligent inquiry under the California Corporation Code that you are a "qualified purchaser" as that term is defined under §25102 and that we will not provide any of this information to a party not affiliated with or involved in the proposed transaction, unless required to do so by law. **Without this information, we cannot process your purchase agreement.**

**Personal Information**

| | |
|---|---|
| Name | Ed Baeza |
| Address | 5238 Live Oak View Ave |
| | Los Angeles, CA 90041 |
| Telephone | (323) 972-6827 |
| D.O.B. | 10/17/1952 |
| Occupation | Property Management Company Owner |
| Highest level of formal education | |
| Number of dependents | |

Marital Status    Single    ✓ Married    Divorced    Separated    Widowed

**Spouse Information**

| | |
|---|---|
| Name | Concepcion Baeza |
| Occupation | |
| Highest level of formal education | |

**Additional Background Information**

How did you hear about life settlements? _____

Who recommended the purchase to you? _____

Do you have a previous relationship with that person or entity? If so, please explain. _____

Have you liquidated another asset to make this purchase? _____

With what source of funds are you making this purchase? _____

**Income Information**

Please provide the information requested below. Please also specify if you are completing this Questionnaire individually or jointly with your spouse.    Individually    Jointly with Spouse

Please provide your annual gross income in U.S. Dollars ($USD) for each time period indicated.

Page 1

Purchaser's Initials: E.B    INITIAL HERE

Exhibit 1003, p. 7

For the Current Tax Year

The total gross aggregate gross income of all parties with respect to whom information is being provided in this Questionnaire for the current tax year is expected to be $_____

For the Previous Tax Year

The total gross aggregate gross income of all parties with respect to whom information is being provided in this Questionnaire for the immediately previous tax year 20__ was $_____, according to the income tax return filed with the United States Internal Revenue Service for that tax year.

For the Next Previous Tax Year

The total gross aggregate gross income of all parties with respect to whom information is being provided in this Questionnaire for the next previous tax year 20__ was $_____, according to the income tax return filed with the United States Internal Revenue Service for that tax year.

What are the sources of your income?  Please check all that apply.

□ Employment    □ Inheritance or Trust    □ Savings and/or Investment    □ Other: _____

**Personal Net Worth Information**
Please provide your net worth in U.S. Dollars, excluding the fair market value of your home, home furnishings and automobiles.  $ _____.    *E-B*    (purchaser initials)

**Investment Information & Experience**
Please check each box that applies with respect to your participation in the listed form of investment.

| PAST | CURRENT | | PAST | CURRENT | |
|------|---------|--|------|---------|--|
| □ | □ | Mutual Funds | □ | □ | Commercial Paper |
| □ | □ | Stocks/Equities | □ | □ | 401(k) or Keogh Plans |
| □ | □ | Bonds | □ | □ | Limited Partnerships |
| □ | □ | IRAs or SEPs | □ | □ | CDs |
| □ | □ | Annuities | □ | □ | Options |
| □ | □ | Real Estate | □ | □ | Futures |
| □ | □ | Life Settlements | □ | □ | Other |

If you selected "Other" please describe: _____

**Representations**
I have carefully examined my financial resources, investment objectives, and tolerance for risk.  I sufficiently understand the risk factors and objectives associated with this investment, either independently or as explained to me by one or more professional advisors not affiliated with or in any way compensated by Seller or its representatives.  I have read and completed this Questionnaire.  I represent and warrant that the information contained herein is complete and accurate and may be relied upon by Seller.  I also agree to notify Seller of any material change in any of the information herein prior to the closing of any purchase that I make under the Purchase Agreement that I have entered into with Seller.

Signature: *Ed Baeza*                    Date: 02-11-2020
Print Name: Ed Baeza

Through my signature below, I am joining this Questionnaire and I am making all of the same representations and warranties appearing above as though set forth here.

Signature: _____            Date: _____
Print Name: _____

Page 2                                    Purchaser's Initials: *E - B*



## Reliant Life Shares, LLC

### FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT

**THIS FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT** ("Agreement") is made this 9th day of October , 2020, by and between Reliant Life Shares, LLC ("RELIANT LIFE SHARES" or the "Seller"), and Gaman LLC (the "Purchaser"). This Agreement covers the purchase of one or more interests in the death benefits of a life insurance policy insuring the life of an individual, or life settlement interests ("Interests").

**WHEREAS**, the Purchaser has reviewed and approves and adopts the criteria utilized by the Seller to purchase said Interests; and

**WHEREAS**, the Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policy(ies) upon the death of the insured(s), and will not be derived from the efforts of any person or entity employed by or associated with the Seller, and the Purchaser expressly waives any and all claims to the contrary; and

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth, each party hereby represents that it or its representatives has/have the requisite authority to enter into this Agreement and hereby agree as follows:

### 1. THE PURCHASE

(a)     The Purchaser hereby agrees to deposit the sum of:

$ 60,000 to acquire an Interest in Policy #: 156 222 969 . Total Fixed Return: 66%

$ 60,000 to acquire an Interest in Policy #: BU1783741 . Total Fixed Return: 71%

$ 60,000 to acquire an Interest in Policy #: 171977 . Total Fixed Return: 75%

$ 30,000 to acquire an Interest in Policy #: 7396208 & 73689651 . Total Fixed Return: 76%

$ 60,000 to acquire an Interest in Policy #: BU1784205 . Total Fixed Return: 98%

$ 80,000 to acquire an Interest in Policy #: B00815053 . Total Fixed Return: 111%

$ _____ to acquire an Interest in Policy #: _____ . Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #: _____ . Total Fixed Return: _____

Page 1

Purchaser's Initials:

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

$ _____ to acquire an Interest in Policy #:_____. Total Fixed Return: _____

(b)    The Purchaser's deposit will be made simultaneous with the delivery of this executed Agreement to Seller, by delivering a check, or effecting a wire transfer, made payable to Seller's Escrow Agent, UMB – *Reliant Life Shares Subscription Escrow Account*. The Purchaser's deposit does not constitute a purchase or a commitment to purchase until five (5) business days after the Purchaser has received all of the disclosures required by California law.

(c)    Upon Seller's receipt of the executed Life Settlement Disclosure Form, but in no event sooner than five (5) days after Purchaser's receipt of the Life Settlement Disclosure Form, the Seller will obtain confirmation of the recording of a change of ownership of such Policy to Reliant Life Shares Series Statutory Trust ("RELIANT LIFE SHARES") and a confirmation of irrevocable beneficiary. In the case of a Group Policy, the Seller will obtain a confirmation of the recording of an absolute assignment of such Group Policy to the Reliant Life Shares Series Statutory Trust and a confirmation of the recording of a change of beneficiary under such Policy naming as beneficiary the Reliant Life Shares Series Statutory Trust. To the extent that the Seller does not at the date of this Agreement have available such policies, the Seller shall use its reasonable efforts to obtain a suitable policy(ies) as soon as practicable after the date of this Agreement.

(d)    Upon the maturity of the life insurance policy (ies) in which Purchaser has purchased a life settlement interest, the trustee (UMB Bank) shall file or cause to be filed a claim for the death benefits with the appropriate insurance company. When the Reliant Life Shares Series Statutory Trust receives payment of such claim, UMB Bank will pay the Purchaser directly it's pro rata share of the death benefits.

(1)    In the event of Purchaser's death before policy maturity, Purchaser designates (Please List: Name, Address and Phone)

_____

_____

as Contingent beneficiary. In the case that both Purchaser and Contingent Beneficiary die in the same accident, Contingent Beneficiary will be deemed to have died first and Purchaser therefore designates (Please List: Name, Address and Phone)

_____

_____

as Tertiary Beneficiary

Purchaser's Initials: _____

Exhibit 1004, p. 2

(e)     The owner of the life insurance policy in which Purchaser will obtain an interest will be a trust. The current trust is Reliant Life Shares Series Statutory Trust. The current Trustee of the Reliant Life Shares Series Statutory Trust is UMB Bank. The Trustee's sole responsibilities are to maintain accounts for the purpose of making the premium payments as more fully described in Section 2(b) of this Purchase Agreement, to be the beneficiary for the death benefits of the life insurance policy in which Purchaser obtains an Interest, and to disburse the death benefits in accordance with the assignments of benefits relating to that policy. Reliant Life Shares has contracted with UMB Bank to perform certain post-closing services as the Trustee, as more fully set forth in Paragraph 3(o) herein.

(f)     The Seller's Escrow Agent is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(g)     The responsibilities of the Escrow Agent are:

1. To hold the funds forwarded by the Purchaser pursuant to this Agreement;
2. To hold the documents received from the Seller of a policy when required;
3. To receive and review written confirmation that the insurance company has accepted, recognized and,/or noted on its books and records the transfer of the policy ownership and the change of beneficiary(ies);
4. To make disbursements at the direction of the Trustee.

(h)     The Escrow Agent is not representing the Purchaser in this transaction and has no responsibility to the Purchaser with regard to this transaction other than to hold the funds in escrow in accordance with Section 1(g).

(i)     Purchaser recognizes that the Trustee and Escrow Agent shall not incur any liability the Seller or to Purchaser for any damages, losses or expenses which either party may sustain or incur, unless the same is a direct result of the gross negligence or intentional misconduct of Trustee or Escrow Agent. Trustee and Escrow Agent shall be protected in any action taken or omitted in good faith with respect to their duties and responsibilities. Trustee and Escrow Agent shall be entitled to rely on any document(s) which Trustee and Escrow Agent reasonably believe satisfy the terms and conditions of the escrow. The Seller and Purchaser each hereby agree to indemnify and hold harmless Trustee and Escrow Agent from and against all losses, except those caused by gross negligence or intentional misconduct, claims, damages, liabilities and expenses which it may sustain or incur hereunder, including, without limitation, reasonable attorney's fees, which may be imposed upon Trustee or Escrow Agent or incurred by Trustee and Escrow Agent in connection with the performance of their duties.

(j)     Seller may from time to time make available for purchase an Interest in a "second to die" life insurance policy. These policies typically insure the life of a husband and wife, and do not pay off until both insured's have died. In the event a second to die policy is offered for investment it will be disclosed that the policy is a second to die policy.

Purchaser's Initials: _____

Exhibit 1004, p. 3

## 2. THE SELLER'S OBLIGATIONS TO THE PURCHASER

(a)      The Seller represents and warrants to the Purchaser that:

(1) At the time of the original life settlement transaction between the insured and the buyer, the Insured's attending physician or other qualified third party confirmed in writing that the Insured was of sound mind and under no constraint or undue influence during the contracting process for the life insurance policies in which an Interest is being purchased.

(2) The life insurance policies in which an Interest is being purchased must be in effect and beyond their respective contestability and suicide periods.

(3) At the time Seller is provided the Life Settlement Disclosure Form, the insurance company that issued the policy must be a highly-rated, legal reserve U.S. life insurance company.

(b)      In the event that the Policy Maintenance Reserve account for a given policy is depleted, and in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser(s) of that policy to make pro rata payments on any policy in which they have an Interest to ensure the policy premium, trust fees and associated servicing fees are paid for until the policy matures and the carrier pays the death benefit. In that event the Purchaser shall be notified no less than 60 days before any policy maintenance payment becomes due.  If the Purchaser does not remit or cause to be remitted to Trustee, in immediately available funds, the required pro rata policy maintenance payments within the time frame stated in said notice to Purchaser, Purchaser shall immediately be divested of the Purchaser's Interest in said policy.

(c)      The Seller shall obtain a written release signed by all the present owners and beneficiaries under the Policy(ies), waiving any and all present and/or future rights to ownership and beneficial interests under the Policy(ies) and provide this information to the Trustee;

(d)      Seller shall obtain and provide to the Trustee the following documents:

1.   Change of Ownership
2.   Change of Beneficiary

(e)      In order to protect the confidentiality and privacy of insureds, their names will not be disclosed to the Purchasers. Insureds will be given a code number which will be recorded and maintained in the records of the Seller and the servicing company's databases. Any insurance company documents provided to the Purchaser will have any identifying information regarding the insured redacted and replaced with this code number.

(f)      Except as set forth in this Agreement, the Seller makes no representations or warranties of any kind, nature or description whatsoever and Purchaser expressly acknowledges that no representations or warranties have been made. The Seller is not liable or bound in any manner by express or implied warranties, guaranties, promises, statements or representations, not included within

Purchaser's Initials: _____

Exhibit 1004, p. 4

this Agreement, that are made or furnished by any broker, agent, employee, servant or other person purporting to represent the Seller.

### 3. DISCLOSURES TO LIFE SETTLEMENT PURCHASERS

(a)     The Seller is Reliant Life Shares, LLC, whose principal business and mailing address is 15260 Ventura Boulevard, Suite 1420, Sherman Oaks, CA 91403.

(b)     The suitability standards for prospective purchasers, set forth at California Corporations Code §25102(q)(1), are as follows:

(1)     Sales of securities described in this subdivision are made only to qualified purchasers or other persons the issuer reasonably believes, after reasonable inquiry, to be qualified purchasers. A corporation, partnership, or other organization specifically formed for the purpose of acquiring the securities offered by the issuer in reliance upon this exemption may be a qualified purchaser only if each of the equity owners of the corporation, partnership, or other organization is a qualified purchaser. Qualified purchasers include the following:

(A)     A person designated in Section 260.102.13 of Title 10 of the California Code of Regulations.

(B)     A person designated in subdivision (i) or any rule of the commissioner adopted thereunder.

(C)     A pension or profit-sharing trust of the issuer, a self-employed individual retirement plan, or an individual retirement account, if the investment decisions made on behalf of the trust, plan, or account are made solely by persons who are qualified purchasers.

(D)     An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, each with total assets in excess of five million dollars ($5,000,000) according to its most recent audited financial statements.

(E)     A natural person who is either an individual or an individual jointly with their spouse, they warrant that they are a qualified investor or (i) have a minimum net worth of one hundred fifty thousand dollars ($150,000) and have during the immediately preceding tax year, gross income in excess of one hundred thousand dollars ($100,000) and reasonably expect gross income in excess of one hundred thousand dollars ($100,000) during the current tax year or (ii) have a minimum net worth of two hundred fifty thousand dollars ($250,000). "Net worth" shall be determined exclusive of home, home furnishings, and automobiles. Other assets included in the computation of net worth may be valued at fair market value.

Purchaser's Initials: _____

Exhibit 1004, p. 5

Each natural person specified above, by reason of his or her business or financial experience, or the business or financial experience of his or her professional advisor, who is unaffiliated with and who is not compensated, directly or indirectly, by the Issuer of any affiliate or selling agent of the Issuer, can be reasonably assumed to have the capacity to protect his or her interests in connection with the transaction. The amount of investment of each natural person shall not exceed 10 percent of the net worth, as determined by this subdivision, of that natural person unless the investor is an accredited investor.

(F)    Any other purchaser designated as qualified by rule of the commissioner.

(c)    RELIANT LIFE SHARES is a limited liability company in the State of California.

(d)    RELIANT LIFE SHARES is in the business of facilitating the sale of interests in life settlements.

(e)    SLG Trust is the shareholder of RELIANT LIFE SHARES.

(f)    Under Section 25508.5 of the California Corporations Code, a person who purchases a life settlement contract or a fractionalized or pooled interest therein may rescind or cancel the purchase at any time before seven (7) calendar days after the date the person remits the required consideration to the issuer or the issuer's agent by giving written notice of rescission or cancellation to the issuer or the issuer's agent. No specific form is required for the rescission or cancellation. The notice is effective when personally delivered, deposited in the United States mail, or deposited with a commercial courier or delivery service. If the Purchaser rescinds or cancels the purchase, the Seller shall refund all of the Purchaser's money within seven (7) calendar days after receipt of the notice of rescission or cancellation.  No rescission or refunds are possible after seven (7) calendar days from the funding of the sale.

(g)    The life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed. The annualized rate of return would be higher if the actual life expectancy turns out to be less than the estimated life expectancy of the insured. The annualized rate of return would be lower if the actual life expectancy turns out to be more than the estimated life expectancy of the insured.

(1) Reliant Life Shares is not responsible for the accuracy of life expectancy reports.

(2) Reliant Life Shares generally does not purchase life expectancy reports, because it receives them from brokers in the life settlement market as part of an overall package when brokers try to sell policies in the secondary market.

(3) There may be other life expectancy reports outstanding on the very same insured(s) on which Reliant has purchased a policy.  These reports may have a higher or lower life expectancies than the data furnished to Reliant by the broker.

Purchaser's Initials: _____

Exhibit 1004, p. 6



(4) As part of the due diligence process prior to the purchase of a policy, Reliant may use third party medical review experts and legal experts to investigate numerous aspects of the insureds health status and the origination of policies before purchase.

(h) As of June 1, 2015, Reliant uses the *median* life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policies escrow reserve period. All life expectancies used for each policy are disclosed on the "Projection Sheet" published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate. The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.

(i) The purchase of a fractional Life Settlement investment should not be considered a liquid purchase. It is impossible to predict the exact time of the insured's death. No fixed date for the payment of the death benefit to Purchaser has been or can be determined at this time. Once the rescission period has passed all of the Purchaser's funds are illiquid and will not be available until after the death of the insured. Purchaser acknowledges that he/she has sufficient financial resources to bear the risk associated with the purchase.

(j) The Purchaser's annual rate of return on purchase decreases as the life of the insured continues. The Purchaser's annual rate of return on purchase may be further adversely affected by, without limitation, (i) the financial stability of the insurance companies issuing the Policies, or (ii) the payment limitations in effect from time to time set by the State Guarantee Funds of the states where the Policies were issued.

(k) Each Purchaser should consult with his or her own tax advisor regarding the tax consequences of the purchase of a life settlement interest. If the Purchaser is using retirement funds or qualified tax deferred accounts for the purchase, they should ask his or her tax advisor whether or not any adverse tax consequences might result from the use of those funds for this purchase.

(l) Purchasers should be aware that some types of group life insurance policies may contain limitations or caps in the amount of coverage that may be converted. Also, the conversion of a group policy to an individual policy may result in additional premium payments.

(m) The Trustee is responsible for making the premium payments as outlined in Section 2(b) of this Agreement. The current Trustee is UMB Bank, n.a., at 1010 Grand Boulevard, Fourth Floor, Kansas City Missouri, 64106.

(n) A Life Settlement Disclosure Form containing specific information regarding the insurance policy(ies) in which the Purchaser may obtain an interest will be provided to the Purchaser at least five (5) business days prior to the closing of any purchase. The commitment to purchase an interest in the death benefits of a specific policy shall not be final until the Purchaser has received this

Purchaser's Initials: _____

Exhibit 1004, p. 7

information and been given the opportunity to advise the Seller if he/she wishes to decline the purchase.

(o)     There are certain post-closing servicing activities that must be undertaken, but are not performed by Seller. These servicing activities include but are not limited to maintaining contact with the insured, tracking the health status of the insured, monitoring the status of disability claims by insured, converting group policies to individual plans of insurance, obtaining required documents needed for filing a claim and filing claims for benefits with the insurance companies. To perform the above-described activities, the Seller has contracted Asset Servicing Group ITS.  Asset Servicing Group ITS is a leading policy servicing company and their responsibilities include all investor support related to policy maintenance and premium payments.

(p)     Selling expenses and commission may be paid by Reliant Life Shares LLC licensed sales agents.  All distributions costs are factored into the purchase of each policy and therefore 100% of each investors funds will be deposited and allocated toward the policies/trusts they select.

### 4. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that:

(a)     Purchaser is a resident of the State of California and the address and other information set forth herein are true and correct.

(b)     The Interest(s) is/are being acquired solely for the Purchaser's own account and not with a view to or for sale in connection with the distribution of the security.

(c)     Other than the Seller's agent, Purchaser has not dealt with any broker or finder in connection with the transaction set forth in this Agreement.

(d)     He/she is sophisticated in financial matters or has access to professional advice, has adequate means for providing for current financial needs and possible personal contingencies, is capable of evaluating the merits and risks of obtaining an Interest and also acknowledges that, once the transaction closes, the funds committed are not liquid and will not be available until the policy matures.

(e)     The Purchaser has been furnished with such information by the Seller as Purchaser requires and has requested regarding the Interest and has had any questions arising from such review answered by the Seller to Purchaser's satisfaction. Purchaser acknowledges, however, that Purchaser has not and will not be furnished with any information regarding the identity of the Insured(s) and purchases this Interest(s) with the expectation that the identity of the Insured will not be known. Purchaser has full legal capacity to enter into this Agreement.

(f)     Purchaser acknowledges that the Seller is willing to provide additional information regarding this transaction and the business of the Seller beyond that contained in any documentation previously provided. The Purchaser also acknowledges that he/she has also had the opportunity to evaluate the merits and risks of this transaction.

Purchaser's Initials: _____

Exhibit 1004, p. 8



(g)    Purchaser acknowledges that he/she understands the meaning and legal consequences of the above representations and warranties and that the Seller has relied on these representations and warranties in entering into this Agreement. Purchaser agrees to indemnify and hold harmless the Seller and its principals, agents, and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by Purchaser.

(h)    Purchaser authorizes the Seller to enter into any agreements or contracts which may be necessary in order to effectuate the purchase of Interests on behalf of the Purchaser.

(i)    Purchaser represents that he/she has completed a Suitability Questionnaire and that he/she understands that Seller will rely upon the representations made in that Suitability Questionnaire for the purpose of determining if the Purchaser is qualified.

(j)    Purchaser acknowledges that life expectancy reports are estimates and hereby expressly waives any action, agrees not to sue, and agrees to hold harmless the Seller and its principals, agents, and employees from any damage based on an insured living past the life expectancy date.

(k)    Purchaser acknowledges that the Life Agent conducting this transaction is an independent contractor with no authority to contractually bind Reliant Life Shares, LLC.  Any errors or omissions made by agent are the sole legal responsibility of the agent.

(l)    Purchaser acknowledges that Reliant utilizes the services of outside vendors who provide specific services which are necessary to ensure the safety, security and to ensure that in the event Reliant is unwilling or unable to perform any key activity,  that the appropriate vendors are in place to perform all necessary functions to maintain the investment operations . These vendors include, trustee and escrow agents, policy servicers, and outside actuaries who compute policy premiums and project future cash flows. To offset these policy expenses the servicer will charge one hundred and fifty dollar per client per year which will be billed only once a policy extends past the Policy Maintenance Reserve Period.

(m)    Purchaser acknowledges and understands that fractional life settlement investments are illiquid investments and therefore any client holding the investment in a self-directed IRA account should consider future required minimum distributions when considering the purchase of this investment.

### 5. MISCELLANEOUS.

(a)    **Entire Agreement**.  This Agreement constitutes the entire agreement between the Seller and Purchaser. No change, modification, termination or amendment of this Agreement shall be valid unless it is in writing and signed by both the Seller and Purchaser.

(b)    **Section Headings**. The section headings contained in this Agreement are for reference only and shall not in any way affect the meaning or interpretation of this Agreement.

Page 9                                                          Purchaser's Initials: _____

(c)      **Gender**. Pronouns shall be deemed to include masculine, feminine and neuter genders and singular or plural numbers as appropriate.

(d)      **Venue for Disputes**.      Arbitration. Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration administered by Judicial Arbitration and Mediation Services ("JAMS") in its Los Angeles County office. Each of the Parties reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the Investor may be entitled may be rendered ineffectual in the absence of such relief. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The award of the arbitrator shall be binding, final, and non-appealable. The Parties may obtain discovery in aid of the arbitration to the fullest extent permitted under law, including California Code of Civil Procedure Section 1283.05. All discovery disputes shall be resolved by the arbitrator. The costs of the arbitration, including any JAMS administration fee, and arbitrator's fee, and costs of the use of facilities during the hearings, shall be borne equally by the Parties. Reasonable attorney's fees and costs shall be awarded to the prevailing party.

(e)      **No Third Party Benefited**. This Agreement is solely for the benefit of the parties hereto, and no other person or entity shall have any right, benefit, priority or interest under this Agreement, or because of the existence of this Agreement.

(f)      **Notices**. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered, certified, or electronic mail, or recognized overnight delivery service to the parties at their respective addresses set forth below or to such other address as either party may designate by notice given in accordance with this Agreement.

| Seller | Purchaser: Purchaser agrees to receive all correspondence via electronic mail. Otherwise, Check this box and insert the info below. |
|---|---|
| Reliant Life Shares, LLC<br>15260 Ventura Blvd., Suite 1420<br>Sherman Oaks, CA 91403 | ☐<br><br>Gaman LLC<br>5238 Live Oak View Ave<br>Los Angeles, CA 90041 |

(g)      **Non Waiver**. No failure on the Seller's part to exercise, and no delay in exercising, any right, power or remedy under this Agreement or under applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further

Purchaser's Initials: _____

Exhibit 1004, p. 10

exercise thereof or the exercise of any other right. All of Purchaser's rights and remedies under this Agreement or arising under applicable law are separate and cumulative and may be pursued separately, successively or concurrently, or not pursued, without affecting or limiting any other right of Purchaser.

(h)     **Invalidity and Severability**. If any provisions of this Agreement are held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, and to that extent, the provisions of this Agreement are intended to be and shall be deemed severable.

(i)     **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the heirs, legal and personal representatives, successors, and assignees of the Purchaser.

**WARNING: THE RETURN ON INVESTMENT FOR FRACTIONAL LIFE SETTLEMENTS IS HIGHLY DEPENDENT ON THE LONGEVITY OF THE INSURED. A POLICY TAKING LONGER TO MATURE, ALONG WITH ANY ADDITIONAL PREMIUMS WHICH MUST BE PAID, WILL RESULT IN LOWER TOTAL ANNUAL RETURNS.  LIFE EXPECTANCIES ARE MERELY ESTIMATES; NO ONE KNOWS WHEN AN INSURED INDIVIDUAL WILL PASS.  IF THE INSURED LIVES LONGER THAN THE PREMIUM RESERVE PERIOD STATED IN THE CONTRACT, ALL INVESTORS MUST MAKE A "PRO RATA" PREMIUM PAYMENT.  FAILURE TO DO SO WILL CAUSE AN INVESTOR'S BENEFICAL INTEREST TO BE FORFEITED. FOR MORE INFORMATION ON THE RISKS ASSOCIATED WITH THIS PRODUCT PLEASE SEE THE "RISK ADDENDUM" ATTACHED HERETO.**

Purchaser's Initials: _____

Exhibit 1004, p. 11

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

RELIANT LIFE SHARES, LLC

By: _____

Date: _____10/28/2020_____

LIFE SETTLEMENT PURCHASER(S)

_____
Signature

Ed Baeza - Manging Member
Printed Name

45-554138
Social Security or Tax ID#

5238 Live Oak View Ave
Address

Los Angeles, CA 90041
City, State, Zip

(323) 972-6827
Telephone Number


_____
Signature

Concepcion Baeza - Member
Printed Name

_____
Social Security or Tax ID#

5238 Live Oak View Ave
Address

Los Angeles, CA 90041
City, State, Zip

_____
Telephone number

Purchaser's Initials: _____

Exhibit 1004, p. 12

RELIANT LIFE SHARES, LLC

RISK DISCLOSURE

**WARNING: Do not sign this Agreement unless you wish to be legally bound. This Agreement is subject to the laws of California and the United States. You are urged to read the entirety of this document. If you are in any doubt regarding the contents of this document and what action you should take, seek your own independent legal advice.**

Potential purchasers of Fractional Life Settlements should understand the risks related to the transaction. All purchases possess the combined elements of risks and rewards.

Life Settlements can deliver an attractive rate of return but are not without a degree of risk. The risks are described by category. Some of the risks described in this section are very remote and some are more likely. This list of risks is not necessarily comprehensive but in the interest of completeness, even risks which are relatively rare are listed. Not every policy will carry every possible risk since Reliant offers different types of policies. We try to provide as much information about the risks as possible but additional risks not contained in this Risk Disclosure may exist.

To aid in the explanation, the most frequently offered type of policy, Universal Life Insurance, is the example used in the following paragraphs. Universal Life policies make up 99% of the policies sold and in the event Reliant chooses to sell a policy that is not a UL policy any additional risks associated will be outlined in the policy disclosure package for that specific policy.

**Liquidity Risk:** A Life Settlement is the purchase of all of or a portion of the death benefit of a life insurance policy. In order for the death benefit to be paid, a demise (or death) of the insured must occur. Until then, the original amount paid and the gain or profit to be earned is not available. This is known as being illiquid. It means Reliant cannot and will not refund Investor's money no matter how much Investor may need it. Therefore, an Investor must not use any funds, which Investor may possibly need during the life expectancy of the insured and for some period afterward. It must be stressed that the death benefit amount received upon maturity of the policy is a known certain amount but it will occur at an uncertain time, almost always earlier or later than the projected life expectancy. The investors' financial objective should be long term capital appreciation and capital preservation. Fractional Life Settlements should not be purchased for speculation or for trading such as stocks or mutual funds. As of this writing, there is no organized secondary market trading in these positions, therefore investors need to consider the purchase of fractional life settlements as a buy and hold investment.

Purchaser's Initials: _____

Exhibit 1004, p. 13



**Longevity Risk**: Longevity Risk is typically defined as the insured outliving the life expectancy estimate.

All policies are purchased using a deterministic model based upon a medical and actuarial life expectancy developed by an independent third party medical laboratory specializing in such forecasts. To help reduce the concentration of risk associated with the specific laboratories used, Reliant uses multiple life expectancy estimates from different life expectancy providers. Since California does not currently license life expectancy underwriters, Reliant wants to ensure that it only uses the most qualified laboratories available. Consequently, Reliant only uses life expectancy providers approved and licensed to do business in Texas or Florida - two large states that regulate life expectancy providers. If California were to license life expectancy underwriters, Reliant would then look to such licensed providers in California.

As of June 1, 2015, Reliant chooses to use the median life expectancy estimate out of three estimates provided by licensed life expectancy providers to establish the policy maintenance reserve period. This is a critical issue and ensures a fair period of time is being used to determine the amount of funds to set aside to pay for the premiums, trust and escrow fees as well as the servicing fees on the policy before an investor needs to begin paying these fees out of pocket. By using three different estimates, Reliant also reduces any concentration of risk associated with using only one life expectancy provider's methodology. All life expectancies used for each policy are disclosed on the projection sheet published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate. The accuracy of these estimates varies on a person-to-person basis. genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition. It is because of this uncertainty and the aforementioned lack of liquidity that life settlements pay much higher returns than that of government bonds and other investment grade investments.

The effect of an insured living beyond life expectancy is a lowering of the annual rate of return and could possibly require an investor to pay additional policy maintenance payments to keep the policy in force. Take for example, a policy with a three-year life expectancy paying a total fixed return of 36%. Its annualized return would pay 12% simple interest per year if the policy matured as expected. However, if the insured lived 4 years instead of 3 years, the fixed total return would still be 36% but the simple annual return would be 9% instead of 12%. If payment of additional policy maintenance payments is necessary on a pro-rata basis, the return is further reduced. In simple terms, the longer an insured lives, the lower the annual return. A further element of this Longevity Risk is associated with the expiration of the policy coverage. Universal Life Policies typically have an expiration age at which time the policy may only pay out the cash value which may exist in the policy. Each Universal Life Policy is different but the most common age of expiration is 100 years old. This may be mitigated if the policy has a rider which extends this age.

Any projected rate of return to the investor from the purchase of a fractionalized interest in a life settlement is based on an estimated life expectancy for the person insured under the life insurance

Purchaser's Initials: _____

Exhibit 1004, p. 14

policy. The return on the purchase may vary substantially from the expected rate of return based on the actual life expectancy of the insured that may be less than, equal to or may greatly exceed the estimated life expectancy. *The rate of return will likely be higher if the actual life expectancy was less than, and lower if the actual life expectancy was greater than, the estimated life expectancy of the insured at the time the life settlement transaction closed.*

**Policy Maintenance/Premium Reserve Risk:** Upon purchase of a policy from a seller, Reliant establishes an escrow reserve account for the payment of premiums, trust fees and servicing fees for a specific period of time. Once the time period is determined, Reliant utilizes the services of an independent firm who specializes in premium estimation, Cost of Insurance estimates and insurance policy construction, to determine the exact dollar amount necessary to be funded into the Policies Maintenance Reserve Account in order to pay for the policy and expenses through the given period of time. These services are provided by an actuarial firm who is a specialist in this field with a track record of service. Once a policy's escrow period has passed or the policy reserve funds are exhausted, it is the Investor's responsibility to pay additional payments based upon the percentage of the policy the Investor owns. Although this outside firm specializes in providing this type of service there is the risk that its estimates are wrong. This account is funded as Investors purchase fractional interests in each policy. If an adequate amount of certificates are not sold there is the risk that the policy reserve account will not be sufficient to fund the policy premiums during the Policy's Reserve Period. Typically this policy reserve period provides for the payment of premiums for each year of life expectancy but, at times, Reliant may choose to provide a policy reserve which is longer than the life expectancy, therefore the exact policy reserve period for each policy is disclosed in the Contract and Policy Disclosure Package.

**Premium Call Risk: (Applicable only if the insured lives past the Policy's Reserve Period)** Once the Policy's Reserve Period has ended and, if, the insured is still alive, it is the responsibility of each Investor to pay for their pro rata portion of the expenses to keep the policy and Trust in force along with ensuring the third party servicing company is paid. Reliant, through our servicing partner Asset Servicing Group ITS, will send to the Investors in each policy a Policy Maintenance Invoice, which details all expenses due. An early warning notice (usually some months in advance), and then an invoice for each Investor's share of the premiums, trust fees and policy servicing costs attributable to the purchasers pro-rata portion of the policies they own after the original Policy Reserve Escrow funds are depleted. The Investor must pay this Policy Maintenance Invoice. It is part of the agreement. *If the Investor does not pay the Policy Maintenance Invoice, the Investor will forfeit their beneficial interest in the policy in order to protect other Investors in the policy.*

**Insurance Policy Construction and Performance**: When a Policy's maintenance reserve escrow amount is established by Reliant's outside vendor who specializes in such service, they take many factors into consideration. If cost of insurance charges increase there is no guarantee that the Policy Maintenance Reserve that is established is sufficient to fund the policy through the Policy's Reserve Period. Mortality charges increase dramatically with age. Each policy and each life insurance company charge differently. In the analysis of each policy, Reliant commonly obtains an in-force illustration produced by the life insurance company. Premiums on life insurance policies vary in many ways. A Universal Life Insurance policy typically has a flexible premium payment and can accumulate cash values within the policy. In

Purchaser's Initials: _____

Exhibit 1004, p. 15

some policies this cash value may be used to offset future premiums. Other times the policy Surrender Charge may be higher than the cash value, rendering any cash value useless. The cash values in a policy also may differ from policy to policy. The life insurance company may have enjoyed a profitable year and the interest rate provided on the cash value of the policy may exceed the guaranteed rate thus amplifying the account value. The life insurance company may be a mutual company and have declared a dividend to policyholders. Mortality changes may increase or decrease based upon loss experience. All of these events can affect the policy performance.

Year-by-year projections are impacted by several key assumptions:

A.      The current account value.

B.      The charges against this account for mortality and other expenses.

C.      The interest earnings credited based upon the earnings from the invested account value and the premiums paid.

D.      The premiums necessary to keep the policy in force for every year remaining in the policy life.

These assumptions can change on a year by year basis, and are only valid if the premiums are paid as illustrated.

**Policy Seller Rescission Risk**:  The insured who sold their policy is afforded a 'rescission period' to change their mind and keep the policy.  This period varies from state to state.  However, this risk is mitigated by the fact that the rescission period has expired on ALL policies Reliant sells to investors.

**Taxation Risk**:  The purchase and resale of life insurance policy is a Transfer for Value.  Reliant recognizes this and pays taxes on profits, which it earns by arranging such transactions. Neither Reliant nor its employees, independent contractors or sales representatives are authorized to give tax advice.

The investor should consult with their own tax advisor regarding (i) the tax consequences of the purchase of the fractionalized interest in a life settlement and (ii) if the investor is using retirement funds or accounts for such purchase, whether or not any adverse tax consequences might result from the use of those funds for the purchase of the certificates.

**Insurable Interest Risk**: A life insurance carrier can rescind a policy for lack of insurable interest until the claim is paid.  Insurable Interest is a fundamental element unique to a life insurance contract. This means the person acquiring the contract (the applicant or the original beneficiary) must be subject to loss upon the death of the person being insured.  This interest must exist at the inception of the policy. It does not have to continue and that is the basis for the life settlement industry. Though laws differ slightly from state to state, in general the following types of relationships automatically carry insurable interest:

-An individual has as insurable interest in his or her own life.

-A husband or wife has an insurable interest in a spouse.

Page 16

Purchaser's Initials: _____

Exhibit 1004, p. 16

-A parent has an insurable interest in his or her child.

-A business has an insurable interest in the lives of its officers, directors and other key employees.

-Business partners have an insurable interest in each other.

-A creditor has an insurable interest in the life of a debtor but only to the extent of the debt.

In 2002, life insurance policies began to be sold to wealthy individuals for the purposes of estate planning using non-recourse premium finance contracts. Estate planning is a United States death tax strategy, which has a definite insurable interest on the part of the insured. However, some of these contracts were issued to individuals who entered into them solely for the purpose of resale. When this happens, it changes the life insurance policy from a contract at risk to a purchase contract. This violates the principal of insurable interest. The life insurance company may choose to contest the death benefit of such contracts and if it prevails, is only obligated to return the premiums paid during the life of the contract. This would have the effect of dramatically lowering the Investor's overall return and a probable loss of all or part of the Investor's principal. While Reliant's underwriting procedures are extremely thorough, it may not identify a policy such as this and a life insurance company may uncover such a policy and may choose to contest it. If such an event took place, Reliant would seek a refund of all premiums paid and the purchase price paid to the seller.

**Contestability Risk:** Every life insurance policy has a contestability period. This is typically 24 months after the issue date. During this period, the life insurance company has the right to cancel the policy and return any premiums paid. This is often known as a "suicide clause" although the company can cancel the policy if it suspects malfeasance in the application or for other reasons. As a business practice, Reliant does not purchase or arrange the purchase of polices while they are in the contestable period The effect of a cancellation during contestability is the extinguishments of the death benefit obligation on the part of the insurance company and the loss of the purchased policy.

**Insurance Company Insolvency Risk:** On occasion in the United States, a life insurance company becomes insolvent. If it were to do so and there was no regulatory intervention, the company would be unable to pay its death benefit obligations. There exists a framework of regulatory measurements and controls, reinsurance, resale options as well as special funds employed by the State Insurance Commissioners to significantly reduce this possibility. A. M. Best Company is the premier insurance rating company. It publishes financial strength ratings for all life, health and casualty insurance companies. Reliant will purchase or arrange the purchase only of policies issued by life insurance companies with ratings of B+ or above.

**Regulatory Risk (US):** The majority of the states in the US regulate the life settlement industry on a state-by-state basis. Many of these regulations mirror or closely follow the NAIC Model Viatical Settlements Act. The life insurance companies have been active in attempting to promote changes in the law which would make life settlements less attractive or even illegal. The life settlement industry association LISA (Life Insurance Settlement Association) has been robustly and successfully combating these attempts. The fundamental argument offered by LISA is that a policy holder has a constitutional

Purchaser's Initials: _____

Exhibit 1004, p. 17

right to dispose of their assets as they see fit; be that a home, an automobile, a stock portfolio or a life insurance policy.   So far, lawmakers have agreed with this position and all attempts have been struck down in both the legislatures and in the courts. There is no guarantee however that this will remain the case and laws or regulations may be enacted which adversely affect the continuance of the industry or the profitability of the transaction.  The impact of these changes is impossible to speculate upon but it is very unlikely that they would be applied retroactively.

In addition, the life settlement industry had been the subject of investigations by various state and Federal governmental entities.  In 2010, the Life Settlements Task Force of the Securities and Exchange Commission issued a staff report discussing life settlements, practices in the life settlements market, regulation of the life settlements market and related recommendations.  Such recommendations included (i) recommending to Congress that the definition of 'security' under Federal securities laws include life settlements, (ii) continue monitoring that legal standards are being met by brokers and providers, (iii) monitor the development of a life settlement securitization market, (iv) encourage Congress and state legislators to consider more significant and consistent regulation of life expectancy underwriters and (v) consider issuing an investor bulletin regarding investments in life settlements.

Likely as a result of this increased industry scrutiny, the Securities and Exchange Commission recently brought a case against Pacific West Capital Group and others in U.S. District Court in the Central District of California.  In this case, the Securities and Exchange Commission alleges, among other things, that (i) the issuer issued securities with the proceeds used to pay returns to original investors (i.e. a Ponzi scheme), (ii) the issuer misrepresented annual returns and stressed that returns had no relation to the issuer, (iii) the securities were not issued through broker-dealers, (iv) actuarial-based estimates were not given to investors, (v) the trust agreement was not provided to investors, (vi) reserve funding mechanics were not adequately explained to investors, (vii) policies were purchased even if not sufficiently funded, (viii) the increase in premiums for the policies were not adequately disclosed to investors, and (ix) the securities were not registered.  These allegations do not relate to Reliant and the certificates; the broker-dealer and registration issues are dealt with under the captions 'Securities Risk (CA)' and 'Securities Risk (US)' below.

**Regulatory Risk (CA):** Reliant operates under California Corporations Code Section 25102(q) established to regulate the fractionalized life settlement Industry in California.  This statute and related regulations may change without notice and at any time preventing Reliant from operating as currently structured.

**Securities Risk (CA):**  Fractional Life Settlements are a security under California law but are exempt from registration under California law if offered through a life agent licensed in California subject to numerous requirements including, among other things, that they only be sold to qualified purchasers as defined under the California Corporations Code. Reliant relies on this state securities exemption to market this security in California.

**Securities Risk (US):**  Under Federal law, it is not fully settled law whether Fractional Life Settlements, each backed by a single policy, are securities.

Purchaser's Initials: _____

If considered to be securities under Federal law, Reliant would be able to look to several exemptions from registration including: (i) intrastate exemption under Rule 147 of the Securities Act of 1933, as amended (the "Securities Act") where all of the certificates are sold to persons resident within a single state (in our instance, California) and where the issuer is a person resident and doing business within such state, (ii) limited offering exemption under Rule 505 of the Securities Act for sales of securities not exceeding $5 million which limits sales to thirty-five (35) non-accredited investors and (iii) Rule 506 of the Securities Act for sales of securities to accredited investors. The Securities Act defines 'issuer' as either the depositor or manager pursuant to the trust agreement and, it is Reliant's belief, that it is the issuer as depositor and manager of the program under the trust agreement. However, the Securities and Exchange Commission and the courts could determine that the trustee is the sole issuer for purposes of Rule 147. In such an event, the Investors could not rely on the Rule 147 exemption since the Trustee's principal place of business is not in California.

As a result, our offerings have not been and, absent a change in Federal law or interpretation of Federal law, will not be registered under the Securities Act or any foreign securities law.

It should be noted that even if either the exemptions under Rule 505 or Rule 506 of the Securities Act are met, the broker arranging the Fractionalized Life Settlements must be registered broker-dealers; life agents licensed in California relate only to California securities law and not Federal securities law (*see* 'Securities Risk (CA)' above.

**Insolvency Risk**: The possibility exists that Reliant Life Shares, LLC, could become insolvent. While Reliant considers that we enjoy a prosperous and growing position in our industry, we, like all businesses are exposed to events which may be beyond our control and which could alter our destiny. We take comfort in the fact that our business practices employ the concept of naming an independent trust established on the Investor's behalf as the direct beneficiary of the death benefit purchased. This means that the obligation to pay rests solely on the life insurance company and the independent trustee and not on Reliant. Further, the policy maintenance reserves established for the payment of the premiums and other expenses are held in an escrow account under the control of a third-party Trustee. Reliant pays certain maintenance, servicing costs and Trust fees that would have to be paid by investors in the case of insolvency. The likely impact of Reliant's insolvency will be a degree of confusion as to communication with the Investor and the possible substitution of another issuer to replace Reliant and, if no replacement is quickly found, the possible resignation of the current Trustee. Certain contingency plans are in place to minimize this confusion. The Trustee of the Trust enjoys a wide degree of latitude to address this situation and has access to each policy's reserve account to pay the costs associated with maintaining and servicing the policy until the policy maintenance reserves are exhausted and at that point moving forward the investor understands they are responsible for the policy maintenance expenses including servicing costs and trust fees which will be invoiced from the servicer. In the event the policy maintenance reserve period has elapsed, then Investors have the duty to pay their Policy Maintenance Invoices from which the Trustee will pay the continued operational expenses. Should these expenses increase, investors may pay up to three hundred dollars per policy per year for additional servicing responsibilities by the servicer. These expenses will be part of the Policy Maintenance invoices once the policy maintenance reserve is exhausted.

**Line of Business or Acquisition Risk**: For a number of reasons, Reliant may discontinue a product offering, a line of business or its shares, its assets or the business itself may be sold. While this would not

Purchaser's Initials: _____

affect the Investor's purchase per se, it would force the Investor to deal with an unknown third-party entity for its management of the policies.

**Summary: Reliant has attempted to list the main risks associated with our product. It is difficult to predict future scenarios not contained herein. However, if a material change occurs, Reliant shall attempt to assess its impact (if any) on the Investor's position. If there is such an impact or if there is any doubt, Reliant will send an update of this Risk Disclosure to the Investor.**

Purchaser's Initials: _____

Exhibit 1004, p. 20



**Fractional Life Settlement Investments**

**RELIANT** Life Shares

## RELIANT LIFE SHARES' AGENT OF RECORD CERTIFICATION
### Referenced Investor Data:

Date: 10.20.20.Tuesday

Investor: Ed & Concepcion Baeza GAMAN LLC

Policy #: 158 222 969/ BUI1783741/ 171977/ 7286206/ 73889651/ BUI1784205/ B00815053

Investment Amount: $350,000.00

As the writing Agent of Record, I hereby certify and attest to the following:                     Initial↓

| | | |
|---|---|---|
| 1. | I was the life insurance agent of record on the above-referenced transaction and discussed all material aspects of it directly with the investor. | |
| 2. | I disclosed to the above-referenced investor that this investment is considered a "security" in the State of California and governed by the California Department of Business Oversight; | |
| 3. | I fully complied with all aspects of California Senate Bill, 1837, including confirming that the above-referenced investor is a "Qualified Investor" within the meaning of Senate Bill 1837; | |
| 4. | I made sure the above-referenced investor understood and agreed to the terms in the Reliant Life Shares' Investor Suitability Questionnaire; | |
| 5. | I made sure the above-referenced investor understood and agreed to the terms, disclosure statement AND disclosures in the Reliant Life Shares' Purchase Agreement; | |
| 6. | I made sure the above-referenced investor understood and agreed to the terms in the Reliant Life Shares' Investor Documents for the above-referenced policy; | |
| 7. | I made sure the above-referenced investor understood and agreed to the terms in the UMB Bank, n.a. Investor Documents for the above-referenced policy; | |
| 8. | I made sure the above-referenced investor understood and agreed to the terms in the SDIRA Co. Documents for the above-referenced policy IF APPLICABLE. | |
| 9. | I have acted in the best interest of the client making this purchase recommendation and have not made any misleading statements to the client | |
| 10. | I have fully explained the potential impact to the client of any premium calls should the insured live past the premium reserve escrow period | |

I hereby certify the above-information is true and accurate.

Dated: 10.20.20.Tuesday

By: _____

Name: Larry Tupler

CA Life Ins. License #: 0H4061

15260 Ventura Blvd., Suite 1420, Sherman Oaks, CA 91403 • 818-788-1904 • ww.ReliantLifeShares.com

Exhibit 1004, p. 21

**Fractional Life Settlement Investments**
*Institutional Profitability brought to the individual investor*


**RELIANT**
*Life Shares*

SUBSCRIBERS:

BY: _Ed Baez_ 

Name: Ed Baeza - Manging Member

BY: _Concepon Baeza 10-9-20_

Name: Concepcion Baeza - Member

Acknowledged by:

UMB Bank n.a.. as Trustee

BY: _____ K. Scott Math____

Name: _____ K. Scott Mathews _____

Title: _____ Vice President _____

Exhibit 1004, p. 22

## PRINCIPLE FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT

THIS FRACTIONAL LIFE SETTLEMENT PURCHASE AGREEMENT ("Agreement") is made this 9th day of October , 2020, by and between Principle Financial Services, INC ("Principle" or the "Seller"), and Yeyo LLC

(the "Purchaser"). This Agreement covers the purchase of one or more interests in the death benefits of a life insurance policy portfolio insuring the life of individuals, or life settlement interests ("Interests").

WHEREAS, the Purchaser has reviewed and approves and adopts the criteria utilized by the Seller to purchase said Interests; and

WHEREAS, the Purchaser acknowledges that the economic benefit derived from the transaction(s) contemplated by this Agreement will result solely from the maturity of the life insurance policies upon the death of the insureds, and will not be derived from the efforts of any person or entity employed by or associated with the Seller, and the Purchaser expressly waives any and all claims to the contrary; and

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, each party hereby represents that it or its representatives has/have the requisite authority to enter into this Agreement and hereby agree as follows:

## 1. THE INVESTMENT PURCHASE

(a)    The Purchaser hereby agrees to deposit a total sum of $ 450,000   to acquire interest in the following portfolio(s):

| Portfolio: | Investment Amount: | Ownership Percentage: | Policy Reserve Amt |
|---|---|---|---|
| Portfolio: 0919 | $ 450,000 | % 14.9322 | $ 130,353.43 |

(b)    The Purchaser's deposit will be made simultaneous with the delivery of this executed Agreement to Seller, by delivering a check, or effecting a wire transfer, made payable to Seller's Trustee, First Western – *Principle Series Statutory Trust Account 0919*. The Purchaser's deposit does not constitute a purchase or a commitment to purchase until five (5) business days after the Purchaser has received all of the disclosures required by California law.

(c)    Upon Seller's receipt of the executed Life Settlement Disclosure Form, but in no event sooner than five (5) days after Purchaser's receipt of the Life Settlement Disclosure Form, the Seller will obtain confirmation of the recording of a change of ownership of such Policy to Principle Series Statutory Trust ("Principle") and a confirmation of beneficiary. To the extent that the Seller does not at the date of this Agreement have available such policies, the Seller shall use its reasonable efforts to obtain suitable policies as soon as practicable after the date of this Agreement.

(d)    Upon the maturity of the life insurance policies in which Purchaser has purchased a life settlement interest, the trustee (First Western Trust) shall file or cause to be filed a claim for the death benefits with the appropriate insurance company. When the Principle Statutory Trust receives payment

Purchaser's Initials: _E. B._

_E B_

Exhibit 1005, p. 1

of such claim, First Western Trust will pay the Purchaser directly it's pro rata share of the death benefits less any premium reimbursement to the policy maintenance reserve.

(e)     The owner of the life insurance policies in which Purchaser will obtain an interest will be a trust. The current trust is Principle Series Statutory Trust. The current Trustee of the Principle Series Statutory Trust is First Western Trust. The Trustee's sole responsibilities are to maintain accounts for the purpose of making the premium payments as more fully described in Section 2(a) of this Purchase Agreement, to be the beneficiary for the death benefits of the life insurance policy in which Purchaser obtains an Interest, and to disburse the death benefits in accordance with the assignments of benefits relating to that policy. Principle has contracted with First Western Trust to perform certain post-closing services as the Trustee, as more fully set forth in Paragraph 3(k) herein.

(f)     The Seller's Trustee is First Western Trust, at 1901 Avenue of the Stars, Suite 200, Los Angeles, CA 90067.

(g)     The responsibilities of the Trustee are:

1. To hold the funds forwarded by the Purchaser pursuant to this Agreement;
2. To hold the documents received from the Seller of a policy when required;
3. To receive and review written confirmation that the insurance company has accepted, recognized and, /or noted on its books and records the transfer of the policy ownership and the change of beneficiary(ies);
4. To make disbursements.

(h)     The Trustee is not representing the Purchaser in this transaction and has no responsibility to the Purchaser with regard to this transaction other than to hold the funds in reserve in accordance with Section 1(g).

(i)     Purchaser recognizes that the Trustee shall not incur any liability to the Seller or to Purchaser for any damages, losses or expenses which either party may sustain or incur, unless the same is a direct result of the gross negligence or intentional misconduct of Trustee. Trustee shall be protected in any action taken or omitted in good faith with respect to their duties and responsibilities. Trustee shall be entitled to rely on any document(s) which Trustee reasonably believe satisfy the terms and conditions of the agreement. The Seller and Purchaser each hereby agree to indemnify and hold harmless Trustee from and against all losses, except those caused by gross negligence or intentional misconduct, claims, damages, liabilities and expenses which it may sustain or incur hereunder, including, without limitation, reasonable attorney's fees, which may be imposed upon Trustee or incurred by Trustee in connection with the performance of their duties.

## 2. THE SELLER'S OBLIGATIONS TO THE PURCHASER

(a)     In the event that the Policy Maintenance Reserve account for the portfolio of policies is depleted, and in order to safeguard the policy against a lapse in coverage, it will become the responsibility of the Purchaser(s) of that portfolio to make pro rata payments on any policy in which they have an Interest to ensure the policy premium, trust fees and associated servicing fees are paid for until the policy matures and the carrier pays the death benefit. In that event the Purchaser shall be

Purchaser's Initials:_____

notified no less than 60 days before any policy maintenance payment becomes due.  If the Purchaser does not remit or cause to be remitted to Trustee, in immediately available funds, the required pro rata policy maintenance payments within the time frame stated in said notice to Purchaser, Purchaser shall immediately be divested of the Purchaser's Interest in said portfolio.

*Once the Policy's Reserve Period has ended and, if, the insured is still alive, it is the responsibility of each Investor to pay for their pro rata portion of the expenses to keep the policy and Trust in force along with ensuring the third party servicing company is paid.  Principle Financial Services INC, through our servicing partner LS Direct LLC, will send to the Investors in each policy a Policy Maintenance Invoice, which details all expenses due.  An early warning notice (usually some months in advance), and then an invoice for each Investor's share of the premiums, trust fees and policy servicing costs attributable to the purchaser's pro-rata portion of the policies they own after the original Policy Reserve funds are depleted.  The Investor must pay this Policy Maintenance Invoice.  It is part of the agreement.  If the Investor does not pay the Policy Maintenance Invoice, the Investor will forfeit their beneficial interest in the policy in order to protect other Investors in the policy.*

*Principle Financial Services INC establishes a reserve account for the payment of premiums, trust fees and servicing fees for a specific period of time. Once the time period is determined, Principle Financial Services INC utilizes the services of an independent firm who specializes in premium estimation, cost of Insurance estimates and insurance policy construction, to determine the exact dollar amount necessary to be funded into the Policies Maintenance Reserve Account in order to pay for the policy and expenses through the given period of time. These services are provided by an actuarial firm that specializes in this field with a track record of service. Once a policy's reserve period has passed or the policy reserve funds are exhausted, it is the Investor's responsibility to pay additional payments based upon the investor's percentage of ownership in the policy. Although this outside firm specializes in providing this type of service there is the risk that its estimates may not be accurate. Also, this account is funded as Investors purchase fractional interests in each policy.  If an adequate number of certificates are not sold there is the risk that the policy reserve account will not be sufficient to fund the policy premiums during the Policy's Reserve Period. Typically this policy reserve period provides for the payment of premiums for each year of life expectancy but, at times, Principle Financial Services INC may choose to provide a policy reserve which is longer than the life expectancy, therefore the exact policy reserve period for each policy is disclosed in the Contract and Policy Disclosure Package.*

       (b)      In order to protect the confidentiality and privacy of the insured, their names will not be disclosed to the Purchasers. The insured will be given a code number which will be recorded and maintained in the records of the Seller and the servicing company's databases. Any insurance company documents provided to the Purchaser will have any identifying information regarding the insured redacted and replaced with this code number.

       (c)      The Seller shall obtain and provide to the Trustee, Change of Ownership and Change of Beneficiary forms. The Seller shall also obtain a written release signed by all the present owners and beneficiaries under the Policies, waiving any and all present and/or future rights to ownership and beneficial interests under the Policies.

Page | 3                                        Purchaser's Initials:_____

(d)    The Seller represents and warrants to the Purchaser that at the time of the original life settlement transaction between the insured and the buyer, the Insured's attending physician or other qualified third party confirmed in writing that the Insured was of sound mind and under no constraint or undue influence during the contracting process for the life insurance policies in which an Interest is being purchased.  The seller also warrants that the life insurance policies in which an Interest is being purchased must be in effect and beyond their respective contestability and suicide periods. *Every life insurance policy has a contestability period.  This is typically 24 months after the issue date.  During this period, the life insurance company has the right to cancel the policy and return any premiums paid.  This is often known as a "suicide clause" although the company can cancel the policy if it suspects malfeasance in the application or for other reasons.  As a business practice, Principle Financial Services INC does not purchase or arrange the purchase of polices while they are in the contestable period. The effect of a cancellation during contestability is the extinguishments of the death benefit obligation on the part of the insurance company and the loss of the purchased policy.*

(e) At the time of purchase the Seller is provided the Life Settlement Disclosure Form, which states the insurance company that issued the policy must be a highly rated, legal reserve U.S. life insurance company.

(e)    Except as set forth in this Agreement, the Seller makes no representations or warranties of any kind, nature or description whatsoever and Purchaser expressly acknowledges that no representations or warranties have been made. The Seller is not liable or bound in any manner by express or implied warranties, guaranties, promises, statements or representations, not included within this Agreement, that are made or furnished by any broker, agent, employee, servant or other person purporting to represent the Seller.

## 3. DISCLOSURES TO LIFE SETTLEMENT PURCHASERS

(a)    The suitability standards for prospective purchasers, set forth at California Corporations Code §25102(q)(1), are as follows:

(1)    Sales of securities described in this subdivision are made only to qualified purchasers or other persons the issuer reasonably believes, after reasonable inquiry, to be qualified purchasers. A corporation, partnership, or other organization specifically formed for the purpose of acquiring the securities offered by the issuer in reliance upon this exemption may be a qualified purchaser only if each of the equity owners of the corporation, partnership, or other organization is a qualified purchaser. Qualified purchasers include the following:

(A) A person designated in subdivision (i) or any rule of the commissioner adopted thereunder.

(B)    A natural person who is either an individual or an individual jointly with their spouse, they warrant that they are a qualified investor or (i) have a minimum net worth of one hundred fifty thousand dollars ($150,000) and have during the immediately preceding tax year, gross income in excess of one hundred thousand dollars ($100,000) and reasonably expect gross income in excess of one hundred

Purchaser's Initials:_____

Exhibit 1005, p. 4

thousand dollars ($100,000) during the current tax year or (ii) have a minimum net worth of two hundred fifty thousand dollars ($250,000). "Net worth" shall be determined exclusive of home, home furnishings, and automobiles. Other assets included in the computation of net worth may be valued at fair market value.

Each natural person specified above, by reason of his or her business or financial experience, or the business or financial experience of his or her professional advisor, who is unaffiliated with and who is not compensated, directly or indirectly, by the Issuer of any affiliate or selling agent of the Issuer, can be reasonably assumed to have the capacity to protect his or her interests in connection with the transaction. The amount of investment of each natural person shall not exceed 10 percent of the net worth, as determined by this subdivision, of that natural person unless the investor is an accredited investor.

(C)     An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, each with total assets in excess of five million dollars ($5,000,000) according to its most recent audited financial statements.

(D)     A pension or profit-sharing trust of the issuer, a self-employed individual retirement plan, or an individual retirement account, if the investment decisions made on behalf of the trust, plan, or account are made solely by persons who are qualified purchasers.

(E)     A person designated in Section 260.102.13 of Title 10 of the California Code of Regulations.

(F)     Any other purchaser designated as qualified by rule of the commissioner.

(b)     The Seller is Principle Financial Services INC, whose principal business and mailing address is:

5805 Sepulveda Blvd, Suite 601,
Sherman Oaks, CA 91411

(c)     Mark Sansoucy is the shareholder of Principle Financial Services INC.

(d)     Principle Financial Services INC is in the business of facilitating the sale of interests in life settlements.

(e)     Principle Financial Services INC is an Incorporated company in the State of California.

(f)     Under Section 25508.5 of the California Corporations Code, a person who purchases a life settlement contract or a fractionalized or pooled interest therein may rescind or cancel the purchase at any time before seven (7) calendar days after the date the person remits the required consideration to the issuer or the issuer's agent by giving written notice of rescission or cancellation to the issuer or

Purchaser's Initials:_____

Exhibit 1005, p. 5



the issuer's agent. No specific form is required for the rescission or cancellation. The notice is effective when personally delivered, deposited in the United States mail, or deposited with a commercial courier or delivery service. If the Purchaser rescinds or cancels the purchase, the Seller shall refund all the Purchaser's money within seven (7) calendar days after receipt of the notice of rescission or cancellation.  No rescission or refunds are possible after seven (7) calendar days from the funding of the sale.

(g)    The purchase of a fractional Life Settlement investment should not be considered a liquid purchase.  It is impossible to predict the exact time of the insured's death. No fixed date for the payment of the death benefit to Purchaser has been or can be determined at this time.  Once the rescission period has passed all the Purchaser's funds are illiquid and will not be available until after the death of the insured. Purchaser acknowledges that he/she has sufficient financial resources to bear the risk associated with the purchase.

(h)    Each Purchaser should consult with his or her own tax advisor regarding the tax consequences of the purchase of a life settlement interest. If the Purchaser is using retirement funds or qualified tax deferred accounts for the purchase, they should ask his or her tax advisor whether or not any adverse tax consequences might result from the use of those funds for this purchase.

(i)    A Life Settlement Disclosure Form containing specific information regarding the insurance policies in which the Purchaser may obtain an interest will be provided to the Purchaser at least five (5) business days prior to the closing of any purchase. The commitment to purchase an interest in the death benefits of a specific policy shall not be final until the Purchaser has received this information and been given the opportunity to advise the Seller if he/she wishes to decline the purchase.

(j)    The Trustee is responsible for making the premium payments as outlined in Section 2(a) of this Agreement. The current Trustee is First Western Trust, at 1901 Avenue of the Stars, Suite 200, Los Angeles, CA 90067.

(k)    There are certain post-closing servicing activities that must be undertaken but are not performed by Seller. These servicing activities include but are not limited to maintaining contact with the insured, tracking the health status of the insured, monitoring the status of disability claims by insured, converting group policies to individual plans of insurance, obtaining required documents needed for filing a claim and filing claims for benefits with the insurance companies. To perform the above-described activities, the Seller has contracted LS Direct, LLC.  LS Direct responsibilities include all investor support related to policy maintenance and premium payments.

(l)    Selling expenses and commission may be paid by Principle Financial Services INC licensed sales agents.  All distributions costs are factored into the purchase of each policy and therefore 100% of each investor's funds will be deposited and allocated toward the policies/trusts they select.

(m)    The life expectancy of any particular insured and the annual rate of return on a life settlement contract are only estimates and cannot be guaranteed. The annualized rate of return would

Purchaser's Initials:_____

Exhibit 1005, p. 6

be higher if the actual life expectancy turns out to be less than the estimated life expectancy of the insured. The annualized rate of return would be lower if the actual life expectancy turns out to be more than the estimated life expectancy of the insured.

    (1)     Principle Financial Services INC is not responsible for the accuracy of life expectancy reports.

    (2)     There may be other life expectancy reports outstanding on the very same insured(s) on which Principle has purchased a policy.  These reports may have a higher or lower life expectancies than the data furnished to Principle Financial Services INC by the broker.

    (3)     Principle Financial Services INC uses a life expectancy estimate to establish the policies reserve period. The life expectancies used for each policy are disclosed and published for each policy.

It is important to understand that these estimates are based upon actuarial tables, medical impairments, and lifestyle choices which help determine an insured's life expectancy estimate.  The accuracy of these estimates varies on a person-to-person basis. Genetics, a will to live, family history, and lifestyle choices, all of which have as much to bear on an actual demise as does an actual medical condition.

*Longevity Risk is typically defined as the insured outliving the life expectancy estimate. All policies are purchased using a deterministic model based upon a medical and actuarial life expectancy developed by an independent third-party medical laboratory specializing in such forecasts.  It is because of this uncertainty and the lack of liquidity that life settlements pay much higher returns than that of government bonds and other investment grade investments. Any projected rate of return to the investor from the purchase of a fractionalized interest in a life settlement is based on an estimated life expectancy for the person insured under the life insurance policy. The return on the purchase may vary substantially from the expected rate of return based on the actual life expectancy of the insured that may be less than, equal to, or may greatly exceed the estimated life expectancy. The rate of return will likely be higher if the actual life expectancy was less than, and lower if the actual life expectancy was greater than, the estimated life expectancy of the insured at the time the life settlement transaction closed.*

    (n)     The Purchaser's annual rate of return on purchase decreases as the life of the insured continues. The Purchaser's annual rate of return on purchase may be further adversely affected by, without limitation, (i) the financial stability of the insurance companies issuing the Policies, or (ii) the payment limitations in effect from time to time set by the State Guarantee Funds of the states where the Policies were issued.

Purchaser's Initials:_____

Exhibit 1005, p. 7

(o)      Purchasers should be aware that some types of group life insurance policies may contain limitations or caps in the amount of coverage that may be converted. Also, the conversion of a group policy to an individual policy may result in additional premium payments

(p)      The purchase and resale of life insurance policy is a Transfer for Value.  Principle Financial Services INC recognizes this and pays taxes on profits, which it earns by arranging such transactions. Neither Principle Financial Services INC nor its employees, independent contractors or sales representatives are authorized to give tax advice.

The investor should consult with their own tax advisor regarding (i) the tax consequences of the purchase of the fractionalized interest in a life settlement and (ii) if the investor is using retirement funds or accounts for such purchase, whether or not any adverse tax consequences might result from the use of those funds for the purchase of the certificates.

(q)      Seller may from time to time make available for purchase an Interest in a "second to die" life insurance policy. These policies typically insure the life of a husband and wife, and do not pay off until both insured's have died. In the event a second to die policy is offered for investment it will be disclosed that the policy is a second to die policy.

(r)      A Life Settlement is the purchase of all of or a portion of the death benefit of a life insurance policy.  In order for the death benefit to be paid, a demise (or death) of the insured must occur.  Until then, the original amount paid and the gain or profit to be earned is not available.  This is known as being illiquid.  It means Principle Financial Services INC cannot and will not refund Investor's money no matter how much Investor may need it.  Therefore, an Investor must not use any funds, which the Investor may possibly need during the life expectancy of the insured and for some period afterward.  It must be stressed that the death benefit amount received upon maturity of the policy is a known certain amount, but it will occur at an uncertain time, almost always earlier or later than the projected life expectancy.  The investors' financial objective should be long term capital appreciation and capital preservation.  Fractional Life Settlements should not be purchased for speculation or for trading such as stocks or mutual funds. As of this writing, there is no organized secondary market trading in these positions, therefore investors need to consider the purchase of fractional life settlements as a buy and hold investment.

(s)      Principle operates under California Corporations Code Section 25102(q) established to regulate the fractionalized life settlement Industry in California.  This statute and related regulations may change without notice and at any time preventing Principle Financial Services INC from operating as currently structured.

(t)      <u>Principle Financial Services INC has attempted to list the main risks associated with our product.  It is difficult to predict future scenarios not contained herein.  However, if a material change occurs, Principle Financial Services INC shall attempt to assess its impact (if any) on the Investor's position.  If there is such an impact or if there is any doubt, Principle Financial Services INC will send an update of this Risk Disclosure to the Investor. Listed below are further risks pertaining to fractional life settlements. We try to provide as much information about the risks as possible but additional risks not contained in this Risk Disclosure may exist.</u>

Purchaser's Initials:_____

Exhibit 1005, p. 8

(1) _Securities Risk (CA)_:  Fractional Life Settlements are a security under California law but are exempt from registration under California law if offered through a life agent licensed in California subject to numerous requirements including, among other things, that they only be sold to qualified purchasers as defined under the California Corporations Code. Principle Financial Services INC relies on this state securities exemption to market this security in California.

(2) _Securities Risk (US)_:  Under Federal law, it is not fully settled law whether Fractional Life Settlements, each backed by a single policy, are securities.

If considered to be securities under Federal law, Principle would be able to look to several exemptions from registration including: (i) intrastate exemption under Rule 147 of the Securities Act of 1933, as amended (the "Securities Act") where all of the certificates are sold to persons resident within a single state (in our instance, California) and where the issuer is a person resident and doing business within such state, (ii) limited offering exemption under Rule 505 of the Securities Act for sales of securities not exceeding $5 million which limits sales to thirty-five (35) non-accredited investors and (iii) Rule 506 of the Securities Act for sales of securities to accredited investors.  The Securities Act defines 'issuer' as either the depositor or manager pursuant to the trust agreement and, it is Principle Financial Services INC 's belief, that it is the issuer as depositor and manager of the program under the trust agreement.  However, the Securities and Exchange Commission and the courts could determine that the trustee is the sole issuer for purposes of Rule 147.  In such an event, the Investors could not rely on the Rule 147 exemption since the Trustee's principal place of business is not in California.

As a result, our offerings have not been and, without a change in Federal law or interpretation of Federal law, will not be registered under the Securities Act or any foreign securities law.

It should be noted that even if either the exemptions under Rule 505 or Rule 506 of the Securities Act are met, the broker arranging the Fractionalized Life Settlements must be registered broker-dealers; life agents licensed in California relate only to California securities law and not Federal securities law (see 'Securities Risk (CA)' above.

(3) _Insolvency Risk_: The possibility exists that Principle Financial Services, INC, could become insolvent.  While Principle Financial Services INC considers that we enjoy a prosperous and growing position in our industry, we, like all businesses are exposed to events which may be beyond our control and which could alter our destiny. We take comfort in the fact that our business practices employ the concept of naming an independent trust established on the Investor's behalf as the direct beneficiary of the death benefit purchased.  This means that the obligation to pay rests solely on the life insurance company and the independent trustee and not on Principle Financial Services INC.  Further, the policy maintenance reserves established for the payment of the premiums and other expenses are held in a reserve account under the control of a third-party Trustee.  Principle Financial Services INC pays certain maintenance, servicing costs and Trust fees that would have to be paid by investors in the case of insolvency.  The likely impact of Principle Financial Services INC's insolvency will be a degree of confusion as to communication with the Investor and the possible substitution of another issuer to replace Principle Financial Services INC and, if no replacement is quickly found, the possible resignation of the current Trustee.  Certain contingency plans are in place to minimize this confusion.  The Trustee of the

Purchaser's Initials:_____

Exhibit 1005, p. 9

*Trust enjoys a wide degree of latitude to address this situation and has access to each policy's reserve account to pay the costs associated with maintaining and servicing the policy until the policy maintenance reserves are exhausted and at that point moving forward the investor understands they are responsible for the policy maintenance expenses including servicing costs and trust fees which will be invoiced from the servicer. In the event the policy maintenance reserve period has elapsed, then Investors have the duty to pay their Policy Maintenance Invoices from which the Trustee will pay the continued operational expenses. Should these expenses increase, investors may pay up to three hundred dollars per policy per year for additional servicing responsibilities by the servicer. These expenses will be part of the Policy Maintenance invoices once the policy maintenance reserve is exhausted.*

*For a number of reasons, Principle Financial Services INC may discontinue a product offering, a line of business or its shares, its assets or the business itself may be sold. While this would not affect the Investor's purchase per se, it would force the Investor to deal with an unknown third-party entity for its management of the policies.*

*(4)      <u>Insurable Interest Risk</u>: A life insurance carrier can rescind a policy for lack of insurable interest until the claim is paid.  Insurable Interest is a fundamental element unique to a life insurance contract. This means the person acquiring the contract (the applicant or the original beneficiary) must be subject to loss upon the death of the person being insured.  This interest must exist at the inception of the policy. It does not have to continue and that is the basis for the life settlement industry. Though laws differ slightly from state to state, in general the following types of relationships automatically carry insurable interest:*

*An individual has as insurable interest in his or her own life, a husband or wife has an insurable interest in a spouse, a parent has an insurable interest in his or her child, a business has an insurable interest in the lives of its officers, directors and other key employees, Business partners have an insurable interest in each other, a creditor has an insurable interest in the life of a debtor but only to the extent of the debt.*

*In 2002, life insurance policies began to be sold to wealthy individuals for the purposes of estate planning using non-recourse premium finance contracts.  Estate planning is a United States death tax strategy, which has a definite insurable interest on the part of the insured.  However, some of these contracts were issued to individuals who entered into them solely for the purpose of resale. When this happens, it changes the life insurance policy from a contract at risk to a purchase contract.  This violates the principal of insurable interest.  The life insurance company may choose to contest the death benefit of such contracts and if it prevails, is only obligated to return the premiums paid during the life of the contract.  This would have the effect of dramatically lowering the Investor's overall return and a probable loss of all or part of the Investor's principal.  While Principle Financial Services INC's underwriting procedures are extremely thorough, it may not identify a policy such as this and a life insurance company may uncover such a policy and may choose to contest it.  If such an event took place, Principle Financial Services INC would seek a refund of all premiums paid and the purchase price paid to the seller.*

Purchaser's Initials:_____

Exhibit 1005, p. 10

(5)    _Regulatory Risk (US):_ The majority of the states in the US regulate the life settlement industry on a state-by-state basis.  Many of these regulations mirror or closely follow the NAIC Model Viatical Settlements Act.  The life insurance companies have been active in attempting to promote changes in the law which would make life settlements less attractive or even illegal.  The life settlement industry association LISA (Life Insurance Settlement Association) has been robustly and successfully combating these attempts.  The fundamental argument offered by LISA is that a policy holder has a constitutional right to dispose of their assets as they see fit; be that a home, an automobile, a stock portfolio or a life insurance policy.  So far, lawmakers have agreed with this position and all attempts have been struck down in both the legislatures and in the courts.  There is no guarantee however that this will remain the case and laws or regulations may be enacted which adversely affect the continuance of the industry or the profitability of the transaction.  The impact of these changes is impossible to speculate upon, but it is very unlikely that they would be applied retroactively.

In addition, the life settlement industry had been the subject of investigations by various state and Federal governmental entities.  In 2010, the Life Settlements Task Force of the Securities and Exchange Commission issued a staff report discussing life settlements, practices in the life settlements market, regulation of the life settlements market and related recommendations.  Such recommendations included (i) recommending to Congress that the definition of 'security' under Federal securities laws include life settlements, (ii) continue monitoring that legal standards are being met by brokers and providers, (iii) monitor the development of a life settlement securitization market, (iv) encourage Congress and state legislators to consider more significant and consistent regulation of life expectancy underwriters and (v) consider issuing an investor bulletin regarding investments in life settlements.

Likely as a result of this increased industry scrutiny, the Securities and Exchange Commission recently brought a case against Pacific West Capital Group and others in U.S. District Court in the Central District of California.  In this case, the Securities and Exchange Commission alleges, among other things, that (i) the issuer issued securities with the proceeds used to pay returns to original investors (i.e. a Ponzi scheme), (ii) the issuer misrepresented annual returns and stressed that returns had no relation to the issuer, (iii) the securities were not issued through broker-dealers, (iv) actuarial-based estimates were not given to investors, (v) the trust agreement was not provided to investors, (vi) reserve funding mechanics were not adequately explained to investors, (vii) policies were purchased even if not sufficiently funded, (viii) the increase in premiums for the policies were not adequately disclosed to investors, and (ix) the securities were not registered.  These allegations do not relate to Principle Financial Services INC and the certificates; the broker-dealer and registration issues are dealt with under the captions 'Securities Risk (CA)' and 'Securities Risk (US)' below.

(6)    _Regulatory Risk (CA):_ Principle operates under California Corporations Code Section 25102(q) established to regulate the fractionalized life settlement Industry in California. This statute and related regulations may change without notice and at any time preventing Principle from operating as currently structured.

Purchaser's Initials:_____

Exhibit 1005, p. 11

4.    <u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>

<u>The Purchaser warrants and represents to the Seller that:</u>

(a)    Purchaser acknowledges and understands that fractional life settlement investments are illiquid investments and therefore any client holding the investment in a self-directed IRA account should consider future required minimum distributions when considering the purchase of this investment.

(b)    Purchaser acknowledges that life expectancy reports are estimates and hereby expressly waives any action, agrees not to sue, and agrees to hold harmless the Seller and its principals, agents, and employees from any damage based on an insured living past the life expectancy date.

(c)    Purchaser represents that he/she has completed a Suitability Questionnaire and that he/she understands that Seller will rely upon the representations made in that Suitability Questionnaire for the purpose of determining if the Purchaser is qualified.

(d)    Purchaser is a resident of the State of California and the address and other information set forth herein are true and correct.

(e)    The Interest(s) is/are being acquired solely for the Purchaser's own account and not with a view to or for sale in connection with the distribution of the security

(f)    The purchaser is sophisticated in financial matters or has access to professional advice, has adequate means for providing for current financial needs and possible personal contingencies, is capable of evaluating the merits and risks of obtaining an Interest and also acknowledges that, once the transaction closes, the funds committed are not liquid and will not be available until the policy matures.

(g)    Purchaser acknowledges that the Seller is willing to provide additional information regarding this transaction and the business of the Seller beyond that contained in any documentation previously provided.

(h)    The Purchaser has been furnished with such information by the Seller as Purchaser requires and has requested regarding the Interest and has had any questions arising from such review answered by the Seller to Purchaser's satisfaction. Purchaser acknowledges, however, that Purchaser has not and will not be furnished with any information regarding the identity of the Insureds and purchases this Interest(s) with the expectation that the identity of the Insured will not be known. Purchaser has full legal capacity to enter into this Agreement.

(i)    Purchaser acknowledges that he/she understands the meaning and legal consequences of the above representations and warranties and that the Seller has relied on these representations and warranties in entering into this Agreement. Purchaser agrees to indemnify and hold harmless the Seller and its principals, agents, and employees from any damage or liability due to or arising out of a breach of any representation or warranty made herein by Purchaser.

Purchaser's Initials:_____

Exhibit 1005, p. 12



(j)    Purchaser acknowledges that Principle Financial Services INC utilizes the services of outside vendors who provide specific services which are necessary to ensure the safety, security and to ensure that in the event Principle Financial Services INC is unwilling or unable to perform any key activity, that the appropriate vendors are in place to perform all necessary functions to maintain the investment operations.  These vendors include, trustee, policy servicers, and outside actuaries who compute policy premiums and project future cash flows. To offset these policy expenses the servicer will charge two hundred dollars per client per year which will be billed only once a policy extends past the Policy Maintenance Reserve Period or the Policy Maintenance Reserve is depleted.

(k)    Purchaser agrees to receive all correspondence via electronic mail.

(l)    Purchaser authorizes the Seller to enter into any agreements or contracts which may be necessary in order to effectuate the purchase of Interests on behalf of the Purchaser.

(m)    Other than the Seller's agent, Purchaser has not dealt with any broker or finder in connection with the transaction set forth in this Agreement.

(n)    Purchaser acknowledges that the Life Agent conducting this transaction is an independent contractor with no authority to contractually bind Principle Financial Services INC.  Any errors or omissions made by agent are the sole legal responsibility of the agent.

<u>5. MISCELLANEOUS.</u>

(a)    <u>Entire Agreement.</u>  This Agreement constitutes the entire agreement between the Seller and Purchaser. No change, modification, termination or amendment of this Agreement shall be valid unless it is in writing and signed by both the Seller and Purchaser.

(b)    <u>Section Headings.</u> The section headings contained in this Agreement are for reference only and shall not in any way affect the meaning or interpretation of this Agreement.

(c)    <u>Gender.</u> Pronouns shall be deemed to include masculine, feminine and neuter genders and singular or plural numbers as appropriate.

(d)    <u>Venue for Disputes.</u>    <u>Arbitration.</u>  Except as otherwise provided in this Agreement, any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration administered by Judicial Arbitration and Mediation Services ("JAMS") in its Walnut Creek, California office.  Each of the Parties reserves the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order and/or appointment of a receiver on the grounds that the arbitration award to which the Investor may be entitled may be rendered ineffectual in the absence of such relief. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The award of the arbitrator shall be binding, final, and non-appealable.  The Parties may obtain discovery in aid of the arbitration to the fullest extent permitted under law, including California Code of Civil Procedure Section 1283.05.  All discovery disputes shall be resolved by the arbitrator.  The costs of the arbitration, including any JAMS administration fee, and arbitrator's fee, and

Purchaser's Initials:_____

costs of the use of facilities during the hearings, shall be borne equally by the Parties.  Reasonable attorney's fees and costs shall be awarded to the prevailing party.

(e)    <u>No Third Party Benefited</u>. This Agreement is solely for the benefit of the parties hereto, and no other person or entity shall have any right, benefit, priority or interest under this Agreement, or because of the existence of this Agreement.

(f)    <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered, certified, or electronic mail, or recognized overnight delivery service to the parties at their respective addresses set forth below or to such other address as either party may designate by notice given in accordance with this Agreement.

**Seller:**

Principle Financial Services, INC
5805 Sepulveda Blvd, Suite 601,
Sherman Oaks, CA 91411

**Purchaser:**

NAME: Yeyo LLC

ADDRESS: 5238 Live Oak View Ave - Los Angeles, CA 90041

(g)    <u>Non-Waiver.</u> No failure on the Seller's part to exercise, and no delay in exercising, any right, power or remedy under this Agreement or under applicable law shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. All of Purchaser's rights and remedies under this Agreement or arising under applicable law are separate and cumulative and may be pursued separately, successively or concurrently, or not pursued, without affecting or limiting any other right of Purchaser.

(h)    <u>Invalidity and Severability.</u> If any provisions of this Agreement are held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, and to that extent, the provisions of this Agreement are intended to be and shall be deemed severable.

(i)    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the heirs, legal and personal representatives, successors, and assignees of the Purchaser.

Purchaser's Initials:_____

Exhibit 1005, p. 14

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**Principle Financial Services, INC**

By: _Mark Senry_          Date: _10/15/2020_

**PURCHASER(S):**

**Purchaser:**

_Ed Baezo_
_____
Signature

## Ed Baeza - Managing Member
_____
Print Name

## 5238 Live Oak View Ave - Los Angeles, CA 90041
_____
Address

## (323) 972-6827          ## 27-3718887
_____        _____
Telephone Number               Social Security or Tax ID#

**Purchaser:**

_Concepcion Baeza_
_____
Signature

## Concepcion Baeza - Member
_____
Print Name

## 5238 Live Oak View Ave - Los Angeles, CA 90041
_____
Address

                                ## 27-3718887
_____        _____
Telephone Number               Social Security or Tax ID#

Purchaser's Initials: _C.B._
                                              _C.B_

Exhibit 1005, p. 15